# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| CABINETS TO GO, LLC, | |
| Plaintiff, | |
| vs. | Case No. 3:21-cv-00711 |
| QINGDAO HAIYAN REAL ESTATE GROUP CO., LTD (青岛海燕置业集团有限公司), QINGDAO DROUOT WOOD INDUSTRY CO. LTD (青岛德鲁奥木业有限公司), ALNO INDUSTRY SDN BHD, and SCIOTO VALLEY WOODWORKING, INC., doing business as VALLEYWOOD CABINETRY, | Judge Waverly D. Crenshaw, Jr. Magistrate Judge Jeffery S. Frensley |
| Defendants. | |

---

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

Pursuant to Fed. R. Civ. P. 56, Plaintiff Cabinets to Go, LLC ("Cabinets to Go"), by counsel, moves for summary judgment against Defendant Qingdao Haiyan Real Estate Group Co., Ltd ("Haiyan"). Specifically, Cabinets to Go is entitled to summary judgment on all claims because the undisputed evidence of record establishes that Cabinets to Go and Haiyan had a contract for the sale of goods, which Haiyan breached in two material respects: (1) it failed to certify the country of origin for goods that Cabinets to Go ordered; and (2) it failed to fulfill some of Cabinets to Go's purchase orders. These breaches caused Cabinets to Go to suffer damages in the form of increased tariffs, lost sales, and lost profits. Additionally, Haiyan's admitted refusal to certify the country of origin of the products constitutes a breach of warranty and violation of the Tennessee Consumer Protection Act ("TCPA").

1

## FACTS

### 1. *Cabinets to Go's Business and Early Relationship with Haiyan*

Cabinets to Go is the leading retailer of kitchen and bath cabinets, countertops, flooring, closets, and related accessories in the United States. *See* DE #26, Am. Compl., p. 5, ¶ 21; DE #126, Declaration of Jason Delves ("Delves Decl."), ¶ 4. It specializes in providing "ready to assemble" products to customers, typically within one to two weeks of the date of order. *See* DE #26, Am. Compl., p. 6, ¶¶ 28-30; Delves Decl., ¶ 4. Because Cabinets to Go is able to fulfill customer orders quickly, it enjoys a substantial competitive advantage over other suppliers of kitchen and bath products. *See* DE #26, Am. Compl., p. 6, ¶¶ 28-30; Delves Decl., ¶ 5. As part of this business model, Cabinets to Go houses approximately twenty-two weeks' worth of inventory at its distribution center in Lawrenceburg, Tennessee. *See* DE #26, Am. Compl., p. 6, ¶¶ 28-30; Delves Decl., ¶ 6. However, Cabinets to Go also relies heavily on its global supply chain. *See* DE #26, Am. Compl., p. 6, ¶¶ 28-30; Delves Decl., ¶ 7. Cabinets to Go obtains products from various suppliers around the world, each of whom is responsible for timely producing specific styles and colors of products exclusive to Cabinets to Go in amounts sufficient to fill purchase orders. *See* DE #26, Am. Compl., p. 6, ¶¶ 28-30; Delves Decl., ¶ 7.

Haiyan had a long-standing business relationship with Cabinets to Go that lasted from 2011 to 2021. In fact, Haiyan was one of Cabinets to Go's main suppliers. *See* Delves Decl., ¶ 8; DE #125, Plaintiff's Statement Of Undisputed Material Facts In Support Of Motion For Summary Judgment ("Undisp. Stmt. Mat. Facts"), ¶ 3. Cabinets to Go placed purchase orders for particular lines of product with Haiyan, and Haiyan manufactured the product according to Cabinets to Go's specifications. *See* Delves Decl., ¶ 9. Until Fall 2019, Haiyan manufactured products for Cabinets to Go at its facility in Qingdao City, China. *Id.*, ¶ 12; Undisp. Stmt. Mat. Facts, ¶ 7. The product

22729912.v7

was then shipped to Cabinets to Go's warehouse in Lawrenceburg, Tennessee. *See* Delves Decl., ¶ 10. This entire process took several months to complete. *Id.* As a result of this lengthy course of dealing, Haiyan was well aware of Cabinets to Go's need for timely manufacturing and delivery of products.

### 2. *Changes in U.S. Trade Policy*

In August 2017, the United States Trade Representative ("USTR"), acting on the instructions of then-President Donald Trump, launched an investigation into "China's laws, policies, practices, or actions that may be unreasonable or discriminatory and that may be harming American intellectual property rights, innovation, or technology development." *See* 82 FR 39007. The USTR issued a finding that the Chinese trade practices in question were "unreasonable and or discriminatory and burden or restrict U.S. commerce" in April 2018. *See* 83 FR 14906. It proposed the imposition of an additional *ad valorem* duty of 25% on a laundry list of products from China, which became effective on August 16, 2018. *See* 83 FR 40823; Undisp. Stmt. Mat. Facts, ¶ 1. One month later, the President imposed an additional 10% duty on Chinese products with an annual trade value of approximately $200 billion. *See* 84 FR 20459. That rate increased to 25% on May 10, 2019. *Id.*; Undisp. Stmt. Mat. Facts, ¶ 1.

Meanwhile, on March 6, 2019, the American Kitchen Cabinet Alliance ("AKCA") filed petitions with the International Trade Commission ("ITC") and Department of Commerce ("DOC"), alleging that subsidized imports of wooden cabinets and vanities from China were materially injuring the domestic cabinetmaking industry. *See* 84 FR 17890. The ITC launched its own investigation and ultimately substantiated the AKCA's allegations. *See* 84 FR 39798; Undisp. Stmt. Mat. Facts, ¶ 2. On August 12, 2019, the ITC announced that the DOC was formulating final anti-dumping duties ("AD") and countervailing duties ("CVD") for Chinese cabinet suppliers,

which were scheduled for issuance in December 2019. *Id.* While not final, the ITC noted that estimated countervailable subsidy rates for these suppliers ranged from 10% to over 200%. *Id.*

Both Cabinets to Go and Haiyan were tracking these changes in American trade policy. *See* Delves Decl., ¶ 13. In June 2019, one of Haiyan's representatives, Vivian Zheng ("Zheng") emailed Cabinets to Go's Chief Legal Officer, Jill Witter ("Witter"), to ask if Cabinets to Go could apply for an exemption from the tariffs that took effect in May 2019. *Id.*; *see also* Exh. 1 to Delves Decl., Email between V. Zheng and J. Witter re: Application to request to exclude particular products from the Section 301, CTG 001132-001133. Witter responded that an exemption was unlikely, particularly in light of the AKCA's anti-dumping petition. *See* Delves Decl., ¶ 13; Exh. 1 to Delves Decl. Zheng indicated that she understood, stating that "we just want to do anything if it is possible to reduce the Cabinets to Go's import cost." *See* Delves Decl., ¶ 14; Exh. 1 to Delves Decl.

By Fall 2019, Cabinets to Go had decided to change its business plan due to these policy developments. *See* Delves Decl., ¶ 15; Undisp. Stmt. Mat. Facts, ¶ 5. It stopped purchasing products manufactured in China or made with Chinese-manufactured parts to avoid paying the aforementioned tariffs, AD, and CVD that had been imposed on Chinese-made products. *See* Delves Decl., ¶ 16; Undisp. Stmt. Mat. Facts, ¶ 6. Jason Delves ("Delves"), Cabinets to Go's President, informed Zheng and another Haiyan representative, Lei "Sabrina" Lee ("Lee"), of Cabinets to Go's plan. *See* Delves Decl., ¶ 17. Although Cabinets to Go had purchased over $17 million in products from Haiyan between January and September 2019, it did not appear that Zheng and Lee were taking these changes seriously. *Id.*, ¶ 18. Because Haiyan continued to manufacture products in China, Cabinets to Go ceased doing business with it around October 2019. *Id.*, ¶ 19. Cabinets to Go did not place any orders with Haiyan in November 2019, December 2019, or

January 2020. *Id*., ¶ 20.

### 3. *Haiyan Agrees to Stop Manufacturing Products for Cabinets to Go in China.*

In late 2019, shortly after Cabinets to Go stopped purchasing from Haiyan, a delegation of Haiyan representatives traveled to Lawrenceburg, Tennessee. *Id*., ¶ 21. The delegation consisted of Haiyan's Chairman, Liyan Jiao ("Liyan"), his son, Philip Jiao ("Philip"), Zheng, and Lee. *Id*., ¶ 22. They met with Delves and other Cabinets to Go executives to persuade them to resume the business relationship with Haiyan. *Id*., ¶ 23. Delves and other Cabinets to Go executives repeatedly stated that Cabinets to Go would no longer purchase any Chinese products, and that a material term of any agreement for Cabinets to Go to purchase products from Haiyan was that the products could not be manufactured in China. *Id*., p. ¶ 24; Undisp. Stmt. Mat. Facts, p. 2, ¶¶ 6-7. Liyan represented that Haiyan would take steps to manufacture product outside of China, all in an effort to meet Cabinets to Go's requirements. *See* Delves Decl., ¶ 25. He later indicated that Haiyan had acquired a mill in Malaysia, called Alno, that Haiyan would use to manufacture Cabinets to Go's products. *Id*., ¶ 26; Undisp. Stmt. Mat. Facts, ¶ 8. This was acceptable to Cabinets to Go because there were no tariffs, AD, or CVD on Malaysian-made goods. *See* Delves Decl., ¶ 26.

During this period, Cabinets to Go repeatedly emphasized its unwillingness to purchase Chinese goods. *See* Delves Decl., ¶¶ 27-30; Exh. 2 to Delves Decl., November 2019 Email Thread Between J. Witter and V. Zheng re: Plywood for Malaysian factory, CTG 001173-001176; DE #26, Am. Compl., p. 10, ¶ 56; DE #85, Answer, p. 7, ¶ 56; Undisp. Stmt. Mat. Facts, ¶ 10.  In November 2019, Zheng noted that the cost of sourcing plywood from Vietnam was driving up the product price, and asked whether they could use Chinese plywood instead. *See* Delves Decl., ¶¶ 28-30; Exh. 2 to Delves Decl.; Undisp. Stmt. Mat. Facts, ¶ 10. She specifically acknowledged that Chinese plywood was subject to anti-dumping duties, but wondered whether that rule would still

apply if the plywood was processed and used to manufacture goods in Malaysia. *See* Delves Decl., ¶¶ 28-30; Exh. 2 to Delves Decl. Witter expressly rejected this suggestion, unequivocally stating that "[w]e cannot and will not accept plywood from China." *See* Delves Decl., ¶¶ 28-30; Exh. 2 to Delves Decl. Zheng indicated that she understood and that Haiyan would continue sourcing plywood from Vietnam. *See* Delves Decl., ¶¶ 28-30; Exh. 2 to Delves Decl.

About one month later, Witter emailed Zheng with a summary of Haiyan's obligations under the new agreement. *See* Delves Decl., ¶¶ 31-33; Exh. 3 to Delves Decl., December 2019 Email Thread Between J. Witter and V. Zheng re: Haiyan Malaysia, CTG 001464-001466; Undisp. Stmt. Mat. Facts, ¶ 11. Witter explicitly stated:

> "NO PLYWOOD FROM CHINA WILL BE ACCEPTED. Additionally, all major components (the box, doors, drawers) must be manufactured in Malaysia for us to avoid additional tariffs." *Id.*

Witter also noted the importance of following the requirements set forth in Cabinets to Go's Supplier Manual. *See* Delves Decl., ¶¶ 31-33; Exh. 3 to Delves Decl. Zheng expressly agreed to these terms by sending the following response: "Well received your explanation and the information in details. We will do it accordingly." *See* Delves Decl., ¶¶ 31-33; Exh. 3 to Delves Decl.; Undisp. Stmt. Mat. Facts, ¶ 11.

Cabinets to Go's Manager of Customs Compliance & Process Development, Kim Surber ("Surber"), sent Zheng the latest version of the Supplier Manual (revised December 2019) shortly thereafter. *See* Delves Decl., ¶ 34; Exh. 4 to Delves Decl., Supplier Manual; Exh. 5 to Delves Decl., December 2019 Email Thread between V. Zheng and K. Surber re: Supplier Manual, CTG 001244; Undisp. Stmt. Mat. Facts, ¶¶ 12-14. The Supplier Manual included an "International Shipping" section, which specifically stated that: "Supplier is responsible for fulfilling any customs obligations origin marking or labeling requirements, and certification or local content

reporting requirements." *See* Delves Decl., ¶ 35; Undisp. Stmt. Mat. Facts, ¶ 13.  It also noted that "[a] commercial invoice must be produced for each entry to U.S. Customs, and must meet the following general conditions," which included "country or origin of merchandise." *See* Delves Decl., ¶ 36; Undisp. Stmt. Mat. Facts, ¶ 14.  These requirements were not only necessary for customs purposes, but also to ensure compliance with other laws, including Title VI of the Toxic Substances Control Act ("TSCA Title VI"), the Lacey Act, and California Air Resources Board ("CARB") Phase 2. *See* Delves Decl., ¶ 37; Undisp. Stmt. Mat. Facts, ¶ 15.  Because Cabinets To Go repeatedly emphasized the importance of manufacturing goods outside of China, Haiyan knew it was a material term of the contract. Additionally, Haiyan knew it was a material term of the contract because it understood Cabinets To Go would be subject to substantial tariffs if it had to import products manufactured in China. *See* Delves Decl., ¶ 38; Exh. 6 to Delves Decl., CTG 001263; Undisp. Stmt. Mat. Facts, ¶ 16.

In January 2020, Cabinets to Go held its first Managers' Summit in Franklin, Tennessee, where it gathered all of its store managers together for presentations and training opportunities. *See* Delves Decl., ¶¶ 39-41. The event also incorporated a mini-trade show, where Cabinets to Go suppliers could display new products. *Id*. The managers then voted on which products to incorporate into Cabinets to Go's existing business. *Id*. Lee and Zheng attended the mini-trade show and displayed products made by Haiyan there. *Id*. As a result of their efforts, Cabinets to Go began purchasing seven new lines of product exclusively from Haiyan: Springhill Hickory, Annapolis Blue, Hampton Pewter, Worthington White, Worthington Gray,  Palm Beach Dark Chocolate, and Kensington Mist. *Id.*, ¶ 42; Undisp. Stmt. Mat. Facts, ¶ 17. Three of these lines subsequently became top sellers for Cabinets to Go and generated millions of dollars in revenue for Haiyan. *Id.*, ¶ 42; Undisp. Stmt. Mat. Facts, ¶ 17.

Between February 2020 and July 2021, Cabinets to Go purchased an average of over $950,000 of products from these exclusive Haiyan lines per month. *See* Delves Decl., ¶ 43; Undisp. Stmt., Mat. Facts, ¶ 21. Cabinets to Go would place purchase orders with Haiyan representatives and Haiyan used its mill in Malaysia to manufacture the products ordered by Cabinets to Go. *See* Delves Decl., ¶ 44; Undisp. Stmt., Mat. Facts, ¶ 22. Haiyan was also responsible for following the labeling and certification requirements set forth in the December 2019 version of the Supplier Manual. *See* Delves Decl., ¶¶ 34-37; Undisp. Stmt., Mat. Facts, ¶¶ 11-14.

Once Haiyan manufactured the product, it was placed on a container ship in Malaysia and sent to Savannah, Georgia. *See* Delves Decl., ¶ 45; Undisp. Stmt., Mat. Facts, ¶ 18. After arriving in Savannah, the containers were shipped by rail to Huntsville, Alabama, where they were processed by U.S. Customs and Border Patrol. *Id*. The containers were then delivered to Cabinets to Go's distribution center in Lawrenceburg, Tennessee. *Id.*. This entire process took between four and eight months. *Id.* Again, Haiyan was well acquainted with Cabinets to Go's supply chain and understood its need for timely manufacturing and delivery of products. *See* Delves Decl., ¶ 11; Undisp. Stmt. Mat. Facts, ¶ 11.

### 4. *Transshipping Scheme*

As part of its quality control measures, Cabinets to Go utilized inspectors who would visit Alno and spot-check the products that were ready for shipment. *See* Delves Decl., ¶ 46; Undisp. Stmt. Mat. Facts, ¶ 23. In late July 2021, the inspectors discovered evidence that products coming from the Alno mill had actually been manufactured in China, in breach of the agreement between the parties. *See* Delves Decl., ¶ 47; Exh. 7 to Delves Decl., Benchmark Report, CTG 000775-000779; Undisp. Stmt. Mat. Facts, ¶ 24. The inspectors identified thirteen containers' worth of product at issue, which related to purchase orders placed in February and March of 2021. Delves

Decl., ¶ 48; Exh. 7 to Delves Decl.; Undisp. Stmt. Mat. Facts, ¶ 25. Delves and Witter attempted to contact Lee multiple times to discuss the issue and obtain clarification as to the country of origin of the products, but received slow and evasive responses. *See* Delves Decl., 49; Exh. 8 to Delves Decl., CTG 001478-001480; Undisp. Stmt. Mat. Facts, ¶ 26. Meanwhile, Cabinets to Go identified other purchase orders that may have been affected by Haiyan's deceptive practices, and asked Haiyan to certify the country of origin for those products as well. *See* Delves Decl., ¶ 50; Exh. 9 to Delves Decl., CTG 00782-00785; Undisp. Stmt. Mat. Facts, ¶ 27.

In early August 2021, another Haiyan representative, Wei Wei Wang ("Wang"), responded in Lee's stead and stated that the products at issue met Cabinets to Go's standards, but there would be further investigation. *See* Delves Decl., ¶ 51; Exh. 10 to Delves Decl., CTG 001070-001072; Undisp. Stmt. Mat. Facts, ¶ 28. On August 24, 2021, Delves received a phone call from Lee and another Haiyan representative, Amanda Li ("Li"), who advised that they could not certify as to the country of origin because the products and/or component parts of the products had been manufactured in China. *See* Delves Decl., ¶ 52; *see also* DE #26, Am. Compl., p. 7-8, ¶¶ 35, 42-43; DE #85, Answer, p. 5-6, ¶¶ 35, 42-43; Undisp. Stmt. Mat. Facts, ¶ 29.

### 5. *Damage to Cabinets to Go*

In September 2021, the thirteen containers landed in the United States. *See* Delves Decl., ¶ 53; Undisp. Stmt. Mat Facts, ¶ 30. Cabinets to Go immediately attempted to return the products listed in those thirteen containers (the "Landed POs"), but the shipping company refused to take them back. *See* Delves Decl., 53; Exh. 11 to Delves Decl.; Undisp. Stmt. Mat Facts, ¶ 30. Cabinets to Go began searching for a bonded warehouse to store the products listed in the Landed POs, but could not locate one. *See* Delves Decl., ¶ 54; Undisp. Stmt. Mat Facts, ¶ 32. On September 27, 2021, U.S. Customs and Border Protection ("CBP") notified Cabinets to Go that it must

immediately import the Landed POs or CBP would seize them. *See* Delves Decl., ¶ 55; Undisp. Stmt. Mat Facts, ¶ 33. As a result of that notice, Cabinets to Go amended its customs declaration regarding the country of origin for the Landed POs and imported those products. *See* Delves Decl., ¶ 56; Undisp. Stmt. Mat Facts, ¶ 34. Because the Landed POs were then subject to tariffs associated with importing Chinese products, Cabinets to Go had to pay an additional $769,989 in tariffs. *See* Delves Decl., ¶ 56; Undisp. Stmt. Mat Facts, ¶ 34.

A substantial amount of Cabinets to Go's products were also still in transit. *See* Delves Decl., ¶ 59; Undisp. Stmt. Mat Facts, ¶ 37. After Cabinets to Go raised concerns regarding country of origin and reiterated the requirement that Cabinets to Go's products must not be manufactured in China, Haiyan refused to provide additional products to Cabinets to Go (the Undelivered POs).[1] *See* Delves Decl., ¶ 58-59; Exh. 12-13 to Delves Decl.; Undisp. Stmt. Mat Facts, ¶¶ 36-37. All of the products ordered by Cabinets to Go under Undelivered POs were needed by Cabinets to Go to be able to maintain its supply chain and fill orders. *See* Delves Decl., ¶ 61; Undisp. Stmt. Mat Facts, ¶ 39. As a result, Cabinets To Go did not have the products it needed and suffered substantial lost sales and lost profits. *See* Delves Decl., ¶ 62; Undisp. Stmt. Mat Facts, ¶ 40.

## ARGUMENT

### 1. *Standard of Review*

"Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its

---

[1] The returned products included some products already paid for by CTG in the amount of $180,429.46. *See* Delves Decl., ¶ 60; Undisp. Stmt. Mat. Facts, ¶ 38.

22729912.v7

very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Burnett v. Sonya Express, Inc.*, 3:07-CV-00489, 2009 WL 159688, at *2 (M.D. Tenn. Jan. 22, 2009) quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "'As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Id.*

There are "four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law; and (4) are there any genuine factual issues with respect to those material facts under the governing law. *Hennelly v. Florim, USA Inc.*, 3:09-0260, 2010 WL 4698647, at *6 (M.D. Tenn. Nov. 10, 2010).

The initial burden of proof for a motion for summary judgment rests with the moving party, specifically to identify parts of the record that establish an absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). After this burden is met, "[t]he mere existence of a scintilla of evidence in support of the [non-moving] party's position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving] party." *Anderson,* 477 U.S. at 255. Instead, the non-moving party must "present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424. All reasonable inferences must be drawn in favor of the non-

11

moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001), citing *Liberty Lobby*, 477 U.S. at 255.

The Court should grant summary judgment in favor of Cabinets to Go because the evidence of record establishes that Cabinets to Go and Haiyan had a contract, pursuant to which Haiyan would supply Cabinets to Go with Malaysian-made products. Haiyan breached this contract in two respects. <u>First</u>, Haiyan admits it failed to provide the required country of origin certification for these products, which was a material term of the contract. This failure also constituted a breach of the warranty that Haiyan had promised to provide to Cabinets to Go, and a violation of the TCPA. <u>Second</u>, Haiyan refused to deliver product it had manufactured for Cabinets to Go even though that product was in transit to Cabinets to Go or ready to ship. These breaches resulted in significant damage to Cabinets to Go, in the form of increased tariffs for the product it did receive and lost sales from the product that it did not receive.[2]

### 2. Breach of Contract – United Nations Convention on Contracts for the International Sale of Goods (CISG)

#### A. Applicability of the CISG

"The CISG, which is a multilateral treaty, sets out substantive provisions of law to govern the formation of international sales contracts and the rights and obligations of the buyer and seller." *Am.'s Collectibles Network, Inc. v. Timlly (HK)*, 746 F. Supp. 2d 914, 918 (E.D. Tenn. 2010) (internal quotations omitted). "The goal is to promote worldwide uniformity in dealing with sales disputes arising from international sales." *Id*. (internal quotations omitted). "The CISG applies to international sales contracts between parties that are located in signatory countries, and who have

---

[2] Cabinets to Go filed a Motion to Amend Case Management and Order and Order Setting Case for Trial and Continue Remaining Deadlines on February 15, 2023 (DE #116). The Court has not yet ruled on that Motion. Cabinets to Go submits this Motion for Summary Judgment based on the information currently available to it, but would certainly benefit from additional time to complete discovery, in the event that the Court grants its Motion to Amend.

not opted out of CISG coverage at the time of the contracting." *Id.* (internal quotations omitted); *see also* CISG, Pt. I, Chp. I, Art. 1(1)(b).

Cabinets to Go is a Florida limited liability company. *See* Am. Compl., DE #26, p. 1, ¶ 1; Answ., DE #85, p. 1, ¶ 1. Its sole member is F9 Brands, Inc., a Delaware corporation with a principal place of business located at 1124 W. McEwen Drive, Franklin, Tennessee, 37067. *See* Am. Compl., DE #26, p. 1, ¶ 2; Answ., DE #85, p. 1, ¶ 2. Haiyan is a Chinese company with a principal place of business located at Jihongtan Town, Chengyang District, Qingdao City, PR China. *See* Am. Compl., DE #26, p. 2, ¶ 3; Answ., DE #85, p. 2, ¶ 3. "[B]oth the U.S. and the People's Republic of China are Contracting States under the CISG." *Am.'s Collectibles*, 746 F. Supp. 2d at 919; *see also* <u>Status: United Nations Convention on Contracts for the International Sale of Goods (Vienna, 1980) (CISG) | United Nations Commission On International Trade Law</u> (last visited April 6, 2023). Because both parties to this action are located in signatory states, the CISG applies to this dispute.

### B. Formation of a Contract

"A proposal for concluding a contract addressed to one or more specific persons constitutes an offer if it is sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance."[3] CISG, Pt. II, Art. 14. "A proposal is sufficiently definite if it indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and the price." *Id.* "A statement made by or other conduct of the offeree indicating assent to an offer is an acceptance." *Id.*, Pt. II, Art. 18(1). "An acceptance of an offer becomes effective at the moment the indication of assent reaches the offeror." *Id.*, Pt. II, Art. 18(2). "A contract is concluded at the moment when

---

[3] "Contracts for the supply of goods to be manufactured or produced are to be considered sales unless the party who orders the goods undertakes to supply a substantial part of the materials necessary for such manufacture or production." CISG, Pt. I, Chp. I, Art. 3(1).

22729912.v7

an acceptance of an offer becomes effective in accordance with the provisions of this Convention." *Id.*, Pt. II, Art. 23.

The oral and written communications between the parties resulted in the formation of a contract in late 2019. Cabinets to Go offered to start placing purchase orders with Haiyan again, provided that Haiyan would fulfill those purchase orders with Malaysian-made products. Haiyan accepted that offer, and agreed that it would manufacture products for Cabinets to Go at its mill in Malaysia and comply with Cabinets to Go's certification and labeling requirements.

Both parties understood and agreed that the country of origin of the products was a key term of that contract. As evidenced by Zheng's correspondence with Witter, Haiyan had been tracking changes in American trade policy, and understood that Chinese goods were becoming too expensive to import. Haiyan knew that Cabinets to Go was no longer willing to accept Chinese-made goods for that reason, hence the drastic drop in purchase orders in October 2019. Cabinets to Go was clear that any future relationship with Haiyan could not include Chinese-made goods, and Haiyan's willingness to accommodate that term and manufacture products in Malaysia was the very thing that brought Cabinets to Go back to the bargaining table. *See* Delves Decl., ¶ 24; Undisp. Stmt. Mat. Facts ¶ 9. Cabinets to Go repeatedly and unequivocally reiterated its requirement that its products must not be manufactured in China and Haiyan assented to this condition, both in Zheng's email correspondence with Witter and Surber, and in communications with Delves. *See* Delves Decl., ¶¶ 24-38; Exhs. 2-6 to Delves Decl.; Undisp. Stmt. Mat. Facts, ¶¶ 8-16. At no point did Haiyan or any of its representatives indicate that it was unable or unwilling to manufacture products outside of China.

Moreover, the parties' course of dealing over the next year and a half was consistent with that overarching agreement. Haiyan accepted Cabinets to Go's terms by manufacturing products

for Cabinets to Go and shipping them to the United States. Haiyan never indicated, through communications or conduct, that it was unwilling to abide by those terms. Thus, there was a contract between the parties for the supply of Malaysian-made products (or at the very least products not made in China) under the CISG.

### C.    Breach

"A breach of contract committed by one of the parties is fundamental if it results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract, unless the party in breach did not foresee and a reasonable person of the same kind in the same circumstances would not have foreseen such a result." CISG, Pt. III, Chp. I, Art. 25.

As noted above, a key term of the contract between Cabinets to Go and Haiyan was the requirement that Haiyan manufacture the goods for Cabinets to Go in Malaysia. Because Cabinets to Go repeatedly emphasized the importance of this condition during negotiations, Haiyan knew it was a material term of the contract. Moreover, Haiyan knew *why* this term was so important to Cabinets to Go: Haiyan understood Cabinets to Go would be subject to substantial tariffs if it had to import products manufactured in China. *See* Delves Decl., ¶ 38; Exh. 6 to Delves Decl.; Undisp. Stmt. Mat. Facts, ¶ 16. Indeed, Haiyan opened a mill in Malaysia to manufacture products that would be compliant with Cabinets to Go's country of origin requirements. Delves Decl., ¶ 26; Undisp. Stmt. Mat. Facts, ¶ 8. ("Due to the policy changes in the US, Haiyan opened a plant in Malaysia to mitigate the additional fees and continue to provide services for our clients in the US.").

Haiyan also knew it was Cabinets to Go's only supplier for seven of its lines, three of which were top sellers. *See* Delves Decl., ¶ 42. These are the seven, exclusive lines Cabinets to Go agreed to purchase from Haiyan after Haiyan agreed to manufacture products in Malaysia and not China.

Through its history with Cabinets to Go, Haiyan was well aware of Cabinets to Go's business model and the importance of its supply chain. Thus, it was certainly reasonable for Haiyan to foresee the impact that its breach would have on Cabinets to Go's sales. Delves Decl., ¶ 11; Undisp. Stmt. Mat. Facts, ¶ 4.

Despite that, Haiyan refused to timely respond to Cabinets to Go's repeated requests for certification of the country of origin of the thirteen containers that had been flagged by the quality control inspectors, nor would it acknowledge Cabinets to Go's requests for assurance about the other containers in question. Instead, Haiyan stalled and sent cryptic emails, further hampering Cabinets to Go's ability to understand the extent of the situation and act accordingly. When Cabinets to Go finally did receive responses from Haiyan, they were conflicting. One day, Wang was sending emails indicating that the products were compliant, then two weeks later, Lee and Li were calling Delves to tell him the opposite. Haiyan ultimately refused to provide that certification, as it admits in its Answer to the Amended Complaint. *See* DE #85, p. 5-6, ¶ 35 ("Haiyan admits it would not certify the country of origin for the purchase orders contained in the thirteen containers.").

Additionally, Haiyan breached its contract with Cabinets to Go by accepting multiple purchase orders, manufacturing products for Cabinets to Go under those purchase orders, stopping shipped products in transit, and refusing to ship other products that were manufactured and ready to send. Thus, Haiyan refused to provide the products it had agreed to manufacture and deliver to Cabinets to Go (the Undelivered POs). Delves Decl., ¶ 58-59; Undisp. Stmt. Mat. Facts, ¶ 36-37. Both Haiyan's failure to certify country of origin and its failure to fulfill multiple purchase orders were breaches of the material terms of its contract with Cabinets to Go.

16

### D. Damages

Remedies are available for a fundamental breach of contract. *See* CISG, Chp. IV, Art. 70. "Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach." *Id.*, Pt. III, Chp. V, Sect. II, Art. 74.

As a result of Haiyan's refusal to certify the country of origin of the thirteen containers, Cabinets to Go had to amend its customs declarations, report the goods as Chinese-made, and pay the tariffs, AD, and CVD associated with imports from China and additional fees and expenses. *See* Delves Decl., ¶¶ 56-57; Undisp. Stmt. Mat. Facts, ¶ 34-35. The combined cost of the tariffs and expenses totaled $931,526. *Id.* Cabinets to Go also did not receive a large number of product that it had ordered, some of which had already been paid. *See* Delves Decl., ¶¶ 59-60; Undisp. Stmt. Mat. Facts, ¶¶ 37-38. The loss of these products caused significant damage to Cabinets to Go's sales, as it could not sell products that did not have. Cabinets to Go has suffered significant damage as a result of Haiyan's fundamental breach of the contract, and is entitled to recover from Haiyan.

### 3. Breach of Contract – Tennessee Common Law

In Tennessee, the essential elements of a breach of contract claim are as follows: '(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract.'" *In re: AME Church Employee Ret. Fund Litig.*, 2023 WL 2562784, at *37 (W.D. Tenn. March 17, 2023) (quoting *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs., Ltd.*, 79 F.3d 496, 514 (6th Cir. 1996)). "It is well established that a contract can be express, implied, written, or oral, 'but an enforceable contract is an agreement that results from a meeting of the minds in mutual assent to the terms, is based upon sufficient

consideration, is free from fraud or undue influence, is not against public policy, and is sufficiently definite to be enforced.'" *Thompson v. Hensley*, 136 S.W.3d 925, 929 (Tenn. Ct. App. 2003) (quoting *Klosterman Dev't Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 635 (Tenn. Ct. App. 2002)).

Cabinets to Go and Haiyan had an enforceable contract for the sale of Malaysian-made goods. The parties' communications from Fall 2019 reflect that they had a meeting of the minds as to where the products had to be manufactured. Cabinets to Go repeatedly emphasized the importance of that term, and Haiyan agreed to abide by it. Moreover, the parties' course of dealing reflects a mutual understanding that the products had to be Malaysian-made. Each purchase order reiterated the need for the products to comply with federal law, which required Haiyan to disclose the country of origin of the product. Haiyan accepted those purchase orders, manufactured products in fulfillment of them, and provided appropriate certifications as to country of origin throughout 2020 and early 2021.

Haiyan breached this contract in two different respects, both of which resulted in damage to Cabinets to Go. First, Haiyan refused to certify that the product in the thirteen containers was manufactured in Malaysia, as required by their agreement. Second, Haiyan failed to provide the additional containers of product, which it had manufactured specifically for Cabinets to Go. Those containers were on the water at the time of this dispute, but Haiyan had them turned back. Cabinets to Go never received the product that it had ordered, and Haiyan had agreed to provide, also in violation of their agreement.

"The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have been in had the contract been performed." *Kantz v. Rubin Lublin, PLLC*, No. 3:14-01113, 2015 WL 1543531, at *15 (M.D. Tenn. Apr. 6,

2015). Because Cabinets to Go did not receive the certification with respect to the thirteen containers, it had no choice but to amend its customs declaration, identify the products as Chinese-made, and pay the enhanced tariffs associated with Chinese-made goods. Haiyan's refusal to certify the country of origin for those thirteen containers cost Cabinets to Go a total of $931,526. As for the containers that Haiyan turned back, this was disruptive to Cabinets to Go's supply chain and had a devastating impact on sales because Cabinets to Go could not sell products that it did not have, and Haiyan was its only supplier for seven lines of product (three of which were top sellers). These damages all flowed directly from Haiyan's breaches, and Cabinets to Go is entitled to be put in the same position it would have been had the contract been performed.

### 4. Breach of Warranty – CISG

The CISG provides that "[t]he seller must deliver goods which are of the quantity, quality and description required by the contract and which are contained or packaged in the manner required by the contract." Pt. III, Chp. II, Sect. I, Art. 35(1). Except where the parties have agreed otherwise, the goods do not conform with the contract unless they: (a) are fit for the purposes for which goods of the same description would ordinarily be used; (b) are fit for any particular purpose expressly or impliedly made known to the seller at the time of the conclusion of the contract, except where the circumstances show that the buyer did not rely, or that it was unreasonable for him to rely, on the seller's skill and judgement; (c) possess the qualities of goods which the seller has held out to the buyer as a sample or model; (d) are contained or packaged in the manner usual for such goods or, where there is no such manner, in a manner adequate to preserve and protect the goods. *Id*., Chp. II, Sect. I, Art. 35(2). "The seller is liable in accordance with the contract and this Convention for any lack of conformity which exists at the time when the risk passes to the buyer, even though the lack of conformity becomes apparent only after that time." *Id*., Chp. II, Sect. I,

Art. 36(1).

Again, the contract between the parties required Haiyan to manufacture Malaysian-made goods for Cabinets to Go. The thirteen containers' worth of product that Haiyan provided to Cabinets to Go did not meet that requirement because Haiyan would not certify the country of origin of those products, and even indicated that the products were Chinese-made at one point. In short, Haiyan was attempting to provide goods to Cabinets to Go that were not of the quality and description set forth in the contract – i.e., Malaysian-made. Haiyan's failure to certify the country of origin of these products therefore qualifies as a breach of warranty, and Cabinets to Go is entitled to recover damages in connection with same.

### 5. *Breach of Warranty – Tennessee Common Law*

"To establish a prima facie claim for breach of an express warranty, a plaintiff must prove that (1) the seller made an affirmation of fact intending to induce the buyer to purchase the goods; (2) the buyer was, in fact, induced by the seller's acts; and (3) the affirmation of fact was false regardless of the seller's knowledge of the falsity or intention to create a warranty." *Black v. Boston Sci. Corp.*, No. 2:17-cv-2638-SHM, 2018 WL 3431936, at *9 (W.D. Tenn. July 16, 2018). "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." *Lowe v. Smith*, No. M2015-02472-COA-R3-CV, 2016 WL 5210874, at *14 (Tenn. Ct. App. Sept. 19, 2016).

Haiyan made an affirmation of fact when it promised Cabinets to Go that it would manufacture products for Cabinets to Go in Malaysia. Based on Cabinets to Go's written and oral communications, Haiyan understood that the place of manufacture was critical to Cabinets to Go, and it made this affirmation of fact in an effort to induce Cabinets to Go to place purchase orders

20

with it. Cabinets to Go did so. In fact, it placed multiple purchase orders with Haiyan throughout 2020 and early 2021. Haiyan's promise that it would manufacture Cabinets to Go's product in Malaysia was false, at least as to the thirteen containers that Cabinets to Go imported in September 2021. Although Haiyan had repeatedly indicated that it would abide by this term, it ultimately refused to certify the country of origin of the thirteen containers when asked to do so, and even stated that the products were actually Chinese-made. Cabinets to Go has established a prima facie case of breach of warranty against Haiyan, and is entitled to recover damages in connection with that breach.

### 6. *Deceptive Business Practices under the Tennessee Consumer Protection Act (TCPA)*

In order to recover under the TCPA, the plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA, and (2) that the defendant's conduct caused an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005). Among other acts, the TCPA identifies the following as an unfair or deceptive act declared unlawful: representing that goods or services are of a particular standard, quality or grade, or that the goods are of a particular style or model, if they are of another." Tenn. Code Ann. § 47-18-104(7).

Haiyan's above-described conduct qualifies as an unfair or deceptive act declared unlawful by the TCPA. Haiyan represented to Cabinets to Go that it would manufacture goods for Cabinets to Go in Malaysia, and Cabinets to Go placed purchase orders with Haiyan based on that representation. However, when the quality control inspectors discovered evidence of transshipment, Haiyan refused to certify that the goods were Malaysian-made, which ran directly contrary to their previous representations to Cabinets to Go. Haiyan representatives even called

22729912.v7

Delves and indicated that the goods were Chinese-made, which also contradicted Haiyan's previous representations. This conduct caused Cabinets to Go to lose money, as it was forced to incur significant fees in amending its customs declarations and paying customs associated with Chinese-made goods. Thus, Cabinets to Go has also established that Haiyan violated the TCPA, and that Haiyan's violation caused it ascertainable financial loss.

## **CONCLUSION**

Accordingly, for the reasons stated herein, Plaintiff, Cabinets to Go, respectfully requests that the Court grant its Motion and enter summary judgment in its favor as to all claims.

Respectfully submitted,

*V. Brandon McGrath*
V. Brandon McGrath
Dentons Bingham Greenebaum LLP
312 Walnut Street, Suite 2450
Cincinnati, Ohio 45202
Telephone: (513) 455-7641
Email: brandon.mcgrath@dentons.com

Sarah Laren
Dentons Bingham Greenebaum LLP
300 West Vine Street, Suite 1200
Lexington, KY 40507
Telephone: (859) 288-4635
Email: sarah.laren@dentons.com

Charles E. Dorkey, III
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 905-8330
Email: charles.dorkey@dentons.com

*Attorneys for Plaintiff, Cabinets to Go*

22

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this the 7th day of April, 2023, I filed the foregoing with the Court's electronic filing system, which serves notice upon the following:

Michael Alston
Madeline Leonard Phifer
Daniel Esquivel
Husch Blackwell LLP
736 Georgia Avenue, Suite 300
Chattanooga, TN 37402
Telephone: 423.266.5500
Facsimile: 423.266.5499
E-mail: Michael.alston@huschblackwell.com
E-mail:madeline.leonardphifer@huschblackwell.com
E-mail: Daniel.esquivel@huschblackwell.com

Rebecca J. Johnson
Juan J. Perez
Perez Morris
8000 Ravines Edge Court, Suite 300
Columbus, OH 43235
rjohnson@perez-morris.com
jperez@perez-morris.com

*Attorneys for Defendant,*
*Qingdao Haiyan Real Estate Group Co., Ltd.*

Richard C. Mangelsdorf, Jr.
Matt Byron
120 Brentwood Commons Way, Suite 625
Brentwood, TN 37027
(615) 499-7281
chuckmangelsdorf@mgclaw.com
matt.byron@mgclaw.com

*Attorneys for Scioto Valley Woodworking, Inc.*
*d/b/a Valleywood Cabinetry*

/s/ V. Brandon McGrath
V. Brandon McGrath