# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| CABINETS TO GO, LLC, | |
| Plaintiff, | |
| | Case No. 3:21-cv-00711 |
| vs. | |
| QINGDAO HAIYAN REAL ESTATE GROUP CO., LTD (青岛海燕置业集团有限公司), | Judge Waverly D. Crenshaw, Jr. Magistrate Judge Jeffery S. Frensley |
| Defendant. | |

## APPENDIX OF UNPUBLISHED CASES

| Ex. 1 | *Vrba. v. Allstate Ins. Co,* No. 2:20-cv-02077-TLP-atc, 2020 WL 626871, at *4 (W.D. Tenn. 2020) |
|---|---|
| Ex. 2 | *Auto. Experts, Inc. v. Kallberg,* No. 3:19-CV-00982, 2021 WL 2260058, *6 (M.D. Tenn. June 3, 2021) |
| Ex. 3 | *Farber v. Nucsafe, Inc.,* No. E202200428COAR3CV, 2023 WL 2519411, at *1 (Tenn. Ct. App. Mar. 15, 2023) |
| Ex. 4 | *Jara v. Tennessee State Univ.,* No. 3:20-CV-00131, 2022 WL 331276, at *9 (M.D. Tenn. Feb. 3, 2022) |
| Ex. 5 | *Wade v. Austin Peay State University,* 2008 WL 170081, at *37 (M.D. Tenn. Jan. 16, 2008) |
| Ex. 6 | *Mini Systems, Inc. v. Alexander,* No. W2019-01871-COA-R3-CV, 2020 WL 6892010, at *2 (Tenn. Ct. App. Nov. 24, 2020). |

HB: 4893-5886-9091.3

# EXHIBIT 1

2020 WL 6263871
Only the Westlaw citation is currently available.
United States District Court, W.D. Tennessee, Western Division.

Qishon VRBA, Plaintiff,

v.

ALLSTATE INSURANCE CO. and Wells Fargo, Defendants.

No. 2:20-cv-02077-TLP-atc
|
Signed 10/23/2020

**Attorneys and Law Firms**

Leslie A. Miller, Law Office of Leslie A. Miller, Somerville, TN, for Plaintiff.

Jonathan David Stewart, Russell E. Reviere, Rainey Kizer Reviere & Bell, PLC, Jackson, TN, for Defendant Allstate Insurance Co.

Robert Franklin Springfield, Burr & Forman LLP, Birmingham, AL, for Defendant Wells Fargo.

**ORDER ON DEFENDANT WELLS FARGO'S MOTION TO DISMISS**

THOMAS L. PARKER, UNITED STATES DISTRICT JUDGE

 **\*1**  Defendant Wells Fargo ("Wells Fargo") moves to dismiss claims against it arguing Plaintiff fails to state a claim for which relief can be granted. (ECF No. 15.) Plaintiff has responded. (ECF No. 36.) And Defendant has replied. (ECF No. 38.) For the reasons below, the Court grants Defendant's motion for the most part, but as to the breach of contract claim, the Court dismisses it without prejudice.

## BACKGROUND

Plaintiff alleges these facts in her Complaint. She bought a Homeowner's Insurance Policy ("Policy") from Defendant Allstate ("Allstate") in 2013. (ECF No. 1-2 at PageID 11.) On January 7, 2014, severe weather caused the pipes in her home to freeze and burst, which in turn caused flood damage throughout her entire house. (*Id.*) Plaintiff immediately contacted Allstate and filed a claim for property damage. (*Id.*) And Allstate eventually informed Plaintiff it was her responsibility to hire a contractor to repair the damage. (*Id.* at PageID 13.)

Plaintiff hired Randy Morris Home Builders to complete repairs, but Morris claimed Allstate's repair estimates would be insufficient. (*Id.* at PageID 14.) Allstate revised its estimate, yet Morris still disputed the estimate. (*Id.*) Even still, he started repairing Plaintiff's home, funding the repairs out of his own pocket. (*Id.* at PageID 14–15.)

Morris allegedly submitted invoices to the mortgage lender, Wells Fargo, timely. (*Id.* at PageID 14.) Morris however had difficulties getting Wells Fargo to pay them timely. (*Id.*) And so he wrote letters to Plaintiff and Wells Fargo explaining that he could no longer fund repairs out of his own pocket. (*Id.*) Morris unfortunately then died in July 2014 before completing the job. (*Id.*)

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Shortly after Morris's death, Wells Fargo, as the mortgage lender, sent a letter to Plaintiff explaining that it was holding $10,954.20 for repairs. (*Id.* at PageID 15, 78.) But, before it would apply those funds for any more repairs, Wells Fargo wanted proof that Plaintiff was maintaining her home in proper repair. (*Id.*) Wells Fargo required Plaintiff to provide a 100% home inspection, Certificate of Completion, and a Hold Harmless Agreement. (*Id.*) What is more, Wells Fargo explained that, if Plaintiff ignored these requests, it may instead apply the funds to the unpaid principal balance on her mortgage as allowed by the mortgage security agreement. (*Id.* at PageID 78.) After this, Plaintiff failed to hire a second contractor. (*Id.* at PageID 15–16.)

With that in mind, Plaintiff sued Allstate and Wells Fargo in January 2015, but by April 2015, she requested and received a voluntary dismissal without prejudice. (*Id.* at PageID 16.) After that dismissal, Wells Fargo sent a $20,000.89 check to Plaintiff's attorney with the understanding that Plaintiff would use it for home repair and labor. (*Id.*) Plaintiff's attorney however halted the work because of mold from the water damage. (*Id.* at PageID 17.)

And so in August 2015, Plaintiff hired a company to perform mold testing on her home. (*Id.*) The tests returned positive results. (*Id.*) Plaintiff and her husband made doctors' appointments for "headaches, nausea, and sinusitis" related to the mold exposure. (*Id.*) Plaintiff's attorney contacted Wells Fargo, and Wells Fargo requested a second home inspection. (*Id.*) The home inspection reflected that 50% of the home was still in disrepair. (*Id.*)

 **\*2**  On that basis, Plaintiff claims here that she has lost her home, suffered from ill health because of mold exposure, and has gone through bankruptcy because of Defendants' actions. (*Id.* at PageID 17–18.) Plaintiff claims Wells Fargo is liable for negligence, breach of contract, negligent infliction of emotional distress ("NIED"), and violations of the Tennessee Consumer Protection Act ("TCPA"). She requests $3,000,000 in damages. (*Id.* at PageID 18–25.)

In response, Wells Fargo argues the Court should dismiss Plaintiff's negligence, NIED, and TCPA claims, because they are barred by the applicable statutes of limitations. (ECF No. 15-1 at PageID 122.) And, says Wells Fargo, the breach of contract claim is baseless because it is not a party to the contract here—the insurance policy between Plaintiff and Allstate. (*Id.* at PageID 129.)


## LEGAL STANDARD

Courts assess whether a complaint states a claim for which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure with guidance from the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009), and in *Bell Atlantic, Corp. v. Twombly*, 550 U.S. 544, 555–557 (2007). "Accepting all well-pleaded allegations in the complaint as true, the Court 'consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief.' " *Williams v. Curtin*, 631 Fed.3d 380, 383 (6th Cir. 2011) (*quoting Iqbal*, 556 U.S. at 681).

To survive a motion to dismiss under 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 570 (2007)); *see Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017).

Though a court will grant a motion to dismiss if a plaintiff has no plausible claim for relief, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 Fed.3d 471, 476 (6th Cir. 2007). "A complaint should only be dismissed if it is clear to the court that 'no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Herhold v. Green Tree Services, LLC*, 608 F. App'x 328, 331 (6th Cir. 2015) (quoting *Trzebuckowski v. City of Cleveland*, 319 Fed.3d 853, 855 (6th Cir. 2003)).

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Dismissal is proper if "no law supports the claim made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. Of Educ.*, 570 F. App'x. 485, 487 (6th Cir. 2014). Also, while a 12(b)(6) motion is usually an "inappropriate vehicle" for dismissing because of the statute of limitations, dismissal is appropriate if "the allegations in the complaint affirmatively show that the claim is time-barred." *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013).

## ANALYSIS

Wells Fargo argues here that the Court should dismiss Plaintiff's negligence, NIED, and TCPA claims because they are time-barred. And, because Wells Fargo is not a party to Plaintiff's contract with Allstate, it argues the Court should dismiss the breach of contract claim as well. (ECF No. 15.)

### I. Negligence and NIED Claims

First, Plaintiff concedes that the limitations periods bar her negligence and NIED claims. (ECF No. 36 at PageID 164.) Tennessee gives plaintiffs one year to bring a personal injury action and three years to bring actions for property damages. Tenn. Code Ann. § 28-3-104–05. Plaintiff agrees that these statutes bar her claims for negligence and NIED claims because they relate to events beginning in 2014 and 2015. (*See* ECF No. 1-2.) Because there is no dispute that these claims are barred and the statutory period has expired, the Court may not grant relief for these claims. For that reason, the Court **GRANTS** Wells Fargo's motion to dismiss Plaintiff's negligence and NIED claims. The Court **DISMISSES** those claims **WITH PREJUDICE**.

### II. TCPA Claim

 **\*3** Next, Wells Fargo argues Plaintiff's TCPA claim is also barred by the statute of limitations. (ECF No. 15-1 at PageID 132.) The TCPA gives plaintiffs one year to sue after the person discovers the alleged unlawful act or practice. Tenn. Code Ann. § 47-18-110. "Under [the discovery] rule, a cause of action accrues when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998) (citations omitted). Yet "a plaintiff is not entitled to delay filing until all injurious effects or consequences of the actionable wrong are actually known." *Wyatt v. A–Best, Co., Inc.*, 910 S.W.2d 851, 855 (Tenn. 1995) (citations omitted).

The date of Plaintiff's knowledge is usually a question for the trier of fact. *See Gerdau Ameristeel, Inc. v. Ratliff*, 3688 S.W.3d 503, 509 (Tenn. 2012). But "[w]hen undisputed evidence can lead to only one conclusion ... accrual can be a question of law for the court to determine." *Montesi v. Nationwide Mut. Ins. Co.*, 970 F. Supp. 2d 784, 189–90 (W.D. Tenn. 2013) (referencing *City of Chattanooga v. Hargreaves Assocs.*, No. E2011-01197-COA-R3-CV, 2012 WL 2353688, at \*12 (Tenn. Ct. App. June 21, 2012)).

From the face of Plaintiff's Complaint, she only refers to Wells Fargo's actions from 2014 and 2015. (*See* ECF No. 1-2.) Plaintiff first alleges issues with Wells Fargo's payment processing in July 2014 when her contractor wrote a letter to Wells Fargo complaining of delayed payments. (*Id.* at PageID 14–15.) These payments of course related to work he was doing to repair the water damage that started all this. What is more, Plaintiff had to know about Wells Fargo's alleged role by January 2015 because that is when she sued it the first time. (*See id.* at PageID 16.) And so even under a generous reading of the Complaint, she should have sued again by 2016 to satisfy the one-year TCPA time bar. Instead, Plaintiff waited until January 2020 to sue here—over five years after she first identified problems with Wells Fargo in July 2014.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

In Plaintiff's response to Defendant's motion, she contends that because she continued to make monthly mortgage payments to Wells Fargo there was no reason for her "to think that Wells Fargo would not continue to pay for cost of repairs for the damage." (ECF No. 36 at PageID 166.) Yet even if she continued to make mortgage payments, she still knew of Wells Fargo's alleged misconduct as early as mid-2014. (*See* ECF No. 1-2 at PageID 14–15.) And again, under Tennessee law, Plaintiff does not get to wait to sue until she knows all injurious effects of Defendant's alleged conduct. *See Wyatt*, 910 S.W.2d at 855. So just because Plaintiff continued to have a relationship with Wells Fargo, does not mean she can defeat or postpone the one-year time bar by waiting to see if Wells Fargo would injure her further.

In sum, Plaintiff's TCPA claim against Wells Fargo fails because it is time-barred. The Court finds this to be an "insurmountable bar to relief," which is clear from the face of Plaintiff's Complaint. *Southfield Educ. Ass'n*, 570 F. App'x. at 487. Accordingly, the Court **DISMISSES WITH PREJUDICE** Plaintiff's TCPA claim against Wells Fargo.

### III. Breach of Contract Claim

Finally, Wells Fargo argues that because it is not a party to the contract between Plaintiff and Allstate, Plaintiff's breach of contract claim fails. (ECF No. 15-1 at PageID 129.) Alternatively, Wells Fargo argues that even if for some reason the policy applied to it (i.e., as a third-party beneficiary), the Policy contains a one-year limitations period, and the Court should recognize it and dismiss Plaintiff's claim. (*Id.*)

 **\*4** Plaintiff argues that Wells Fargo was a party to the Policy only because Allstate sent the claims checks to Wells Fargo. (ECF No. 36 at PageID 164.) Also Plaintiff contends that because Wells Fargo holds the mortgage on the property and because it has a "vested interest in the condition and habitability of the property," Wells Fargo is a third-party beneficiary of the Policy (*Id.*) And by extension Plaintiff claims she can sue Wells Fargo—as a third-party beneficiary—for breaching the Policy. [1] All the same, Plaintiff fails to show why she can sue Wells Fargo for breach of contract.

First, Plaintiff did not assert in her Complaint that Wells Fargo was a party to the Policy, nor did she assert that Wells Fargo was a third-party beneficiary. (*See* ECF No. 1-2.) Instead, she claims only that "Allstate Insurance Company and Plaintiff entered into a homeowner's deluxe insurance policy...." (*Id.* at PageID 11, 21.) As to Wells Fargo, she merely claims that it was responsible for approving Allstate's payments and that it delayed that approval which aided in breaching the contract. (*Id.* at PageID 20–21.) But simply approving insurance checks does not necessarily make Wells Fargo a party to Plaintiff's Policy. To prevail here, Plaintiff must show a contractual obligation that Wells Fargo breached.

Under Tennessee law, "[a] breach of contract claim cannot be asserted against a non-contracting party who has no obligation to perform." *Great Am. Ins. Co. v. Nelson, Inc.*, 276 F. Supp. 3d 762, 770 (W.D. Tenn. 2017) (referencing *Bonham Grp. Inc. v. City of Memphis*, No. 02A01-9709-CH-00238, 1999 WL 219782, at \*7 (Tenn. Ct. App. Apr. 16, 1999)). Nowhere in Plaintiff's Complaint does she assert that Wells Fargo was a party to the Policy who had to perform under the Policy. (*See* ECF No. 1-2.) What is more, holding a non-party liable to a contract "is contrary to common reason." *Great Am. Ins. Co.*, 276 F. Supp. 3d at 770; *Bonham Grp. Inc.*, 1999 WL 219782, at \*7.

The theory that Wells Fargo is subject to suit because it is a third-party beneficiary is odd. Tennessee law makes clear "[t]he beneficiary gets a benefit, not an obligation...." *Id.* And "the very description of the status of 'third party beneficiary' belies an assertion of liability as an obligor." *Id.* In other words, beneficiaries get to sue for their rights under the contract, but the contracting parties do not get to sue beneficiaries in turn.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.   4

This law is instructive. From the face of Plaintiff's Complaint, she only claims she has a Policy with Allstate. (ECF No. 1-2 at PageID 11, 21.) To hold Wells Fargo liable for breaching a contract that it did not enter into would defy reason. As for Plaintiff's argument that Wells Fargo is a third-party beneficiary, that does not change the analysis here. Even if it is a third-party beneficiary of the Policy, Wells Fargo would have the right to sue—but not be sued.

In sum, Plaintiff cannot successfully maintain an action against Wells Fargo for breaching her *Allstate* insurance Policy. The Court therefore **DISMISSES WITHOUT PREJUDICE** Plaintiff's breach of contract claim against Wells Fargo.

## CONCLUSION

 **\*5**  In sum, the Court **DISMISSES WITH PREJUDICE** the negligence, NIED, and TCPA claims against Wells Fargo and it **DISMISSES WITHOUT PREJUDICE** the breach of contract claim against Wells Fargo.

**SO ORDERED**, this 23rd day of October, 2020.

**All Citations**

Slip Copy, 2020 WL 6263871

## Footnotes

1       Plaintiff argued in her response to Allstate's motion that Tennessee has a six-year period of limitations for breach of contract claims, and it should control. (ECF No. 35 at PageID 159); *see* Tenn. Code Ann. § 28-3-109. She did not repeat that argument in her response to Wells Fargo, but the Court assumes that Plaintiff is relying on the six-year statutory period for her breach of contract claim against Wells Fargo. In her Complaint, Plaintiff describes issues with Wells Fargo's payments as early as the summer of 2014. (*See* ECF No. 1-2 at PageID 14–15.) Thus, if the six-year limitations applies, Plaintiff's suit is timely.

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

2021 WL 2260058
Only the Westlaw citation is currently available.
United States District Court, M.D.
Tennessee, Nashville Division.

AUTOMOTIVE EXPERTS, INC., Plaintiff,

v.

Keith KALLBERG, et al., Defendants.

No. 3:19-cv-00982
|
Filed 06/03/2021

**Attorneys and Law Firms**

Eric Lee, Pro Hac Vice, Lee & Amtzis, P.L., Boca Raton, FL, Gregory S. Reynolds, Riley, Warnock & Jacobson, Nashville, TN, for Plaintiff.

John E. Anderson, Peter F. Klett, III, Dickinson Wright PLLC, Nashville, TN, for Defendants.

## MEMORANDUM OPINION

ELI RICHARDSON, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court is Plaintiff's Motion for Summary Judgment. (Doc. No. 58, "Motion"). Defendants have responded. (Doc. No. 70). Plaintiff has replied. (Doc. No. 72). The Motion is ripe for review.

For the reasons discussed herein, the Court will deny the Motion.

## FACTUAL BACKGROUND [1]

Kallberg Industries, LLC, a Tennessee limited liability company, ("Kallberg Tennessee") [2] was incorporated on October 17, 2017 and was administratively dissolved on August 6, 2019. (Doc. No. 71 at ¶ 1). On or around October 1, 2017, Plaintiff's representative, Michael Kunkel, received a call from one of Kallberg Tennessee's principals, Defendant Matthew Kallberg. (Id. at ¶ 2). Defendant Matthew Kallberg requested equipment and personnel be sent to Puerto Rico to assist in relief efforts after Hurricane Maria (the "mission"). (Id. at ¶ 3). Kallberg Industries, LLC, a Florida limited

liability company ("Kallberg Florida") [3] was engaged to service existing generators that had previously been installed as back-up generators in Puerto Rico following Hurricane Marie. (Id. at ¶ 13). One of Kallberg Florida's owners, Michael Kallberg, requested as many generators, technicians, and storm-ready work trucks as could be provided. (Id. at ¶ 14). Plaintiff supplied eight utility trailers, five 250 gallon used storage containers, five 250 gallon fresh fuel/clean oil tanks, 52 fuel caddies, eight trucks, and nine oil pumps. (Id. at ¶4). Plaintiff also supplied numerous mechanics. (Id. at ¶ 17).

**\*2** Kallberg Tennessee utilized the equipment and submitted invoices to the prime contractor (who presumably was a client of either Kallberg Tennessee or Florida, though this is unclear from the record) and received payment. (Id. at ¶ 27). Kallberg Tennessee benefited from the use of the equipment. (Id.). The parties dispute how much compensation Plaintiff should receive per day for each mechanic. (Id. at ¶ 16). After the mechanics arrived, Defendant Matthew Kallberg called Kunkel and advised that Kallberg Tennessee wished to pay all the mechanics directly (rather than paying Kunkel, [4] who might then pay the mechanics, in total, less than the full amount Kunkel had received from Kallberg Tennessee). (Id. at ¶ 18). The parties dispute the amount of profit that Kunkel had anticipated making by paying the mechanics less than Kallberg Tennessee would pay Kunkel, and what arrangements were made to compensate him for this loss. (Id. at ¶ 19). It is unclear from the Statement of Facts whether Kunkel in fact suffered any loss.

On January 1, 2018, Kallberg Tennessee terminated Kunkel (and, presumably, by extension Plaintiff). (Id. at ¶ 29). At the time Kunkel was terminated, Kallberg Tennessee had not paid Plaintiff for the utilization of Plaintiff's equipment. (Id. at ¶ 34). It appears undisputed that Kallberg Tennessee continued to use the equipment for some time thereafter, though it is unclear when Kallberg Tennessee ceased using the equipment. [5] Whether or not Kunkel was immediately (as of January 1, 2018) able to access his equipment is disputed. (Id. at ¶ 32). When he did inspect the equipment, Kunkel discovered that many of the trailers were covered in oil and waste, and the vehicles had to be cleaned before they were shipped to Florida because they would not be accepted for shipment or admitted into the United States in that condition. (Id. at ¶ 33).

On January 2, 2018, Plaintiff requested payment for its equipment and referred employees. (Id. at ¶ 36). On October 9, 2018, Kallberg Tennessee tendered a check to Plaintiff as

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 1

payment for the utilization of Plaintiff's equipment. (*Id.* at ¶ 38). At the time Kallberg Tennessee tendered the check, it also filed a declaratory judgment action against Plaintiff and Kunkel in Florida. (*Id.* at ¶ 39). On December 4, 2019, an Amended Final Judgment [6] was entered against Kallberg Tennessee for the total amount of $1,735,025.00. [7] (*Id.* at ¶¶ 40, 83). Though the amount owed remains disputed as the matter is currently on appeal, the parties agree that Defendants were aware that Kallberg Tennessee owed Plaintiff some amount of payment for its provision of equipment and labor. (*Id.* at ¶ 41). [8] Defendants Keith Kallberg, Matthew Kallberg, and Kathryn Kallberg made numerous attempts to calculate

the amount owed to Plaintiff prior to January 15, 2018. (*Id.* at ¶ 42). The balance in Kallberg Tennessee's bank account on January 1, 2018 was $37,877.64. (*Id.* at ¶ 86). It is undisputed that in January 2018, Kallberg Tennessee was aware that Plaintiff believed Kallberg Tennessee owed it approximately $1.8 million. (*Id.* at ¶ 82).

**\*3** Despite knowing that it owed money to Plaintiff—in some disputed amount—Kallberg Tennessee made numerous conveyances in 2017-2018. (*Id.* at ¶ 43). Defendants do not dispute that the following chart accurately reflects the transfers made from Kallberg Tennessee to Defendants Keith Kallberg and Lisa Kallberg:

| 10/27/2017 | Transfer | $16,000.00 |
|---|---|---|
| 11/20/2017 | Transfer | $18,000.00 |
| 2/12/2018 | Wire | $281,650.00 |
| 2/22/2018 | Transfer | $360,473.00 |
| 4/3/2018 | Transfer | $13,817.86 |
| 4/4/2018 | Transfer | $294,453.00 |
| 4/9/2018 | Transfer | $13,817.86 |
| 4/20/2018 | Transfer | $6,908.93 |
| 4/25/2018 | Wire | $747,667.00 |
| 4/27/2018 | Transfer | $6,908.93 |
| 6/8/2018 | Transfer | $9,100.00 |
| 6/22/2018 | Transfer | $9,100.00 |
| 6/22/2018 | Transfer | $9,100.00 |
| 7/2/2018 | Transfer | $9,100.00 |
| 7/6/2018 | Transfer | $9,100.00 |
| 7/16/2018 | Transfer | $9,100.00 |
| 7/20/2019 | Transfer | $9,100.00 |
| 7/27/2018 | Transfer | $9,100.00 |
| 8/3/2018 | Transfer | $9,100.00 |
| 8/10/2018 | Transfer | $1,900.00 |
| 8/15/2018 | Transfer | $7,200.00 |

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  2

| 8/17/2018 | Transfer | $9,100.00 |
|---|---|---|
| 8/27/2018 | Transfer | $9,100.00 |
| 9/4/2018 | Transfer | $9,100.00 |
| 9/7/2018 | Transfer | $9,100.00 |
| 9/14/2018 | Transfer | $9,100.00 |
| 11/20/2018 | Wire | $100,000.00 |
| 04/29/2019 | Wire | $20,000.00 |
| 06/12/2019 | Wire | $225,000.00 |
| **TOTAL** | | **$2,239,196.58** |

(Doc. No. 60 at 6; Doc. No. 71 at ¶ 44). It is undisputed that Kallberg Tennessee also made the following transfers to Defendant Kathryn Kallberg:

| 1/8/2018 | Wire | $7,901.14 |
|---|---|---|
| 2/12/2018 | Wire | $236,650.00 |
| **TOTAL** | | $244,551.14 |

(Doc. No. 60 at 6; Doc. No. 71 at ¶ 45). Finally, it is undisputed that Kallberg Tennessee made the following transfers to Defendant Kallberg Emergency Management ("KEM"):

| 3/9/2018 | Wire | $1,110,260.00 |
|---|---|---|
| 4/25/2018 | Wire | $252,333.00 |
| 9/21/2018 | Wire | $100,000.00 |
| 12/12/2018 | Transfer | $33,000.00 |
| 04/29/2019 | Wire | $20,000.00 |
| 06/12/2019 | Wire | $225,000.00 |
| **TOTAL** | | $1,840,593.00 |

Therefore, it is undisputed that Kallberg Tennessee made transfers in 2017-2018 amounting to (at least) $4,324,340.72. (Doc. No. 71 at ¶ 47). Citing particular evidence, Defendant disputes the veracity of Plaintiff's statement that these transfers represented profit distributions, instead asserting that the transfers represented compensation.[9] (*Id.* at ¶ 68; Doc. No. 70 at 6-7). It is undisputed that Defendant KEM made numerous subsequent conveyances, despite knowing that money was owed to Plaintiff. (Doc. No. 71 at ¶ 48).[10] After the transfer of March 2018,[11] Kallberg Tennessee's ending balance was $4,453.53, and on March 14, 2018, Defendant Keith Kallberg had to lend $25,000 back to Kallberg Tennessee (a few days after the $1.1 million wire transfer to Defendant KEM). (*Id.* at ¶¶ 84, 85).[12]

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   3

**\*4** During the time of the transfers, Defendants Keith Kallberg and Matthew Kallberg received paid wages of $400 a day plus per diem. (*Id.* at ¶¶ 74, 76). After ending the participation in the mission, Defendant Keith Kallberg was paid wages in excess of $1,000 a day. (*Id.* at ¶ 75). During the time period he was paid by Kallberg Florida, Matthew Kallberg was paid around $9,100 per week. (*Id.* at ¶ 78). Kallberg Florida also made payments to Defendant KEM, even though Defendant KEM provided no services for Kallberg Florida. (*Id.* at ¶¶ 77, 79). The second and third sentences of this paragraph seem potentially to be in conflict with the first sentence. Yet for whatever reason, none of the statements comprising these three sentences is disputed. However, it is unclear to the Court whether (as seems likely) the two referenced time periods overlap or to what extent the referenced payments overlap (or do not overlap) with the other payments listed in this paragraph and with those transfers discussed above.

The parties dispute many of the details surrounding Kallberg Tennessee's bookkeeping practices, such as whether Kallberg Tennessee knew what assets and liabilities it had. (*Id.* at ¶¶ 63, 64). [13] It is undisputed that Kallberg Tennessee did not maintain any books and records other than bank statements, that Kallberg Tennessee does not have any records that provide information as to its assets on the date of any distributions, and that Kallberg Tennessee does not have records that provide information as to its liabilities on the date of any distribution. (*Id.* at ¶¶ 65-67).

Plaintiff and Defendants dispute whether Kallberg Tennessee had any assets when it was formed. (*Id.* at ¶ 5). Kallberg Tennessee received money from Kallberg Florida, but it is disputed whether this money was a loan or advance against receivables. (*Id.* at ¶ 6). Because the nature of this money is disputed, the parties also dispute the amount of the loans, how the loans were tracked, how the loans would be repaid, whether they were personally guaranteed, and whether Kallberg Tennessee was able to compute loan repayments. (*Id.* at ¶¶ 7-9, 12). Plaintiff and Defendants also dispute whether Kallberg Tennessee incurred $3 million in debt to fund the mission to Puerto Rico. (*Id.* at ¶ 10). The parties dispute whether Kallberg Tennessee had receivables, and whether or not those receivables were of significant value. [14] (Doc. No. 73 at ¶ 4). Defendants assert that Kallberg Tennessee possessed the following receivables derived from invoices submitted by Kallberg Florida to Louis Berger U.S., Inc.:

| | |
|---|---|
| January 2018 | $5,124,647.00 |
| February 2018 | $1,072,598.00 |
| March 2018 | $88,779.00 |
| April 2018 | $1,726,695.00 |
| May 2018 | $915,225.00 |
| June 2018 | $446,199.00 |
| July 2018 | $4,578.00 |
| August 2018 | $51,402.00 |

**\*5** (Doc. No. 73 at ¶ 8). [15] Because of these receivables, Defendants assert that Kallberg Tennessee was solvent and able to pay its debts at all relevant times. (*Id.* at ¶ 9). [16]

The parties agree that Kallberg Tennessee's 2018 tax return contains several pieces of information about Kallberg Tennessee: 1) that it distributed $3,494,572.00 in profits to its members, 2) that it had only $37,878.00 in assets as of December 31, 2017, 3) that it did not include any obligation to Plaintiff in its balance sheet as of December 31, 2017, and 4) that it listed $37,878.00 in cash as its only asset as of December 31, 2017. (Doc. No. 71 at ¶¶ 69-72). [17]

The Amended Complaint [18] brought counts of: I) fraudulent conveyance under Tenn. Code Ann. § 66-3-305(a)(1), II) Fraudulent Conveyance under Tenn. Code Ann. § 66-3-305(a)(2), III) Fraudulent Conveyance under Tenn. Code Ann. § 66-3-306(a), and IV) Fraudulent Conveyance under Tenn. Code Ann. § 66-3-306(b). Plaintiff brings these claims against the following Defendants: Keith Kallberg, Kathryn Kallberg,

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 4

Matthew Kallberg, Lisa Kallberg, and KEM for a judgment for the value of the asset transferred or the amount necessary to satisfy Plaintiff's claim, whichever is less. Plaintiff has moved for summary judgment on all four counts.

## LEGAL STANDARD

**\*6** Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]' " *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

A party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court

should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at \*5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

## DISCUSSION

As noted, Plaintiff brings its claims for fraudulent conveyance under four state statutory provisions: Tenn. Code Ann. § 66-3-305(a)(1), Tenn. Code Ann. § 66-3-305(a)(2), Tenn. Code Ann. § 66-3-306(a), and Tenn. Code Ann. § 66-3-306(b). Plaintiff asserts that it is entitled to summary judgment on all of these claims, and that the Court should find as a matter of law that the transfers constituted fraudulent conveyances. (Doc. Nos. 58, 59). The Court will first discuss the two claims brought under Tenn. Code Ann. § 66-3-305, before turning to the two claims brought under Tenn. Code Ann. § 66-3-306.

### 1. Tenn. Code Ann. § 66-3-305

**\*7** Tennessee has adopted the Uniform Fraudulent Transfer Act ("UFTA"), which provides remedies to creditors when insolvent debtors fraudulently transfer assets to third parties. *See* Tenn. Code Ann. § 66-3-301 *et seq.*

Tenn. Code Ann. § 66-3-305 provides:

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   5

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under subdivision (a) (1), consideration may be given, among other factors, to whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tenn. Code Ann. § 66-3-305.

Under the UFTA, a "creditor" means a person who has a claim. Tenn. Code Ann. § 66-3-302(4). Neither party seems to dispute that Plaintiff is a creditor due to the previous declaratory judgment action finding in Plaintiff's favor. "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance. Tenn. Code Ann. § 66-3-302(12). As indicated above, Plaintiff and Defendants do not dispute that "transfers" were made to Defendants from Kallberg Tennessee. The statute additionally defines insolvency as:

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation.

(b) A debtor who is generally not paying such debtor's debts as they become due is presumed to be insolvent.

(c) A partnership is insolvent under subsection (a) if the sum of the partnership's debts is greater than the aggregate of all of the partnership's assets, at a fair valuation, and the sum of the excess of the value of each general partner's nonpartnership assets over the partner's nonpartnership debts.

**\*8** (d) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this part.

(e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

Tenn. Code Ann. § 66-3-303.

A. Analysis of Tenn. Code Ann. § 66-3-305(a)(1) claim

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiff argues that it has shown that there is no genuine dispute that Defendants had actual intent to defraud Plaintiff, as shown by the eleven factors [19] in the statute, which (according to Plaintiff) all weigh in favor of Plaintiff. [20] (Doc. No. 59). Defendants respond that 1) the Court need not even reach the factors enumerated in the statute, because they have raised a genuine dispute of material fact regarding their intent even without resort to the eleven factors, and 2) the eleven factors actually do not weigh in favor of Plaintiff. (Doc. No. 70).

**\*9** Defendants are correct that, in dealing with a similar situation, another court in this circuit denied summary judgment to both parties without giving individualized assessment to the eleven factors, explaining as follows:

> The briefs filed by the debtor and the trustee deal extensively with the badges of fraud set out in § 66–3–305(b)[.] The trustee argues that enough badges of fraud exist to raise a presumption and require the debtor to produce evidence showing a lack of intent to harm creditors. The debtor's response is that she did not intend the transfer to harm her creditors ...

> In cases such as this, the question is whether the debtor has a plausible reason for the transfer other than the intent to hinder, delay or defraud creditors. If so, the court is faced with a question of intent that must be decided at trial after hearing the debtor and other witnesses testify and judging their credibility. The debtor's explanation is sufficient to create a dispute as to her intent despite the badges of fraud asserted by the trustee. *United States v. Alfano*, 34 F.Supp.2d 827 (E.D.N.Y.1999); *Macon Bank and Trust v. Holland*, 715 S.W.2d 347 (Tenn.Ct.App.1986); *Neshewat v. Salem*, 365 F. Supp. 2d 508 (S.D.N.Y.2005); *Rowlands v. Fraser (In re Rowlands)*, 346 B.R. 279 (1st Cir. BAP 2006); 10B Charles A. Wright, et al., Federal Practice and Procedure § 2730. On the other hand, the badges of fraud asserted by the trustee are sufficient to create a dispute as to whether the debtor's explanation is true. The trustee and the defendant have thoroughly criticized each other's interpretation of the facts. Indeed, they have done such a good job that they have unintentionally cooperated in showing that neither side should be granted summary judgment on the question of whether the debtor had the actual intent to hinder, delay or defraud creditors. There is a genuine issue of material fact as to the debtor's intent.

*In re Silvey*, 378 B.R. 186, 190 (Bankr. E.D. Tenn. 2007); *see also In re Walker*, 566 B.R. 503, 540 (Bankr. E.D. Tenn. 2017) (stating that "intent is not a subject that lends itself to a motion for summary judgment," finding that some badges of fraud were present, and ultimately concluding that "Defendants offer an alternative reason for the transfers and contend that they are willing to pay for the value that they received. Summary judgment is not appropriate for this count of the complaint"). The Court agrees that Defendants properly can show a genuine dispute of fact regarding actual intent by showing an alternative reason (other than fraud) for the transfers, without arguing each of the eleven factors discussed below.

**\*10** Citing to depositions of the individual Defendants, Defendants argue that 1) the purpose of each of the allegedly fraudulent transfers was to compensate Defendants Keith Kallberg, Matthew Kallberg, and Kathryn Kallberg for services performed, and 2) at least one of the individual Defendants has denied ever having any intent to defraud Plaintiff. [21] (Doc. No. 70 at 17; Doc. No. 73 at ¶ 3). Plaintiff has asserted that the purpose of the transfers was instead to distribute profits. (Doc. No. 71 at ¶ 68; Doc. No. 70 at ¶ 6-7). The Court agrees with Defendants that they have indicated (via evidence) a plausible reason (other than fraud) for the transfers. Therefore, Defendants' countervailing assertion serves to create a genuine dispute of material fact, and so summary judgment is inappropriate.

Alternatively, many of the factors set forth in Tenn. Code Ann. § 66-3-305(b) are disputed, and so the Court would not grant summary judgment to Plaintiff even if it did reach the statutory factors. It appears undisputed that the first [22] and tenth factors weigh in favor of Plaintiff, and the eleventh factor does not appear to be relevant. The Court will discuss later in this opinion the genuine dispute of material fact that exists as to factors eight and nine, which are requirements under the other statutory provisions at issue, § 66-3-305(a)(2) and § 66-3-306 (and not just factors bearing on Tenn. Code Ann. § 66-3-305(a)(1)). Therefore, the Court will briefly address factors two, three, five, six, and seven. [23]

### 1. Factor Two: Whether the Debtor Retained Possession or Control of the Property Transferred after the Transfer

**\*11** Regarding the second factor, Plaintiff asserts that although Kallberg Tennessee did not "technically retain possession," the money could have been transferred back to Kallberg Tennessee at any time. (Doc. No. 59 at 15). Plaintiff notes that at one point, Defendant Keith Kallberg transferred $40,000 to Kallberg Tennessee. (*Id.*). Plaintiff does not cite

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 7

any authority for its proposition that a debtor should be treated as "retaining possession" within the meaning of the second factor, despite not "technically" retaining possession, based on mere speculation that the transferred property could have been transferred back to the debtor. (*Id.*). Defendants respond that Kallberg Tennessee did not remain in possession or control of the funds after they had transferred. (Doc. No. 70 at 17). To support this assertion, Defendants note that Defendants Matthew and Kathryn Kallberg did not at any time transfer funds back to Kallberg Tennessee. (Doc. No. 70 at 17). In its Reply, Plaintiff notes that "Defendants fail to address the fact that the transfers were all profit distributions, which means that Kallberg Tennessee retained control over the assets because at any time, the owners could have (and did) transfer money back. These were not transfers to the third parties."[24] (Doc. No. 72 at 3). Plaintiff does not explain why a company would necessarily retain control over assets after transfers to owners or why transfers back to a company would indicate some level of possession or control. However, there is a genuine dispute of material fact regarding whether these distributions were profit distributions or compensation. (*Id.* at ¶ 68; Doc. No. 70 at ¶¶ 6-7).

Therefore, the Court finds that there is a genuine dispute of material fact as to whether this factor cuts in Plaintiff's favor.

### 2. Factor Three: Whether the Transfer or Obligation was Disclosed or Concealed

Regarding the third factor, Plaintiff argues that the transfers were not disclosed to Plaintiff, without citing any authority that indicates that this alleged fact is relevant to the analysis. (Doc. No. 59 at 15). Defendants respond that Plaintiff has misstated the law in this regard:

> This is an erroneous interpretation of the statute as it creates the absurd requirement that any person or entity must disclose to their creditors the nature of their business dealings at all times. This factor is relevant where a party transfers property and fails to record the sale, or otherwise avoids disclosure requirements. Defendants here did nothing out of the ordinary with respect to the transfers of funds as all were identified on their respective bank account statements,

> they were not required to keep Plaintiff apprised of all their business dealings simply because they had entered into an agreement together. To imply fraudulent intent because Kallberg Industries did not do so would be erroneous.

(Doc. No. 70 at 17). In other words, Defendants dispute that there is any relevance to the (asserted) fact that Kallberg Tennessee did not disclose their transfers to *Plaintiff in particular*; Defendants appear to suggest that the issue instead is whether Kallberg Tennessee disclosed the transfers to anyone to whom it had some obligation to make disclosure. However, like Plaintiff, Defendants cite no authority supporting their position.

Because both parties have made legal arguments and have not explained their respective arguments (as to the relevance of non-disclosure to *Plaintiff*) with supporting case law, the Court finds that this factor is neutral because it is unclear whether non-disclosure to Plaintiff is of any relevance.

### 3. Factor Four: Whether, Before the Transfer was Made or the Obligation was Incurred, the Debtor had Been Sued or Threatened with Suit[25]

Plaintiff notes that in January 2018, before any of the transfers were made, Plaintiff demanded payment in a letter to "Kallberg Industries."[26] (Doc. No. 59 at 15-16). The letter included a demand for payment and return of equipment, and "clearly threatened suit." (*Id.*). Defendants respond that "[i]t must also be noted that Kallberg Industries itself filed the initial declaratory action in the Southern District of Florida for purposes of determining the exact amount owed to Plaintiff. Clearly Kallberg Industries lacked intent to 'defraud' Plaintiff where it concurrently filed an action in which the end result would be a determination that such a payment [in at least some amount] would be made." (Doc. No. 70 at 19). Though it is true that Kallberg Tennessee filed the action in Florida, Defendants do not argue that the letter did not threaten that a suit would be filed against "Kallberg Industries"—which is just as well, because in fact the letter certainly did.

**\*12** Therefore, the Court finds that this factor weighs in favor of Plaintiff.

#### 4. Factor Five: Whether the Transfer was of Substantially All the Debtor's Assets

Plaintiff asserts that this factor weighs in its favor because Kallberg Tennessee's bank account contained less than $10,000 on March 15, 2018 and at the end of March 2018. (Doc. No. 59 at 16). Defendants respond that cash in its bank account was not Kallberg Tennessee's only asset at the time of the transfers, as Kallberg Tennessee had generated significant receivables by way of the pass-through arrangement with Kallberg Florida. (Doc. No. 70 at 18). Plaintiff responds that since the receivables were not listed on Kallberg Tennessee's tax returns, they were too contingent to count as substantial assets. (Doc. No. 72 at 3). Therefore, as has been discussed, there exists a genuine dispute of material fact regarding the value of the receivables and the valuation of assets that Kallberg Tennessee possessed.

Therefore, the Court finds that there exists a genuine dispute of material fact as to whether this factor favors Plaintiff.

#### 5. Factors Six and Seven: The Debtor Absconded and the Debtor Removed or Concealed Assets

Plaintiff cites *Orlowski v. Bates*, No. 2:11-CV-01396, 2015 WL 6159494, at *10 (W.D. Tenn. Oct. 20, 2015) for a general definition of "abscond": "To abscond, in a legal sense, means to hide, conceal, or absent oneself clandestinely, with the intent to avoid legal process." (Doc. No. 59 at 16). Plaintiff then argues that:

> Kallberg Tennessee, by making profit distributions to its members and insiders, absconded. At a time when Kallberg Tennessee knew that it owed a substantial debt to AEI, as soon as funds came in, Kallberg Tennessee transferred them to the Defendants. After AEI made its demand for payment in January 2018, rather than pay AEI and Kunkel the amounts owed, Kallberg Tennessee delayed payment, even after having received payment for utilization of the equipment and mechanics from the prime contractor.

(*Id.*). Plaintiff does not cite any further authority or explain why merely making a profit distribution is equivalent to absconding. Under Plaintiff's own proffered definition for absconding, it is not; whatever may be said about these transfers, Plaintiff has pointed to no evidence indicating that they involved Kallberg Tennessee (or, for that matter, any of its agents or any Defendants) hiding, concealing, or absenting itself (or himself or herself). Regarding concealing, Plaintiff similarly argues with no citation that by transferring its assets, Kallberg Tennessee necessarily concealed its assets. (*Id.* at 17).

Defendants respond that Kallberg Tennessee did not abscond with the funds or conceal assets.[27] Defendants also note that each individual Defendant testified that Kallberg Tennessee was able and willing to pay as necessary for the equipment. (Doc. No. 70 at 18-19). The Court has also previously discussed that there is a genuine dispute of material fact regarding whether the transfers were profit distributions or compensation. Therefore, the Court finds that there is a genuine dispute of material fact regarding whether these factors (six and seven) are present in this case.

**\*13** In sum, the first, fourth, and tenth factors weigh in favor of Plaintiff. As to whether the second, fifth, sixth, seventh, eighth (discussed later in this opinion), and ninth (discussed later in this opinion) factors weigh in Plaintiff's favor, there exist outstanding genuine disputes of material facts. The third factor is neutral. The eleventh factor is irrelevant. Therefore, as only three factors weigh in favor of Plaintiff, the Court would not find that a sufficient number of factors weigh in favor of Plaintiff to shift the burden to Defendants to show the absence of a genuine issue of material fact as to whether, based specifically on the factors set forth in Tenn. Code Ann. § 66-3-305(b), transfers to Defendants were made "[w]ith actual intent to hinder, delay, or defraud" Plaintiff.

In summary, for the reasons discussed, the Court finds that it would be inappropriate to grant summary judgment to Plaintiff on Count I. Plaintiff shifted the burden to Defendants for purposes of summary judgment, and Defendants have sufficiently shown that there remains a genuine dispute of material fact as to whether (under either an analysis focusing more directly on the motivation of Kallberg Tennessee and the presence of an alternative reason for the transfers or an analysis focusing on the eleven statutory factors) the transfers at issue were made with the intent required for liability under Tenn. Code Ann. § 66-3-305(a)(1).

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 9

### B. Tenn. Code Ann. § 66-3-305(a)(2) [28]

Plaintiff argues that Kallberg Tennessee did not receive anything of value for the transfers, the remaining assets were unreasonably small, and Kallberg Tennessee knew that it was incurring debts beyond its ability to pay as they came due. [29] (Doc. No. 59 at 21-22). Defendants argue that the transfers were made to compensate the individual Defendants for services performed on behalf of Kallberg Tennessee and that equivalent value is a question of fact not appropriate for summary judgment. [30] (Doc. No. 70 at 19).

As noted above, Tenn. Code Ann. § 66-3-305(a)(2) provides that:

> **\*14** (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The statute further defines "equivalent value," explaining that:

> (a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.
> (b) For the purposes of §§ 66-3-305(a)(2) and 66-3-306, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.
>
> (c) A transfer is made for present value if the exchange between the debtor and the transferee is intended by

them to be contemporaneous and is in fact substantially contemporaneous.

Tenn. Code Ann. § 66-3-304.

"Whether Defendant received a reasonably equivalent value in exchange for the payments to her is a question of fact." *JRS Partners, GP v. Warren*, No. 3:17-CV-01258, 2021 WL 1143829, at \*3 (M.D. Tenn. Mar. 25, 2021) (Richardson, J.) (citing *In re Wilkinson*, 196 F. App'x 337, 341 (6th Cir. 2006)); *see also In re Webb Mtn, LLC*, 420 B.R. 418, 433 (Bankr. E.D. Tenn. 2009), *aff'd*, No. 3:09-CV-559, 2010 WL 1544092 (E.D. Tenn. Apr. 19, 2010). "A court considering this question should first determine whether the debtor received any value in the exchange. If so, the court should determine if the value received was reasonably equivalent." *JRS Partners, GP*, 2021 WL 1143829, at \*3 (footnote omitted).

Plaintiff maintains that the transfers were not made in exchange for a reasonably equivalent value, because the transfers were profit distributions. (Doc. No. 59 at 18). Plaintiff cites to case law indicating that profit distributions cannot be considered compensation (which is typically paid in exchange for something of value, *i.e.*, services performed on a job) as a matter of law, and that profit distributions cannot be given in exchange for reasonably equivalent value since the company receives nothing in return. (*Id.*). Defendants point out that Plaintiff has provided no binding authority for its proposition (citing only out-of-circuit cases) that profit distributions or dividends "generally cannot be considered compensation as a matter of law." (Doc. No. 70 at 20). Therefore, the Court is unpersuaded by Plaintiff's assertion that as a matter of law profit distributions cannot be considered compensation, and the Court finds that even if it did accept this assertion, there would be a genuine dispute of material fact regarding whether the transfers at issue were profit distributions *or* compensation (though Plaintiff seems to characterize Defendants as arguing that the transfers were *both* profit distributions *and* compensation, and that therefore the law would require the payments to just be considered as profit distributions).

**\*15** In the Memorandum in Support of the Motion, Plaintiff points to the following evidence: that Kallberg Tennessee's 2018 tax return designated the transfers as profit distributions, that one individual Defendant (Keith Kallberg) in his deposition referred to the transfers as profit distributions, [31] that some individual Defendants were separately compensated for services provided, that the

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 10

transfers continued even after Kallberg Tennessee finished providing services and operating as a subcontractor, and that Defendant Lisa Kallberg received a Form K-1 for profit distributions despite not rendering services. (Doc. No. 59 at 19). However, Defendants maintain that the transfers were to compensate the individual Defendants for work done for Kallberg Tennessee and have presented supporting evidence in this regard. (Doc. No. 70 at 20).

Although Plaintiff shifted the burden on this issue, Defendants have met their resulting burden of showing a genuine dispute of material fact regarding whether there was an exchange for equivalent value. Thus, the Court finds that it cannot grant summary judgment to Plaintiff on Count II.

### C. Tenn. Code Ann. § 66-3-306

Plaintiff asserts that Kallberg Tennessee was insolvent at all relevant times. (Doc. No. 59 at 22-24). Defendants disagree. (Doc. No. 70; Doc. No. 73 at ¶¶ 1, 2).

As the Court has suggested in a footnote above, insolvency is a requirement for Plaintiff's claims brought under Tenn. Code Ann. § 66-3-306. [32] Tenn. Code Ann. § 66-3-306 provides (emphasis added):

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation *and the debtor was insolvent* at that time or the debtor became insolvent as a result of the transfer or obligation.

> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, *the debtor was insolvent at that time*, and the insider had reasonable cause to believe that the debtor was insolvent.

Solvency is typically a question of fact. A court in this district has noted in the context of constructive fraud:

> Whether a debtor is insolvent at the time a contested transfer occurs or is thereby rendered insolvent is a question of fact which must be determined on a case-by-case basis. *Credit Managers Assn. of Southern California v. The Federal Co.*, 629 F. Supp. 175 (C.D.Cal.1985), citing *Wells Fargo Bank v. Desert View Building Supplies, Inc.*, 475 F. Supp. 693 (D.Nev.1978), *aff'd.*, 633 F.2d 225 (9th Cir.1980). Here, [the movants] assert that [the company] was not insolvent at the time the transfer/ obligation occurred and, further, that [the company] was not rendered insolvent as a result of the subject transactions. Rather, they assert, other factors which were completely unrelated to the leveraged buyout; *i.e.*, the prevailing market conditions, caused the ultimate insolvency of, and Chapter 11 filing by, [the company]. [The movants] offer as supporting data for their assertions an Affidavit of [one of the movants] and a diagram of prices in the market during the relevant periods of time. Plaintiff [the non-movant] has submitted documentary evidence in support of its position that summary judgment is inappropriate at this time. Upon a review of the data, the Court determines that there remain questions of fact with regard to [the company's] solvency, which can only be resolved upon a trial of this cause.

**\*16** *Matter of Ohio Corrugating Co.*, 70 B.R. 920, 927–28 (Bankr. N.D. Ohio 1987); *see also In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 803 (Bankr. S.D.N.Y. 2005) ("Solvency or insolvency is ordinarily a question of fact[.]"); *Citimortgage, Inc. v. Chicago Bancorp, Inc.*, No. 4:14CV01278 AGF, 2016 WL 3627284, at *9 (E.D. Mo. July 6, 2016) (finding that "[t]he Court agrees with the [individual defendants] that the potential for the return of these underlying notes and collateral may have some contingent value that should be accounted for in determining Chicago Bancorp's [the primary corporate defendant's] solvency at the time of the transfers ... a material question of fact remains as to the [primary corporate defendant's] solvency at the time" made summary judgment inappropriate); *Askanase v. Fatjo,*

No. CIV. A. H-91-3140, 1993 WL 208440, at *7 (S.D. Tex. Apr. 22, 1993) ("There also are outstanding questions of fact regarding LivingWell's [a company the plaintiff-trustee represented] solvency on January 13, 1987, including numerous, subordinate valuation issues. Accordingly, this Court RECOMMENDS that Plaintiff Askanase's motion for partial summary judgment be DENIED."), *report and recommendation adopted* (June 4, 1993), *aff'd*, 130 F.3d 657 (5th Cir. 1997).

Plaintiff asserts that Kallberg Tennessee was insolvent because 1) Kallberg Tennessee did not keep enough money in its bank account to cover Plaintiff's invoice, 2) Defendants are unaware of the assets and liabilities of Kallberg Tennessee at the time of transfers, and Kallberg Tennessee did not maintain adequate books and records, 3) Kallberg Tennessee was aware that it had an obligation to pay Plaintiff by January 2018, and 4) Kallberg Tennessee was unable to pay its debts as they became due because its assets were less than the sum of its liabilities. (Doc. No. 59 at 21-24). The Court finds that Plaintiff has properly shifted the burden for purposes of summary judgment to Defendants on the issue of insolvency, as it has identified evidence supporting its position, and it also made a colorable (rather than wholly conclusory) assertion that there is no contrary evidence that Defendants can point to. (Doc. No. 59 at 23 ("As there are no records pertaining to the loans, repayments, and amounts due, Kallberg Tennessee cannot refute the conclusion that it was insolvent.")).

Defendants assert that there is a genuine dispute of material fact regarding whether Kallberg Tennessee was solvent, in light of Defendants' expert report.[33] (Doc. No. 70). Defendants summarize their expert report as refuting Plaintiff's arguments by stating:

> Defendants' Expert Report reflects the shortcomings involved with Plaintiff's analysis—it rests upon the presumption that Kallberg Industries must have recorded all accruals and receivables in its books to be considered an "asset" for purposes of determining insolvency. (Ex. 3, pp. 3-4). On the contrary, Defendants knew Kallberg Industries was owed amounts receivable from Kallberg Industries Florida and also possessed incurred but un-billed labor and use of equipment, both of which existed whether or not they were expressly recorded on Kallberg Industries' books and records. (*Id.*). Here, because the provision of services for the O&M Mission was to be a direct pass-through from Kallberg Industries Florida to Kallberg Industries, every invoice submitted by Kallberg Industries Florida to Louis Berger created an account receivable for the same amount on the books of both Kallberg Industries Florida and Kallberg Industries, regardless of whether they were formally recorded. (*Id.*).

(Doc. No. 70 at 11). As indicated in the background section, Defendants have also presented a chart reflecting the accounts receivable. (Doc. No. 70 at 13). Defendants also point to statements made by each of the individual Defendants in their depositions that Kallberg Tennessee was solvent. (*Id.* at 14-15).

**\*17** Plaintiff responds that the expert opinion is wrong, because it ignores the tax returns that determined, for tax purposes, that the alleged receivables had zero value as of December 31, 2017. (Doc. No. 72 at 5). Despite Plaintiff's argument, the Court cannot weigh evidence on a motion for summary judgment, and the Court cannot resolve a dispute between expert opinions on summary judgment. A "battle of the experts" is a question left for the finder of fact. The Sixth Circuit has held that:

> This approach of weighing the credibility of the competing expert reports amounts to improper fact-finding. *See Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 449 (6th Cir. 2002). Indeed, competing expert opinions present the " 'classic battle of the experts' and it [is] up to a jury to evaluate what weight and credibility each expert opinion deserves." *Cadmus v. Aetna Casualty and Surety Co.*, 1996 WL 652769 (6th Cir. Nov.7, 1996) (unpublished) (citation omitted).

> The matter before the magistrate judge was a motion for summary judgment, not a trial, where credibility determinations are not appropriate.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 12

*Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005); *see also Frausto v. Cooper Tire & Rubber Co.*, No. 3-12-0761, 2014 WL 581724, at \*2 (M.D. Tenn. Feb. 13, 2014), *vacated sub nom. on other grounds Nieves Frausto v. Cooper Tire & Rubber Co.*, No. 3-12-0761, 2014 WL 12928244 (M.D. Tenn. Feb. 21, 2014) ("There is no requirement that Plaintiffs put forth the opinions of more than one expert in order to survive summary judgment ... Defendant's expert may disagree, but that simply creates a 'battle of the experts'... those questions are left to the fact finder who will determine which witnesses to believe, in whole or in part."); *AmGuard Ins. Co. v. Fire Sys. of Michigan, Inc.*, No. 18-11952, 2019 WL 3456809, at \*5 (E.D. Mich. July 31, 2019) ("The expert testimony of the parties' respective witnesses creates a triable issue of fact as to factual and proximate causation. Defendant's challenges to the testimony of Plaintiff's expert attack the weight of the expert's opinions, not their admissibility. Summary judgment is not appropriate because a jury must determine the proper weight to assign the competing expert opinions."), *reconsideration denied*, No. 18-11952, 2019 WL 4876453 (E.D. Mich. Aug. 20, 2019); *01 Communique Lab'y, Inc. v. Citrix Sys., Inc.*, 151 F. Supp. 3d 778, 804 (N.D. Ohio 2015) ("Competing expert opinions in this case preclude summary judgment."). Therefore, the Court cannot determine at this stage whether or not a particular expert is more credible or accurate than another expert.

Because there is a genuine dispute of material fact regarding whether Kallberg Tennessee was insolvent at the time of the transfers, the Court will not grant summary judgment to Plaintiff on Counts III and IV.

## CONCLUSION

For the reasons discussed above, Plaintiff's Motion (Doc. No. 58) will be denied.

An appropriate order will be entered.

**All Citations**

Slip Copy, 2021 WL 2260058

## Footnotes

1   Unless otherwise noted, the facts in this section are taken from facts in the parties' Responses to Statements of Undisputed Facts (Doc. Nos. 71, 73). Unless indicated otherwise, the facts set forth in this section are undisputed. Thus, the facts set forth here are either undisputed or specifically identified as disputed.

Additionally, the Court notes that Plaintiff expressed concern in its Reply regarding several of Defendants' answers that, according to Plaintiff, "fail to establish factual issues, misrepresent facts, and fail to provide proper evidentiary citations." (Doc. No. 72 at 2). The Court herein has noted where it has found the response to a statement of fact unsupported or lacking. In these instances, the Court has explained why it considers the fact to be disputed or to be undisputed.

The Court additionally notes that the Statements of Undisputed Facts in this case are at times unclear or appear to be lacking relevant information. The Court has noted herein places where it is making an inference based on the Statements of Undisputed Fact or otherwise filling in the gaps left by the parties in a manner the Court is confident is appropriate.

2   Defendants refer to Kallberg Tennessee as "Kallberg Industries" throughout briefing. Kallberg Tennessee is not a Defendant to this action.

3   Kallberg Tennessee is a subcontractor of Kallberg Florida. (Doc. No. 71 at ¶ 24). Kunkel claims that he did not know that there were two distinct Kallberg entities (Tennessee and Florida), and believed himself to be working for and providing services to Kallberg Florida (owned by Michael Kallberg). (*Id.* at ¶ 25). Kunkle states that he did not know about Kallberg Tennessee until he was sued in a declaratory judgment action in Florida

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   13

by Kallberg Tennessee. (*Id.* at ¶ 26). Defendants dispute that Kunkel was unaware of this arrangement. (*Id.*). Neither Kallberg Florida nor Michael Kallberg is a Defendant in this action.

4    Though the Undisputed Statement of Facts indicates that Kunkel would have been paid, it seems likely that Plaintiff was the entity that would have been receiving payment.

5    Defendants dispute that they used Plaintiff's equipment at all past the termination date. (*Id.* at ¶ 30). However, Defendants did not dispute that in mid-January 2018 they no longer desired to utilize Plaintiff's equipment (at least several weeks after the termination date). (*Id.* at ¶ 31). And they additionally do not dispute that equipment was utilized by Kallberg Tennessee from October 11, 2017 through February 15, 2018, when it was released to Plaintiff in Florida (approximately a month and a half after the termination date). (*Id.* at ¶ 35). Therefore, it is unclear if and when Defendants stopped using the equipment after the termination date, though it does seem (contrary to one of Defendants' assertions) that they continued using the equipment for some period of time after the termination date.

6    Presumably, if there was an Amended Final Judgment, there was also an original Final Judgment. Neither judgment appears to be included in the record, though the Court does have a copy of the Findings of Fact and Conclusions of Law. (Doc. No. 61-5). It is not the Court's job "to root through the record not unlike a pig in search of truffles to uncover any grain of evidence that might support the position of a party that chose to otherwise sit on its hands." *Penn-Daniels, LLC v. Daniels*, No. 07-1282, 2010 WL 431888, at *3 (C.D. Ill. Jan. 28, 2010) (citing *Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009)); *see also Emerson v. Norvartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (noting that "judges are not like pigs, hunting for truffles" that might be buried in the record).

7    This amount includes both the outstanding principal and the total amount of accrued post- judgment interest (which Defendants dispute, as the matter is on appeal). (Doc. No. 71 at ¶¶ 103, 104). Plaintiff contends (in response to one of Defendants' statements of fact) that "[a]lthough Kallberg Tennessee filed an appeal, it did not post a bond or obtain a stay and thus the Defendants are collaterally estopped from contesting the amount owed." (Doc. No. 73 at ¶ 6). However, Plaintiff provides no factual or legal citation to support this claim, and Plaintiff does not address the claim in its briefing. Regardless, the exact amount owed is not material to the analysis of the claims herein, as the parties do agree that some money was owed by Kallberg Tennessee to Plaintiff.

8    On November 5, 2019—after issuance of the Final Judgment but before issuance of the Amended Judgment —Kallberg Tennessee tendered a check in the amount of $162,937.90. (Doc. No. 71 at ¶ 101). On December 16, 2019, pursuant to a Writ of Garnishment, Plaintiff recovered $60,986.77 from Bank of America. (*Id.* at ¶ 102).

9    Plaintiff correctly notes that Defendants' response to this statement cites to pages that Defendants have failed to put into the record. Docket Number 70-7 does not contain pages 99-100 of Defendants' expert's report. However, the Court considers this to be in dispute because Defendants have cited to additional evidence in their Response brief indicating that this fact is in dispute, as will be discussed later in this opinion.

10    These conveyances are listed in detail on pages 8-12 of Docket Number 60.

11    Plaintiff indicates that there were multiple transfers in March 2018, but the charts included above indicate that there was only one such transfer. It is also apparent that some amount of money was coming into the account during the same time period, though this is unclear from the record.

12    Defendants purport to dispute this fact, but their asserted basis for disputing it is actually nonresponsive to this fact. To Plaintiff's statement asserting this fact, Defendants responded that "this fact remains in dispute because there is conflicting expert testimony regarding Kallberg Tennessee's solvency and ability to pay

debts as they came due. (Ex. 4 to Defendants Response, Plaintiff's Expert Report, p. 3-4; Ex. 7 to Defendant's Response, Dep. of Joel Glick, p. 22)." Defendants further respond that Kallberg Tennessee's "receivables and the value thereof is not determinable by reviewing its bank account balance sheet." (Doc. No. 71 at ¶¶ 84, 85). Even if accurate, Defendants' response here makes assertions, and cites portions of the record, that do nothing to refute the particular facts asserted here by Plaintiff. Thus, Defendants have failed to demonstrate to the Court a genuine dispute as to these facts as required by the Federal Rules of Civil Procedure and the Local Rules. *See* Fed. R. Civ. P. 56(c)(1); LR56.01(c)(3). Thus, the Court finds these facts undisputed.

13    Plaintiff argues that the exhibits cited by Defendants in making Defendants' response to Plaintiff's statement do not support Defendants' response. (Doc. No. 72 at 2). Though perhaps not directly responsive to Plaintiff's statements, Defendants' citations support the assertion that Kallberg Tennessee believed it possessed assets that Plaintiff disputes it possessed, which appears to be the overarching dispute regarding Kallberg Tennessee's bookkeeping practices.

14    In their Response, Defendants describe the process of collecting receivables as such:

> The individuals assisting with Kallberg Industries organization and operations in Puerto Rico were paid out by Kallberg Industries almost exclusively from funds received at first from Keith Kallberg and later from Kallberg Industries Florida. (*Id.* at p. 37). This way, the labor, reimbursables, and the equipment portions of the O&M Mission were to be a direct pass-through from Kallberg Industries Florida to Kallberg Industries. (Exhibit 3, Expert Report of Joel D. Glick at p. 4; ECF No. 61- 5 ¶27). Accordingly, each invoice Kallberg Industries Florida submitted to Louis Berger for services performed on the O&M Mission created an account receivable for the same amount on the books of both Kallberg Industries Florida and Kallberg Industries, regardless of whether those invoices were recorded on Kallberg Industries books or records. (Ex. 3 at p. 4).

> (Doc. No. 70 at 3).

15    Plaintiff disputes the existence of these receivables by stating:

> Defendants' record citations do not support this statement. Furthermore, Defendants have not and cannot produce admissible evidence to support the allege facts. Kallberg Tennessee provided services at the O&M Mission from early October 2017 through February 28, 2018. (Ex. 2, p. 15). The Defendants agreed that the fact is undisputed for the purpose of ruling on the Plaintiff's Motion for Summary Judgment. (Doc. 71, p. 16). Kallberg Industries, LLC, a Florida limited liability company ("Kallberg Florida") took over the mission after February 28, 2018. (Ex. 2, p. 15). Thus, Kallberg Tennessee did not possess receivables derived from invoices submitted by Kallberg Florida after February 28, 2018.

> (Doc. No. 73 at ¶ 8). Despite stating that the record citation does not support this statement, the cited expert report contains the same information (though in simplified fashion) recited in the statement of facts. (Doc. No. 70-3 at 6). The rest of Plaintiff's dispute serves to create a dispute of fact, and to the extent that Plaintiff seems to be arguing that the expert report is not credible, the Court notes that it cannot weigh expert reports or evidence at the summary judgment stage (as the Court will discuss at length later in this opinion).

16    Plaintiff attacks the credibility of the expert report in response to this fact. The Court will discuss at length later in this opinion that it cannot weigh expert reports or evidence at the summary judgment stage.

17    However, Defendants note that "Kallberg Industries' [Kallberg Tennessee's] receivables and the value thereof is not determinable by reviewing its tax returns." (Doc. No. 71 at ¶¶ 69-72).

18    The Amended Complaint is the operative complaint in this matter. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000).

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    15

19    The undersigned here will reiterate what he has said previously about multi-factor tests generally:

"The undersigned has noted on multiple occasions that multi-factor (or balancing) tests, though often having considerable desirability and merit, tend to foster outcomes that are unpredictable on the front end, given such tests' subjectivity." *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *16 (M.D. Tenn. Aug. 28, 2020) (quoting Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1050 (1997) (proposing a multi-factor test to resolve civil limitations issues, while conceding that when courts "apply[ ] a multi-factor test, [it is] always an unpredictable endeavor") and Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 95 (1995) (proposing multi-factor test to resolve collateral estoppel issues, while conceding that its drawback is that it "would produce unpredictable resolutions of collateral estoppel issues, in that it is so flexible and calls for very subjective judicial determinations")). This reality tends not to bode well for the prospects of a multi-factor test to resolve a question as a matter of law at the summary judgment stage.

*Acosta v. Peregrino*, No. 3:17-CV-01381, 2020 WL 5995049, at *6 (M.D. Tenn. Oct. 9, 2020). Plaintiff points to some case law indicating that it should be able to prevail based on the presence of as few as five factors. (Doc. No. 72 at 2-3) (citing *United States v. Osborne*, 807 F. App'x 511, 524 (6th Cir. 2020) ("Although badges of fraud are not conclusive, a concurrence of several badges will always make out a strong case. The district court's conclusion that six badges of fraud apply (only one of which defendants dispute) is sufficient to establish [Defendant's] actual fraudulent intent." (quotation and internal citation omitted)) and *United States v. Key*, 837 F. App'x 348, 354 (6th Cir. 2020) ("[T]he district court's conclusion that five badges of fraud apply is sufficient to show that [the defendant] acted with actual fraudulent intent.")). Unlike in the cases cited by Plaintiff, Defendants here have disputed almost all of the eleven factors, and even if Plaintiff were to have shown that five of the factors weigh in its favor, there is no magic number of factors that dictates a ruling in Plaintiff's favor.

Sometimes such factors, to the extent that they cut in the creditor's favor, are called "badges" of fraud. One court has explained the terminology as follows:

Whether a transfer is fraudulent is determined by the facts and circumstances of each case. Gibson's Suits in Chancery, (5th Ed.1955) § 1057, p. 328, states: "Inasmuch as frauds are generally secret, and have to be tracked by the footprints, marks, and signs made by the perpetrators, and discovered by the light of the attending facts and circumstances, these evidences are termed 'badges of fraud.' " (A more colorful description of these "badges" is found in *Floyd v. Goodwin*, 16 Tenn. 484: "[Fraud] therefore has to be ferreted out by carefully following its marks and signs; for fraud will, in most instances, though never so artfully and secretly contrived, like the snail in its passage, leave its slime by which it may be traced.") A "badge of fraud" is any fact that throws suspicion on the transaction and calls for an explanation. Where the circumstances of a transfer of property by a debtor are suspicious, the failure of the parties to testify or to produce available explanation or rebutting evidence is a badge of fraud. *Union Bank v. Chaffin*, 24 Tenn. App. 528, 147 S.W.2d 414 (1940).

*Macon Bank & Tr. Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986).

20    The Court finds that this is sufficient to shift the summary judgment burden to Defendants as the non-movants, as Plaintiff has pointed to not only the existence of evidence that supports its position that there was fraudulent intent, but also the absence of evidence contradicting its position. (Doc. No. 59 at 13). Plaintiff states that "there is no question that [Plaintiff's] claim arose before the transfers were made and the factors demonstrate that there is no factual issue that the Defendants intended to hinder, delay, or defraud [Plaintiff]." (*Id.*). Plaintiff then points to evidence indicating that there is an absence of evidence contradicting its position and evidence supporting its position in addressing the factors.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    16

21    In his deposition, Defendant Matthew Kallberg was asked: "Did you ever intend not to pay [Plaintiff]?" Defendant Matthew Kallberg responded: "No. We had full intention to pay everyone that we owed money to." (Doc. No. 70-2 at 12).

22    It is undisputed that Defendants Keith Kallberg, Kathryn Kallberg, Matthew Kallberg, KEM, and Lisa Kallberg each qualifies as an "insider" (as defined in Tenn. Code Ann. § 66-3-302) for purposes of Tenn. Code Ann. § 66-3-305(b)(1). (Doc. No. 71 at ¶¶ 54-58). Defendants Matthew Kallberg and Kathryn Kallberg are also subsequent transferees for purposes of Tenn. Code Ann. § 66-3-309. (*Id.* at ¶¶ 59, 60). Plaintiff included statements indicating this information in its Undisputed Statement of Facts. (Doc. No. 71). Though a statement of facts is not the usual place to decide that there is no dispute of a legal concept, Defendants also raised no arguments regarding this factor in their Response. Therefore, the Court does not believe that this factor is in dispute.

23    As explained above, there is no magic number of factors that need to cut in a creditor's favor for it to prevail under Tenn. Code Ann. § 66-3-305(a)(1). In the Court's view, there likewise is no magic number of factors as to which a creditor, when moving for summary judgment, must remove any genuine issue as to whether the factor cuts in its favor. This reality ultimately hurts a creditor- movant because the court must construe the evidence, and inferences to be drawn from the evidence, against the summary judgment movant—meaning, in pertinent part, that the Court must, if anything, err on the side of the non-movants with respect to the number of factors as to which there is a genuine issue for trial, recognizing the possibility that the non-movants could prevail under these factors on balance even if they prevail on relatively few individual factors. Given the subjective nature of multi-factor tests, as discussed above, it should come as no surprise that it would generally be difficult for the Court, even if presented with relatively few factual disputes as to the application of the factors, to be able to pronounce as a matter of law that the factors collectively weigh in the creditor's favor.

24    It is unclear whom Plaintiff means in referring to "the third parties."

25    Plaintiff asserts that Defendants do not dispute this factor. (Doc. No. 72 at 3). Though not enumerating, factor by factor, their discussion of the factors, it appears that Defendants intended the arguments referenced in this subsection to relate to the fourth factor.

26    It is unclear whether this letter (Doc. No. 61-10) was intended for Kallberg Tennessee, Kallberg Florida, or both, or neither in particular. For what it is worth, the letter was sent to a Florida address.

27    Defendants do not point to evidence tending to show that they did not abscond, but rather merely assert that there is no evidence that they did so. In certain summary judgment contexts, it is not sufficient for a non-movant merely to deny the existence of evidence supporting the other side; in such contexts, if the movant has come forward with evidence suggesting that certain events occurred, it is incumbent upon the non-movant to point to evidence suggesting the non-existence of those events. Here, however, Plaintiff never pointed to any evidence suggesting any "absconding" as Plaintiffs have defined it, so Defendants never had the obligation to point to evidence tending to refute that absconding occurred; that is, it was not required to disprove something the movant (Plaintiff) did nothing to prove in the first place.

28    Defendants argue that Tenn. Code Ann. § 66-3-305(a)(2) requires insolvency. (Doc. No. 70 at 10). However, the Court disagrees. *See In re Walker*, 566 B.R. 503, 541 (Bankr. E.D. Tenn. 2017) ("Tenn. Code Ann. § 66–3–305(a)(2) contains the same requirement for evidence of an insufficient exchange of value [as does Tenn. Code Ann. § 66-3-306(a)], *but rather than insolvency*, it requires a showing that the debtor '[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction,' or that the debtor '[i]ntended to incur, or

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                 17

believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.' " (emphasis added)).

29 The Court finds that this is sufficient to shift the burden to Defendants for purposes of summary judgment, with respect to Tenn. Code Ann. § 66-3-305(a)(2). Plaintiff has both pointed to evidence to support its position and indicated that it believes that Defendants cannot produce evidence to the contrary. (Doc. No. 59 at 21). Plaintiff states that "[t]he uncontradicted evidence establishes that the transfers were constructively fraudulent because Kallberg Tennessee did not receive any value in exchange for the transfers, the remaining assets were unreasonably small, and Kallberg Tennessee knew that it was incurring debts beyond its ability to pay as they became due." (*Id.*). Plaintiff supports this statement with evidence and also presents evidence that Kallberg Tennessee was incurring debts it could not pay as they became due.

30 As previously noted, equivalent value is a factor to be considered under Tenn. Code Ann. § 66- 3-305(b)(8).

31 Defendant Keith Kallberg answered "yes" to the question "[w]ere those profit distributions from Kallberg Tennessee to you?" But he thereafter gave an answer suggesting that he did not actually view the transfers as being what are appropriately considered mere profit distributions; he testified that the "purpose of the transfers" was for "[r]epayment for time, risk, contractual association, and work..." (Doc. No. 61-2 at 9). The following page of the deposition was not provided to the Court, so the full context of Defendant Keith Kallberg's answer regarding the "purpose of the transfers" is unknown.

32 As previously noted, solvency is a factor to be considered under Tenn. Code Ann. § 66-3- 305(b)(9).

33 The Court also notes that there are genuine disputes of material fact regarding Defendants' accounting practices, indicating that there are additionally still genuine disputes of material fact about the facts underlying the expert opinions. (Doc. No. 70 at 13-14).

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  18

# EXHIBIT 3

2023 WL 2519411
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee,
AT KNOXVILLE.

Stephen FARBER et al.

v.

NUCSAFE, INC. et al.

No. E2022-00428-COA-R3-CV
|
Assigned on Briefs October 3, 2022
|
FILED March 15, 2023

**Appeal from the Chancery Court for Anderson County, No. 21CH3012, M. Nichole Cantrell, Chancellor**

**Attorneys and Law Firms**

Mark E. Brown, Knoxville, Tennessee, for the appellants, Nucsafe, Inc. and Breton Equity Company Corp.

J. Chadwick Hatmaker, C. Gavin Shepherd, Knoxville, Tennessee, for the appellees, Stephen Farber and John Maisel, as Personal Representatives for the Estate of Richard Seymour.

Frank G. Clement, Jr., P.J., M.S., delivered the opinion of the Court, in which Carma Dennis McGee and Kristi M. Davis, JJ., joined.

## OPINION

Frank G. Clement, Jr., P.J.

 **\*1** This is a breach of contract action between a lender, borrower, and guarantor on a promissory note. When the borrower ceased payment on the promissory note and the borrower and guarantor failed to cure the default, the lender commenced this action against the borrower and the guarantor. After extensive discovery, the lender passed away, and the personal representatives of the lender's estate were substituted as the party plaintiffs. The estate filed a motion for summary judgment based on two grounds. The first ground was that in their discovery responses, the defendants admitted that they failed to remit payments as required by the promissory note. Second, the defendants' discovery responses denied that the defendants had any facts or evidence upon which to support the affirmative defenses that the lender violated the doctrine of good faith and fair dealing and/or that the note was unenforceable. The defendants filed a response in opposition to the summary judgment motion, supported by the affidavit of the president of both defendants. Relying on the affidavit, the defendants asserted, for the first time, that neither defendant was ever liable for the debt because the lender had never remitted the loan proceeds to the borrower. The trial court ruled that the bulk of the affidavit was inadmissible on three grounds. First, it found the officer's testimony regarding conversations with the deceased lender inadmissible under the Dead Man's Statute, Tennessee Code Annotated § 24-1-203. Second, it found certain statements were directly contradictory to previous discovery responses, so the court accordingly rejected the evidence under the Cancellation Rule. Third, it found

the business records the affiant referenced in his affidavit but did not produce failed to satisfy the best evidence rule. After considering the statement of undisputed facts, discovery responses, and the defendants' admissions, the trial court concluded that the material facts were undisputed and that the estate was entitled to judgment as a matter of law. Accordingly, it granted the estate's motion and awarded a judgment for the outstanding principal and interest totaling $260,710.00 and $12,445.28 in attorneys' fees and expenses. The defendants appealed. We affirm.

## FACTS AND PROCEDURAL HISTORY

In October 2015, Nucsafe, Inc. ("Nucsafe") and Breton Equity Company Corp. ("Breton Equity") (collectively "Defendants") executed a Modified and Amended Promissory Note ("the Note") in favor of Richard Seymour in the principal amount of $1,748,198.26. Nucsafe was primarily obligated to make payments toward the debt, and Breton Equity was the guarantor. [1]

Paragraph 1 of the Note provided that it would gather interest at a rate of three percent per year and that Nucsafe would make the monthly interest payments in the amount of .25% of the remaining balance each month with the first payment being $4,370.50. Beginning January 1, 2016, Nucsafe became obligated to pay Mr. Seymour $6,000.00 per month. The Note also provided for the award of the cost of collection and all reasonable attorneys' fees in the event of default. Upon execution, Nucsafe began making payments pursuant to the terms of the note.

Defendants and Mr. Seymour subsequently executed four separate addendums or modifications to the Note on February 26, 2016; April 21, 2016; August 3, 2016; and September 2, 2016, respectively. Under the February 2016 modification, the scheduled due dates for monthly payments were changed, and the modification provided that the principal payment amount due each month would be no less than $10,000.00. The other modifications are not germane to the issues on appeal. [2]

Nucsafe made its scheduled monthly payments pursuant to the terms of the Note and all subsequent modifications until July 1, 2020, at which time Nucsafe ceased making any monthly payments. As a result, Mr. Seymour sent a demand letter and notice of default demanding payment of the outstanding balance in August of 2020. When Defendants did not cure the default, Mr. Seymour filed the present action for breach of the Note. At the time Mr. Seymour filed his complaint in March 2021, the outstanding balance on the Note was $117,544.50. In response, Defendants filed a joint answer in which they asserted various affirmative defenses including, inter alia, breach of the implied covenants of good faith and fair-dealing, lack of consideration, and estoppel.

**\*2**  Mr. Seymour passed away on June 11, 2021. Subsequently, the personal representatives of Mr. Seymour's estate, Stephen Farber and John Maisel (collectively "Plaintiffs") were substituted as parties in interest.

On July 9, 2021, Defendants responded to Plaintiffs' interrogatories. In their response, Defendants denied having knowledge of any facts to support the contentions in their Answer to the Complaint that Mr. Seymour breached the implied covenants of good faith and fair dealing or that the Note and subsequent addendums were otherwise unenforceable.

Relying on the discovery responses, Plaintiffs filed a Motion for Summary Judgment arguing that, because it was undisputed that Nucsafe did not make any payments in accordance with the terms of the Note and all subsequent modifications, the estate was entitled to judgment as a matter of law on the breach of contract claim.

Defendants filed a response opposing summary judgment, arguing that material facts were in dispute such that summary judgment was not appropriate. To support this contention, Defendants filed an affidavit by Ted Doukas, the President of Nucsafe and Breton Equity. In his affidavit, Mr. Doukas stated that his review of Nucsafe's business

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works. 2

records revealed that Mr. Seymour had never loaned any money to Nucsafe. To that end, Defendants then also argued fraud in the inducement.

The trial court, however, declined to consider all of Mr. Doukas's affidavit for several reasons and ultimately concluded that Defendants failed to create any genuine issue as to any material fact for the following reasons:

1. The Court is of the opinion that Plaintiffs are entitled to summary judgment. There is no material issue of fact that Defendants executed the Modified and Amended Promissory Note and subsequent addendums/ modifications, Defendants are in default as they have not made any payment pursuant to the Modified and Amended Promissory Note and subsequent addendums/modifications since June 2020, or that Defendants made payments pursuant to the Modified and Amended Promissory Note and subsequent addendums/modifications prior to July 2020.

2. The Court is of the opinion that Tenn. Code Ann. § 24-1-203, commonly known as the Dead Man's Statute, bars Mr. Doukas' Affidavit testimony with regard to any transaction with or statement by Richard Seymour ("Mr. Seymour"). The remaining Affidavit testimony of Mr. Doukas does not create any material issue of fact.

3. The Court is of the opinion that Defendants' purported fraudulent inducement defense has been waived for the failure to plead fraud and/or fraudulent inducement in an answer as required by Tenn. R. Civ. P. 8.03. [3]

4. The Court is of the opinion that Tennessee's cancellation rule precludes consideration of the assertions made by Mr. Doukas in the Affidavit. *See Church v. Perales,* 39 S.W.3d 149, 169–70 (Tenn. Ct. App. 2000) (holding "Tennessee follows the rule that contradictory statements by the same witness regarding a single fact cancel each other out."). On July 9, 2021, Defendants responded to interrogatories denying that they have any facts and evidence upon which they rely in support of the affirmative defenses in their Answer that Mr. Seymour violated the doctrine of good faith and fair dealing and/or that the agreements referenced in Mr. Seymour's Complaint are unenforceable. Because these responses were not supplemented, the cancellation precludes any assertion made by Mr. Doukas to the contrary.

**\*3** 5. The Court is of the opinion that Mr. Doukas' Affidavit testimony that "books and records" of Nucsafe, Inc. show fraudulent actions by Mr. Seymour does not create any material issue of fact as such books and records have not been produced as required by Tennessee's best evidence rule. *See* Tenn. R. Evid. 1001, 1002, and 1003.

7. The Court is of the opinion that Plaintiffs are entitled to a monetary judgment in the amount of $260,710 as of March 2, 2022 pursuant to terms of the Modified and Amended Promissory Note and subsequent addendums/ modifications. Plaintiffs are further entitled to the award of reasonable attorneys' fees pursuant to the terms of the Modified and Amended Promissory Note and subsequent addendums/modifications.

In a subsequent order, the trial court awarded the estate $12,445.28 in attorneys' fees and expenses, resulting in a total judgment of § 273,155.28. [4]

This appeal followed.

## ISSUES

Defendants raise one issue for review, stated as follows:

Whether the Chancery Court for Anderson County erred in granting the Plaintiff's Motion
for Summary Judgment and entering Judgment in favor of the Plaintiffs as there were
disputed issues of material fact precluding Judgment as a matter of law.

## STANDARD OF REVIEW

This court "review[s] a trial court's decision on a motion for summary judgment de novo, without a presumption of
correctness." *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Accordingly,
this court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of
Civil Procedure have been satisfied." *See id.* In so doing, we "must view the evidence in the light most favorable
to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d
692, 695 (Tenn. 2002).

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact
and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "A disputed fact is
material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed."
*Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993). A "genuine issue" exists if "a reasonable jury could legitimately
resolve that fact in favor of one side or the other." *Id.*

"The moving party has the ultimate burden of persuading the court that there are no genuine issues of material fact
and that the moving party is entitled to judgment as a matter of law." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76,
83 (Tenn. 2008). The moving party must support its motion with "a separate concise statement of material facts
as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to
be set forth in a separate, numbered paragraph" and "supported by a specific citation to the record." *Id.*

## ANALYSIS

 **\*4** Defendants argue that the trial court erred by finding that Mr. Doukas's affidavit was inadmissible. First,
they contend that parts of his testimony do not violate the Dead Man's Statute. They likewise contend that had
this testimony been considered, it would have created a dispute of material fact regarding whether Mr. Seymour
ever transferred any money to Nucsafe. More specifically, Defendants insist that the Dead Man's Statute does not
preclude the court from considering facts Mr. Doukas discovered while reviewing Nucsafe's business records.
Second, Defendants also argue that Tennessee's "cancellation rule" does not preclude consideration of the affidavit
because none of the statements contained in the affidavit contradict prior statements made by Mr. Doukas. Third,
while Defendants do not discuss this issue in their brief, Plaintiffs posit that the trial court was correct to exclude
Nucsafe's "books and records" under the best evidence rule because Defendants failed to produce originals of the
books and records to prove its contents. We will consider each argument in turn.

### I. TENNESSEE'S DEAD MAN'S STATUTE

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    4

Evidence presented in opposition to summary judgment must be substantively admissible. *Byrd*, 847 S.W.2d at 215–16 ("To permit an opposition to be based on evidence that would not be admissible at trial would undermine the goal of the summary judgment process to prevent unnecessary trials since inadmissible evidence could not be used to support a jury verdict.").

Tennessee Code Annotated § 24-1-203, commonly known as the Dead Man's Statute, renders certain testimony inadmissible in order to "protect estates from spurious claims and prevent interested parties from giving self-serving testimony regarding conversations or transactions" with a decedent. *Mitchell v. Johnson*, 646 S.W.3d 754, 765 (Tenn. Ct. App. 2021) (citations omitted). The statute provides:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party. If a corporation is a party, this disqualification shall extend to its officers of every grade and its directors.

Tenn. Code Ann. § 24-1-203.

The statute does not, however, render a witness "wholly incompetent" to testify when it is applied. *Holliman v. McGrew*, 343 S.W.3d 68, 73 (Tenn. Ct. App. 2009). Instead, the statute simply limits the subjects that a witness may address. *Id.* For example, the Dead Man's Statute prevents "interested parties from giving self-serving testimony regarding conversations or transactions with the deceased when the testimony involves transactions or statements that would either increase or decrease the deceased's estate." *Mitchell*, 646 S.W.3d at 765 (citing *In re Est. of Marks*, 187 S.W.3d 21, 28 n.2 (Tenn. Ct. App. 2005)). As an exception to Tenn. R. Evid. 601's general rule that every person is presumed competent to be a witness, the Dead Man's Statute "must be strictly construed against the exclusion of testimony and in favor of its admission." *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 230–31 (Tenn. Ct. App. 1976).

Here, the trial court declined to consider the entirety of Mr. Doukas's affidavit. The transcript from the hearing on the motion for summary judgment reveals the trial court's reasoning for excluding Mr. Doukas's testimony. The Court found that "the requirements for the Dead Man's Statute to kick in have been met." Noting that Mr. Doukas was the president of both defendant entities, Nucsafe and Breton Equity, the court ruled that Mr. Doukas

> falls within the statutes encompassing of those persons that would be barred under a corporate entity, as he is the president of both. And the subject matter that is being barred is a transaction with or a statement made by the testator in this case which would have been Richard Seymour. [5]

We respectfully disagree with this reasoning, at least, in part.

**\*5** As noted earlier, the Dead Man's Statute does not preclude testimony regarding *all* conversations and transactions a party had with the decedent. Instead, it prevents "interested parties from giving self-serving testimony regarding conversations or transactions with the deceased *when the testimony involves transactions or statements that would either increase or decrease the deceased's estate.*" *Mitchell*, 646 S.W.3d at 765 (emphasis

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.    5

added). Furthermore, because the Dead Man's Statute must be strictly construed against the exclusion of testimony and in favor of its admission, *see Haynes*, 546 S.W.2d at 230–31, evidence Mr. Doukas obtained from Nucsafe's business records, independent of any transaction or conversation with Mr. Seymour, would not violate the Dead Man's Statute. For this reason, we find that the Dead Man's Statute does not render the entirety of Mr. Doukas's affidavit inadmissible. *See Haynes*, 546 S.W.2d at 230–31. Accordingly, we find the decision to exclude all of Mr. Doukas's testimony based on the Dead Man's Statute was error. Nevertheless, we find the error was harmless because, as we explain below, the trial court acted within its discretion to exclude the bulk of Mr. Doukas's testimony based on the cancellation rule and the best evidence rule.

## II. THE CANCELLATION RULE

Under Tennessee's cancellation rule, "contradictory statements by the same witness regarding a single fact cancel each other out." *Helderman v. Smolin*, 179 S.W.3d 493, 501 (Tenn. Ct. App. 2005) (citations omitted). Thus, once a court determines two statements to be contradictory, both statements are "considered to be 'no evidence' of the fact the party seeks to prove." *Id.* (quoting *Wilson v. Patterson*, 73 S.W.3d 95, 104 (Tenn. Ct. App. 2001)). "The cancellation rule only applies, however, 'when the inconsistency in the witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence.' " *Hill v. Tapia*, No. M2012-00221-COA-R3CV, 2012 WL 6697308, at *5 (Tenn. Ct. App. Dec. 21, 2012) (quoting *Taylor v. Nashville Banner Publ'g Co.*, 573 S.W.2d 476, 483 (Tenn. Ct. App. 1978)).

The trial court's ruling on this issue reads as follows:

4. The Court is of the opinion that Tennessee's cancellation rule precludes consideration of the assertions made by Mr. Doukas in the Affidavit. *See Church v. Perales,* 39 S.W.3d 149, 169–70 (Tenn. Ct. App. 2000) (holding "Tennessee follows the rule that contradictory statements by the same witness regarding a single fact cancel each other out."). On July 9, 2021, Defendants responded to interrogatories denying that they have any facts and evidence upon which they rely in support of the affirmative defenses in their Answer that Mr. Seymour violated the doctrine of good faith and fair dealing and/or that the agreements referenced in Mr. Seymour's Complaint are unenforceable. Because these responses were not supplemented, the cancellation precludes any assertion made by Mr. Doukas to the contrary.

We agree with the trial court that Mr. Doukas's statements regarding the existence of records demonstrating that Mr. Seymour never advanced the loan proceeds to Nucsafe contradict Defendants' discovery responses to Plaintiffs' interrogatories on this subject. In July 2021, Plaintiffs asked Defendants to respond to a series of interrogatories regarding evidence Defendants relied on to support their affirmative defenses. Acting on behalf of Defendants in his capacity as their president, Mr. Doukas responded to the relevant interrogatories as follows:

7. Please describe specifically, completely and in full detail all facts and evidence upon which Defendants rely in support of the affirmative defense in their Answer that Mr. Seymour's Complaint is barred in whole or in part by the equitable doctrines of laches, estoppel and waiver.

RESPONSE: Nucsafe and Breton Equity do not have responsive information at this time as discovery is ongoing. Nucsafe and Breton Equity will supplement as appropriate under the Tennessee Rules of Civil Procedure.

...

9. Please describe specifically, completely and in full detail all facts and evidence upon which Defendants rely in support of the affirmative defense in their Answer that the agreements referenced in Mr. Seymour's Complaint fall for lack of consideration.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   6

**\*6** RESPONSE: Nucsafe and Breton Equity do not have responsive information at this time as discovery is on-going. Nucsafe and Breton Equity will supplement as appropriate under the Tennessee Rules of Civil Procedure.

...

11. Please describe specifically, completely and in full detail all facts and evidence upon which Defendants rely in support of the affirmative defense in their Answer that one or more of the agreements referenced in Mr. Seymour's Complaint was not properly executed and is unenforceable.

RESPONSE: Nucsafe and Breton Equity do not have responsive information at this time as discovery is on-going. Nucsafe and Breton Equity will supplement as appropriate under the Tennessee Rules of Civil Procedure.

...

13. Please describe specifically, completely and in full detail all facts and evidence upon which Defendants rely in support of the affirmative defense in their Answer that Mr. Seymour violated the doctrine of good faith and fair dealing associated with the agreements at issue.

RESPONSE: Nucsafe and Breton Equity do not have responsive information at this time as discovery is on-going. Nucsafe and Breton Equity will supplement as appropriate under the Tennessee Rules of Civil Procedure.

Notably, Defendants never supplemented their interrogatory responses and never informed Plaintiffs of the existence of facts, evidence, or business records that supported such claims. Considering these facts, we agree with the trial court that Defendants' answers to the first set of interrogatories constituted an admission by Defendants that they had no knowledge of any facts, evidence, or business records to support their claims or affirmative defenses.

In his affidavit, Mr. Doukas stated that, sometime around August 2020, he discovered Nucsafe business records showing that Mr. Seymour had never paid Nucsafe the original loan amount. Mr. Doukas stated:

26. Before all of the funds could be distributed, in August 2020, one of Nucsafe's major creditors filed an involuntary Chapter 7 Bankruptcy against Nucsafe.

27. It took months to negotiate a resolution of Nucsafe's Chapter 7 case.

28. Around that period of time, began to look more closely into the books and records of Nucsafe and discuss the finances with those who were employed at the time. It then became apparent that Seymour had lied to us the entire time.

29. Contrary to what he expressly represented to me prior to him being provided with the October 2015 Note, Seymour never loaned Nucsafe the money for which he received the original 'demand note' that was later replaced by the October 2015 Note.

Thus, Mr. Doukas's discovery responses on behalf of Defendants cancel out the evidence Mr. Doukas offered in his affidavit in opposition to Plaintiffs' motion for summary judgment. Nevertheless, Defendants argue on appeal that there is no inconsistency between the interrogatory responses and Mr. Doukas's affidavit because the interrogatory answers only asserted that Defendants "did not have any information at [the] time." While we recognize that the cancellation rule does not apply to inconsistent responses resulting from inadvertence or misunderstanding, *see Hill*, 2012 WL 6697308, at \*6 (citations omitted), it is significant that Mr. Doukas's affidavit asserts he discovered the discrepancy in the time prior to responding to Plaintiffs' first set of interrogatories. Thus, the discovery

responses provided on behalf of Defendants stating that Defendants did not possess the relevant information at the time of the July 2021 interrogatories is in conflict with the statements made by Mr. Doukas in his affidavit.

**\*7** As noted earlier, the cancellation rule only applies "when the inconsistency in the witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence." *Hill v. Tapia*, 2012 WL 6697308, at \*5 (quoting *Taylor v. Nashville Banner Publ'g Co.*, 573 S.W.2d at 483). The testimony offered by Mr. Doukas in his affidavit is not only inconsistent with his prior testimony, it is also unexplained and neither version of his testimony is corroborated by other evidence. Thus, as the trial court concluded, the cancellation rule applies to Mr. Doukas's testimony.

For these reasons, we affirm the trial court's decision to not consider that portion of Mr. Doukas's testimony that conflicts with the discovery responses he provided on behalf of Defendants. [6]

### III. BEST EVIDENCE RULE

The trial court found "that Mr. Doukas' Affidavit testimony that 'books and records' of Nucsafe, Inc. show fraudulent actions by Mr. Seymour does not create any material issue of fact as such books and records have not been produced as required by Tennessee's best evidence rule." We agree.

"To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided[.]" Tenn. R. Evid. 1002. "A duplicate is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original." Tenn. R. Evid. 1003. The original writing is not required, and other evidence of the writing is admissible, if all originals are lost or destroyed; no original can be obtained; if the original is under the control of the party against whom it is offered; or if the writing is not related closely to a controlling issue. *See* Tenn. R. Evid. 1004. The party seeking to prove the contents of a writing generally is required to introduce the original writing or a duplicate. *Integon Indem. Corp. v. Flanagan*, No. 02A01–9812–CH–00382, 1999 WL 492656, at \*4 (Tenn. Ct. App. July 13, 1999) (citing Tenn. R. Evid. 1002, 1003)). "The rule is premised on the theory that 'only the best or most accurate proof of written or similar evidence should be admitted, to the exclusion of inferior sources of the same proof, absent some extraordinary justification for the introduction of secondary evidence.' " *Iloube v. Cain*, 397 S.W.3d 597, 602 (Tenn. Ct. App. 2012) (citations omitted).

A nonmoving party can defeat a summary judgment motion by offering evidence in an inadmissible form, so long as the evidence can be reduced to an admissible form at trial. *Byrd*, 847 S.W.2d at 215–16; *see also Benjamin v. Thomas*, 766 F. App'x 834, 837–38 (11th Cir. 2019) ("Because the accounts in the [nonmoving party's] affidavits are inadmissible [under Fed. R. Evid. 1002 and 1004] and irreducible to admissible form at trial, we may not consider them on summary judgment."). As noted above, the Tennessee Rules of Evidence requires a party seeking to prove the contents of a writing to produce the original under 1002, a duplicate under 1003, or other evidence under 1004, provided one of the exceptions apply.

**\*8** Here, Defendants merely offered Mr. Doukas's affidavit testimony to prove that "books and records" of Nucsafe show fraudulent actions by Mr. Seymour. Significantly, however, no "books and records" or copies of such were produced or attached to Mr. Doukas's affidavit or produced on summary judgment. While Mr. Doukas's affidavit testimony qualifies as "other evidence" under Tenn. R. Evid. 1004, Defendants have not offered any proof that the originals have been lost or destroyed, are not obtainable, are in the possession of the opponent, or are related to collateral matters.

Furthermore, in their July 2021 interrogatories to Defendants, Plaintiffs asked Defendants to:

5. Identify each document or other tangible item of which Defendants have knowledge, whether or not such item is in Defendant's possession, custody, or control, that Defendants believe to be relevant to this lawsuit, including but not limited to any document relied on by Defendants or their attorney in preparing these answers.

Mr. Doukas responded to the interrogatory on behalf of Defendants stating, "See Exhibits attached to Complaint." The only documents attached to Mr. Seymour's Complaint were the 2015 Note and each subsequent addendum or modification. Essentially, Defendants have failed to produce an original, a duplicate, or any proof that one of the exceptions in 1004 apply.

For these reasons, we agree with the trial court that Mr. Doukas's statements regarding the existence of business records demonstrating that Mr. Seymour never paid Nucsafe the original loan amount may not be considered evidence of that fact. Defendants failed to present any evidence that can be reduced to an admissible form at trial. Accordingly, we agree with the trial court's finding that there is no genuine dispute as to material fact, and we affirm the decision to grant Plaintiffs' motion for summary judgment

Having considered that portion of Mr. Doukas's affidavit that is admissible, we agree with the trial court's ruling that

> [t]here is no material issue of fact that Defendants executed the Modified and Amended Promissory Note and subsequent addendums/modifications, Defendants are in default as they have not made any payment pursuant to the Modified and Amended Promissory Note and subsequent addendums/modifications since June 2020, or that Defendants made payments pursuant to the Modified and Amended Promissory Note and subsequent addendums/modifications prior to July 2020.

Accordingly, we affirm the judgment of the trial court in all respects.

## IN CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Nucsafe, Inc., and Breton Equity Company Corp.

**All Citations**

Slip Copy, 2023 WL 2519411

## Footnotes

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    9

1  For a period of years prior to this transaction, Mr. Seymour served as the President and CEO of Nucsafe. At the time of the note's execution, Lester Sideropoulos served as President and signed the 2015 Note on behalf of Nucsafe. Ted Doukas, who was President of Breton Equity, signed the guaranty on its behalf. Mr. Doukas subsequently became President of Nucsafe as well as Brenton Equity.

2  The April 2016 addendum added a new paragraph to the language of the Note which provided that if either Defendant paid Mr. Seymour $1,400,000.00 within 120 days of the execution of the addendum, Mr. Seymour would consider the 2015 Note paid in full. The August 2016 addendum later changed the date for payment of the same $1,400,000.00 lump sum payment to any time on or before February 28, 2017. Finally, the August 2016 addendum changed the same lump sum payment date to on or before August 31, 2017.

3  We acknowledge that Defendants make an abbreviated argument in their appellate brief that the trial court erred by holding that Defendants waived the defense of fraud because they failed to include the defense in their answer as an affirmative defense pursuant to Tennessee Rule of Civil Procedure 8.03. Specifically, they contend that the trial court erred by failing to give Defendants the opportunity to amend their Answer. We note, however, that Defendants did not file a motion to amend their pleadings to assert fraud as an affirmative defense. Accordingly, this issue is waived.

4  In their appeal, Defendants do not challenge the amount of the awards.

5  While Defendants concede on appeal that some statements contained in Mr. Doukas's affidavit may be inadmissible under the Dead Man's Statute, they argue that information Mr. Doukas obtained while reviewing Nucsafe's business records is not subject to the Dead Man's Statute.

6  We also note that the trial court had another basis on which to exclude this evidence. Because Defendants failed to supplement their discovery responses on the very subject Mr. Doukas offered in his affidavit, the trial court had discretion to disregard or exclude Mr. Doukas's affidavit testimony. *See Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 133 (Tenn. 2004) ("Excluding a witness's testimony may be an appropriate sanction for failure to supplement answers to interrogatories."); *see also Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn. 1998); *Ammons v. Bonilla*, 886 S.W.2d 239, 243 (Tenn. Ct. App. 1994); *Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981) (stating that trial courts have wide discretion to determine appropriate sanctions for abuse of the discovery process). However, neither party raised this issue; accordingly, we shall not consider it. *See State v. Bristol*, 654 S.W.3d 917, 927 (Tenn. 2022).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

2022 WL 331276

United States District Court, M.D.
Tennessee, Nashville Division.

Patricio JARA, Plaintiff,

v.

TENNESSEE STATE UNIVERSITY, Defendant.

No. 3:20-cv-00131
|
Filed 02/03/2022

**Attorneys and Law Firms**

Robert Charles Bigelow, Bigelow Legal, PC, Nashville, TN,
for Plaintiff.

E. Ashley Carter, John W. Dalton, Tennessee Attorney
General's Office, Nashville, TN, for Defendant.

## MEMORANDUM OPINION

ELI RICHARDSON, UNITED STATES DISTRICT JUDGE

*1 Pending before the Court is Defendant's motion for
summary judgment (Doc. No. 26, "Motion"). Plaintiff
responded to the Motion. (Doc. No. 31). Defendant replied.
(Doc. No. 33). The Motion is ripe for review.

For the reasons discussed herein, the Motion will be granted
in part and denied in part.

## FACTUAL BACKGROUND [1]

Plaintiff is a native of Chile and an American citizen. (Doc.
No. 31-9 at ¶ 1). He is a tenured professor at Tennessee
State University ("Defendant" or "TSU") and has worked
there for approximately one decade. (*Id.* at ¶¶ 1-2). Plaintiff
was awarded academic tenure in 2015 and was promoted
to Associate Professor in the Department of Physics and
Mathematics. (*Id.* at ¶ 3). Plaintiff received multiple salary
increases while working for Defendant from 2016 to 2019.
(*Id.* at ¶ 4).

Plaintiff applied to be the Department Chair of Physics
and Mathematics in April 2017, and his application was
denied. (Doc. No. 31 at 5). Plaintiff was not selected

as one of the three finalists for the position. (Doc.
No. 32 at ¶¶ 3, 5). The Job Announcement stated
under the headings "Minimum Qualifications/Experience"
and "Required Education—Experience—Skills (Minimum
Qualifications)":

> The successful candidate must have
> an earned doctorate (or the foreign
> equivalent or its equivalent in
> training, ability, and/or experience) in
> Mathematics or a closely related field
> and have sufficient experience and
> achievement to qualify for the rank
> of Professor. The successful candidate
> will have a record of scholarship
> and research that includes peer-
> reviewed publications and securing
> external funding. The candidate
> should provide evidence of effective
> leadership experience, exceptional
> communication and interpersonal
> skills, and an ability to work
> productively with faculty and students
> from diverse backgrounds.

*2 (Doc. No. 29-16 at 3).

The individual who received the job, Dr. McMurray, is an
African American individual. (Doc. No. 31-9 at ¶ 36). On his
curriculum vitae ("CV"), Dr. McMurray did not indicate ever
having received any grants even though a record of securing
external funding was a requirement for the position. (Doc. No.
31 at 5; Doc. No. 31-9 at ¶ 21). Dr. McMurray [2] testified at his
deposition that this was an oversight on his resume and that
he did receive a three or four-thousand dollar grant sometime
around 2003. (Doc. No. 31-9 at ¶ 21). Additionally, another
finalist for the position was an African American who had
a degree in agriculture, instead of mathematics or a related
field. (Doc. No. 32 at ¶ 5).

Dr. McMurray had previously served as an Associate
Director, Department Head, and Department Chair at other
higher education institutions. (Doc. No. 31-9 at ¶ 32).
Defendant's decision to hire Dr. McMurray was based in
part on his previous experience as a Department Chair, as
well as other leadership and administrative roles. (*Id.* at ¶

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 1

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

37). Plaintiff had never served as a Department Chair or Department Head. (*Id.* at ¶ 9).

Plaintiff complains not only of the decision to not promote him, but also of various incidents that occurred during his employment. In October 2017, a dean employed by Defendant asked some professors to take an "Oral English Proficiency" test which asked about the professors' country of origin, native language/dialect, and the length of time having lived in the United States. (*Id.* at ¶ 6; Doc. No. 32 at ¶ 6). All faculty in the College of Life and Physical Sciences were asked to participate in this exam. (Doc. No. 31-9 at ¶ 34). No penalty or adverse action was taken towards the faculty who did not participate. [3] (*Id.* at ¶ 35). Also in 2017, [4] Plaintiff was harassed about how he signed his timesheets, and his pay was withheld. (*Id.* at ¶ 7; Doc. No. 32 at ¶ 1).

In 2017 and 2018, Plaintiff filed multiple complaints with Defendant's Equal Employment Opportunity Office ("EEO Office") and with Defendant's superiors and administrators. (*Id.* at ¶ 7). After lodging these complaints, Plaintiff was subjected to various actions:

- Plaintiff was the only professor in his department no longer allowed to teach upper-level courses;

 **\*3** • Plaintiff was removed from the department's curriculum committee;

- Plaintiff was given other committee assignments;

- Plaintiff was not provided with a standard letter of support from a supervisor to help him receive a grant;

- Plaintiff was openly called names such as "incompetent" and "a disgrace" in emails to the faculty; [5]

- Plaintiff was falsely accused of giving students answers to final exams in advance;

- Plaintiff was screamed at, intimidated, and threatened; [6]

- An instructor was sent to sit in on Plaintiff's classes for a semester, and Plaintiff was given an evaluation by the instructor;

- Plaintiff was told that there were student complaints about him but was not given access to these complaints.

(Doc. No. 32 at ¶ 8). [7] Plaintiff believed his work environment was so hostile that he purchased a body camera in 2018 to record instances of harassment. (*Id.* at ¶ 9).

After filing these formal complaints with the EEO Office in 2017 and 2018, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") (as opposed to the EEO Office on TSU's campus) which was received by the EEOC on November 5, 2018. (Doc. No. 31-9 at ¶ 33; Doc. No. 29-2 at 2). The charge referenced various instances of discrimination due to national origin, including: failure to promote, the Oral English Proficiency exam, his signature on time sheets (and the subsequent withholding of his paycheck), class scheduling and hours, and how others spoke to him. (Doc. No. 29-2 at 2). Plaintiff also referenced his previous complaints to the EEO Office, noting that he had made three written complaints to Human Resources, complaints to the Vice President of Academic Affairs, and an email to the President of the University. (*Id.*). On the charge, Plaintiff checked the boxes for "national origin" discrimination and for "continuing action" (instead of a precise date the events occurred). (*Id.*).

 **\*4** In Plaintiff's Concise Statement of Additional Material Facts (Doc. No. 31-10), Plaintiff asserted facts indicating that, in general, non-American born professors are treated worse than American-born professors. In particular, citing his own affidavit filed in opposition to the Motion (Doc. No. 31-4), Plaintiff asserted that American professors in the department of math and physics are assigned to teach significantly fewer classes and class hours than non-American born professors, allowing them more time to have leadership positions and apply for grants. (Doc. No. 31-10 at ¶ 10). Again, citing his affidavit, Plaintiff also asserted that it was undisputed that non-American born professors are not given important leadership or committee positions. (*Id.* at ¶ 11). In response, Defendant admitted only that "Plaintiff so states,", *i.e.*, that Plaintiff claims in his affidavit these things to be true. (Doc. No. 32 at ¶¶ 10-11). But as discussed in a footnote above, by failing to dispute the truth of what Plaintiff states, Defendant is deemed to have admitted the truth of what Plaintiff states and not merely that (as is obvious in any event) Plaintiff states what he states. Defendant also stated in response: "Plaintiff admitted at deposition that he did not know where all the professors in his department were born." (Doc. No. 32 at ¶¶ 10–11). In pointing out this admission, Defendant did *not* deny the facts asserted by Plaintiff; it could be true both that (as conceivably Plaintiff's counsel's investigation could

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    2

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

have revealed or conceivably Plaintiff could have intuited based on the knowledge of where *most* professors were born) American-born professors were given better treatment *and* that Plaintiff did not *personally* know, as to *all* professors (every single professor) whether they were American-born or not. So the facts asserted by Plaintiff are, as noted, deemed admitted. This may seem a harsh result for Defendant, but the ultimate impact of this result is mitigated somewhat by the precise nature of the facts deemed admitted by Defendant; they do not include anything about *why* American professors were treated better.

In the Complaint, Plaintiff brings four counts, which the Court will discuss in some detail below. (Doc. No. 1).

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]' " *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

A party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

**\*5** On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at \*5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

### DISCUSSION

The Court will first discuss what claims Plaintiff brings in his Complaint. The Court will then discuss evidentiary issues raised by Defendant in its Reply. Next, the Court will discuss Defendant's arguments regarding timeliness. Finally, the Court will discuss in turn each count that Defendant has addressed.

A. **Plaintiff's claims**

**Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)**

2022 Fair Empl.Prac.Cas. (BNA) 37,428

### 1. *Differences between race, national origin, and color claims*

As will be discussed, at different points in his Complaint, Plaintiff makes references to his color, national origin/ethnicity, and race. These are three separate and distinct types of claims under the relevant statutes. A plaintiff must (assuming the burden has shifted to it as the non-movant) show sufficient direct or indirect evidence specific as to each type of claim in order to survive summary judgment. *Burrage v. FedEx Freight, Inc.*, No. 4:10CV2755, 2012 WL 1068794, at \*6 (N.D. Ohio Mar. 29, 2012) ("[I]t does not follow that comments supporting one type of discrimination can provide the sole support for a claim for a separate and distinct form of discrimination.").

"[R]ace and national origin are ideologically distinct under Title VII." *Id.* at \*7 (quoting *Kun v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 949 F. Supp. 13, 19 (D.D.C. 1996)). Instead of one's racial identity, "[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Id.* "The legislative history [of Title VII] enunciates precisely that a person's national origin has nothing to do with color, religion, or race." *Id.* (quoting *Roach v. Dresser Indus. Valve & Instrument Div.*, 494 F. Supp. 215, 216 (W.D. La. 1990)). [8] Notably, "Section 1981 prohibits discrimination on the basis of race but not discrimination on the basis of national origin." *Kostic v. United Parcel Serv., Inc.*, No. 3:18-CV-00556, 2021 WL 1213409, at \*3 (M.D. Tenn. Mar. 31, 2021) (Richardson, J.) (citing *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 613 (1987) and *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) ("The Supreme Court has held in *Saint Francis College* that only claims of racial, as opposed to national origin, discrimination are cognizable under § 1981.")).

\*6 Courts are clear that a color discrimination claim is separate from a race or national origin discrimination claim. "[C]olor discrimination is distinct from race discrimination in that the former 'arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American individual.' " *Moore v. Food Lion*, No. 306-0712, 2007 WL 596955, at \*2 (M.D. Tenn. Feb. 21, 2007) (quoting *Bryan v. Bell Atlantic Maryland, Inc.*, 298 F.3d 124, 133 n. 5 (4th Cir. 2002)); *see also Payne v. Lucite Int'l*, No. 13-2948-STA-TMP, 2014 WL 2826343, at \*3 (W.D. Tenn. June 23, 2014). As one court explained, the EEOC Compliance Manual indicates that:

> Title VII prohibits employment discrimination because of "color" as a basis separately listed in the statute. The statute does not define "color." The courts and the Commission read "color" to have its commonly understood meaning—pigmentation, complexion, or skin shade or tone. Thus, color discrimination occurs when a person is discriminated against based on the lightness, darkness, or other color characteristic of the person. Even though race and color clearly overlap, they are not synonymous. Thus, color discrimination can occur between persons of different races or ethnicities, or between persons of the same race or ethnicity.

*Cooper v. Jackson-Madison Cty. Gen. Hosp. Dist.*, 742 F. Supp. 2d 941, 950–51 (W.D. Tenn. 2010) (quoting from and discussing the EEOC's guidance).

### 2. *Plaintiff's counts*

The Court needs next to determine what claims Plaintiff pleads in his Complaint, because the Complaint itself and the parties' briefing are at times unclear on this.

#### a. <u>Count I</u>

Count I of the Complaint asserts a claim for discrimination (what the Court will call "general discrimination," *i.e., one or more* discrete acts of discrimination, to distinguish it from "hostile work environment," a different kind of discrimination) [9] and a claim for hostile work environment under Title VII, citing only Plaintiff's national origin. Though Plaintiff specifically references a hostile work environment claim (which, as noted, appears to be based on national origin), [10] Defendant does not address this claim in its

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

brief, other than merely to mention that the claim was brought. (Doc. No. 27 at 2). Therefore, Defendant has not shifted the burden to Plaintiff on any element [11] of a hostile work environment claim, and the Court will deny summary judgment to Defendant on this claim.

### b. Count II

**\*7** Count II asserts a claim for retaliation under Title VII, alleging retaliation in response to Plaintiff's complaints about his "national origin, race and color" (though, as noted, the discrimination claim mentions only Plaintiff's national origin). (Doc. No. 1 at ¶ 59). As this Court previously has explained:

> Title VII prohibits retaliation by an employer against an employee who has either: (1) "opposed any practice made an unlawful employment practice by this subchapter," or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). These two provisions are referred to as the "opposition" clause and the "participation" clause, respectively.

> Azbell v. Wilkie, No. 3:15-CV-00983, 2019 WL 4887199, at \*2 (M.D. Tenn. Oct. 3, 2019). An employee is said to have engaged in "protected conduct" (or "protected activity") if he or she engaged in the conduct (the "oppos[ition]") reflected in the opposition clause or engaged in the conduct (the "participat[ion]") reflected in the participation clause.

In the Complaint, Plaintiff calls his claim one for "retaliation" and indicates that he is bringing his claim based on an adverse action. (Id. at ¶ 60). In briefing, Plaintiff makes arguments regarding alleged adverse actions including a "retaliatory hostile work environment." (Doc. No. 31 at 13-14). The Sixth Circuit has found that "a retaliatory hostile work environment claim [is] a variety of retaliation." Khamati v. Sec'y of Dep't of the Treasury, 557 F. App'x 434, 443 (6th Cir. 2014). The Sixth Circuit has also explained that a prima facie case of retaliation can be established by a showing, inter alia, "retaliatory harassment"—which the Court believes is synonymous with "retaliatory hostile work environment"—or, alternatively, an adverse employment action. See Morris v. Oldham Cty. Fiscal Ct., 201 F.3d 784, 792 (6th Cir. 2000) ("[To establish a prima facie case of retaliation under Title VII a] plaintiff must now prove that: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was

known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.") (emphasis omitted). In other words, as the third element suggests, a hostile work environment (or harassment) can be a form of (or at least a valid substitute for) an adverse employment action. [12] Therefore, the Court will consider Plaintiff's retaliation claim to include one of "retaliatory hostile work environment" (or "retaliatory harassment"). The Court will discuss Count II in the section discussing the applicable limitations periods.

### c. Count III

Invoking Title VI of the Civil Rights Act of 1964, [13] Count III asserts both a claim for a "hostile and discriminatory educational environment" based on Plaintiff's "national origin, race, and/or color," and a claim for "retaliat[ion] against Plaintiff for lodging complaints with" Defendant. (Id. at ¶ 63, 64). In briefing regarding his Title VI claims in Count III, Plaintiff relies primarily on incorporating his arguments regarding his Title VI claims in Count II. (Doc. No. 31 at 16). He thus both (i) indicates that his Title VI retaliation claim, like his Title VII retaliation claim, is based on both a retaliatory hostile work environment and general retaliation; and (ii) omits any discussion of requirements of Title VI (which concerns discrimination in federally-funded programs, including those administered by Defendant) and the requirements of Title VI (which concerns discrimination in employment by most kinds of employers, including Defendant). [14]

**\*8** As noted above, Defendant does not address the alleged existence of a hostile work environment, [15] but Defendant does address whether the Title VI claims are timely. The Court will discuss the timeliness of such claims below.

### d. Count IV

Count IV asserts a claim under 42 U.S.C. § 1981. The heading for this claim cites solely "race discrimination," but then, in explaining his claim Plaintiff alleges that the discrimination was "due to his national origin, race and/or ethic [sic] characteristics." (Id. at ¶ 67). In so doing, Plaintiff

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

goes astray; as discussed above, the characteristics of national origin and ethnicity are not cognizable bases for a claim under § 1981. Therefore, the Court will grant summary judgment to Defendant on this claim to the extent it is based on his national origin and ethnicity. To the extent that the § 1981 claim is based on Plaintiff's race, the Court will discuss this claim below.

### B. **Evidentiary issues**

In its Reply, Defendant argues that Plaintiff's evidence is insufficient to create a genuine dispute of material fact. [16] Defendant seems to be making (while also unfortunately conflating) two separate arguments: 1) that Plaintiff's own testimony is not enough (without other support) to create a genuine dispute of material fact on certain topics, and 2) that Plaintiff's testimony comprises of speculation and opinions that are not sufficient to show a genuine dispute of material fact. (Doc. No. 33).

Regarding the first argument, the undersigned has previously commented on a similar situation in an employment discrimination case at the summary judgment stage, explaining that:

Some district courts have indicated that the presentation of only self-serving statements by a plaintiff is insufficient to survive summary judgment. *E.g.*, *Gooden v. Ryan's Rest. Grp., Inc.*, No. 5:04CV179R, 2007 WL 855326, at *7 n.5 (W.D. Ky. Mar. 14, 2007) (noting, but not basing its ruling on, case law in other circuits that a plaintiff in a Title VII case cannot solely rely on self-serving testimony, and stating "[u]nder summary judgment, the Court merely decides, as a matter of law, whether a jury could reasonably conclude that the evidence presented is credible"); *Young v. United Parcel Serv., Inc.*, 992 F. Supp. 2d 817, 830 (M.D. Tenn. 2014) ("As an initial matter, [Plaintiff's] self-serving testimony is the only evidence that Simmons made such a statement. Such self-serving and conclusory allegations are insufficient to overcome a motion for summary judgment."); *Morris v. Mary Rutan Hosp.*, No. 2:18-CV-543, 2020 WL 5943022, at *7 (S.D. Ohio Oct. 7, 2020) ("Plaintiff's self-serving testimony is the only evidence he offers to suggest that he was unfairly treated because of his age; he offers no statements from others that suggest that his age was a factor in the decision to impose additional requirements on him. Such self-serving and conclusory allegations are insufficient to overcome a motion for summary judgment.").

**\*9** Despite this line of cases, the Sixth Circuit recently stated:

That evidence, we note, consists wholly of self-serving statements. Sometimes, evidence of that nature might not be sufficient to survive summary judgment. For instance, where self-serving testimony is blatantly and demonstrably false, it understandably may not create a genuine issue of material fact, thereby allowing a court to grant summary judgment. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007) (holding that a court, when determining whether there is a genuine dispute of material fact in a case, may ignore testimonial evidence when it is "blatantly contradicted" by video evidence); *see also* *CenTra, Inc. v. Estrin*, 538 F.3d 402, 419 (6th Cir. 2008) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989) (assuming as true on summary judgment the nonmoving party's version of events unless that version is "totally implausible")). But nothing in the record leads us to the conclusion that Davis's claim that Gallagher planted the drugs is demonstrably false or totally implausible. Although perhaps not as strong as some other evidence might be, self-serving statements can create a genuine dispute of material fact to be resolved at trial. That appears to be the case here.

*Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020); *see also* *Robinson v. Brege*, No. 1:20-CV-449, 2021 WL 1092638, at *2 (W.D. Mich. Mar. 5, 2021), *report and recommendation adopted*, No. 1:20-CV-449, 2021 WL 1091551 (W.D. Mich. Mar. 22, 2021) (rejecting argument that plaintiff's evidence should not be considered and noting that "labeling a party's testimony self-serving, absent, for example, prior contradictory deposition testimony, is an argument without traction, as testimony by a party is inherently self-serving" (relying on *Davis*)); *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 455 (6th Cir. 2004) (considering plaintiff's testimony, which was the only evidence, regarding the use of the "n-word").

Defendant has also not argued that Plaintiffs' testimony is not credible. This Court has previously found in a similar factual context that "[Defendant] maintains that [Plaintiff] has presented 'no evidence' other than 'self-serving testimony' to support his pretext argument. The court disagrees, particularly where the same could be said of the defendants' evidence, which largely consists of self-serving testimony by the supervisors whom [Plaintiff] now

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

accuses of misconduct. [The Court will view] the facts in the light most favorable to [Plaintiff] and resolving factual disputes in his favor[.]" *Foreman v. Five Star Food Serv., Inc.*, 950 F. Supp. 2d 958, 976 (M.D. Tenn. 2013), *order vacated in part on other grounds on reconsideration*, No. 3:11-CV-01124, 2013 WL 5675899 (M.D. Tenn. Oct. 18, 2013) (vacating part of previous ruling upon presentation of new evidence by movant); *see also Pendleton*, 2016 WL 2927983, at *10 (rejecting Defendant's argument that plaintiff's unsubstantiated statement should not be considered on summary judgment) (discussing *Johnson*) ...

**\*10** That is to say, "[on motion for] summary judgment, the Court merely decides, as a matter of law, whether a jury could reasonably conclude that the evidence presented is credible." *Gooden*, 2007 WL 855326, at *7. In so doing, the Court keeps in mind that even unsupported and self-serving statements can be credible under certain circumstances, although "[t]he Court views self-serving testimony opposing a motion for summary judgment with scrutiny when it is unsupported by additional evidence." *Johnson v. Buddy's Bar-B-Q, Inc.*, No. 1:13-CV-254, 2015 WL 1954454, at *5 (E.D. Tenn. Apr. 29, 2015).

*Jordan v. Mathews Nissan, Inc.*, No. 3:18-CV-01233, 2021 WL 1967562, at *20 n.40 (M.D. Tenn. May 17, 2021) (Richardson, J.). Defendant here similarly has not attacked Plaintiff's credibility, and instead merely argues that the Court should not consider (alleged) facts that are supported only by Plaintiff's testimony. Based on the recent Sixth Circuit precedent discussed above, the Court finds that it should consider such testimony, though it may apply some additional scrutiny to the statements when they are entirely unsupported by other evidence in the record. [17]

Regarding the second argument, which Defendant conflates with the first argument, the Court agrees that in seeking to meet its burden, a plaintiff cannot rely purely on mere personal belief, conjecture, and speculation, because these are insufficient to support an inference of discrimination. *Wingo v. Michigan Bell Tel. Co.*, No. 16-CV-12209, 2019 WL 78898, at *9 (E.D. Mich. Jan. 2, 2019), *aff'd*, 815 F. App'x 43 (6th Cir. 2020) ("Plaintiff testified that his knowledge of other employees' discipline was based on undocumented, non-specific conversations and/or his personal belief that individuals were not disciplined or less harshly disciplined in circumstances otherwise comparable to his own. This 'evidence' is insufficient to preclude summary judgment." (internal citation omitted)); *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 827 (E.D. Mich.

2009) ("The record contains nothing more than [Plaintiff's] conclusion that white employees were treated differently than her, with no basis to assess the propriety of the alleged comparators. This evidence is insufficient."); *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996) (stating that affidavits indicating that the plaintiff did a better job than another individual were "bald assertions and conclusory statements [that] fail to provide any factual support for [plaintiff's] claim of sexist, ageist, or politically retaliatory animus."); *Simms v. Maxim Healthcare Servs., Inc.*, No. 11-1052, 2013 WL 435293, at *7 (W.D. Tenn. Feb. 4, 2013) ("The vague statements proffered by Plaintiff fall short of providing the Court with sufficient evidence to permit a finding that [the other employee] was similarly situated."). Therefore, the Court will not consider—let alone find sufficient for purposes of creating a genuine dispute of material fact—statements of Plaintiff that reflect mere personal belief or speculation. [18]

**\*11** In sum, on the instant Motion, the Court finds that it can consider, and ascribe appropriate weight to, unsupported statements made by Plaintiff, but it will not consider Plaintiff's statements that are speculative or mere statements of personal belief.

## C. **Timeliness of Title VII claims (Counts I and II)** [19]

Defendant argues that Plaintiff's Title VII claims, which are brought in Counts I and II, are time-barred. [20] (Doc. No. 27 at 6–7). Plaintiff asserts that all of the Title VII claims are timely, were "continuous," or are subject to equitable tolling. (Doc. No. 31 at 9).

Title VII requires an employee to file a charge with the EEOC within either 180 days or 300 days of an allegedly unlawful employment practice, depending on the law of the applicable state and whether that state is a "deferral state." [21] 42 U.S.C. § 2000e-5(e)(1); *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 407 (6th Cir. 1999). "The United States Supreme Court has held that these time periods operate, essentially, as a form of [limitations period]." *Whitehead v. Grand Home Furnishings, Inc.*, No. 2:19-CV-00040-DCLC, 2020 WL 1237423, at *4 (E.D. Tenn. Mar. 13, 2020) (citing *Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 122 (2002)). Tennessee is a deferral state, and so the 300-day limitations period, instead of the 180-day limitations period, applies if a plaintiff who has filed with the EEOC filed first or contemporaneously with the Tennessee Human Rights Commission ("THRC"). *Equal Employment Opportunity Comm'n v. Dolgencorp, LLC*, 196 F. Supp. 3d

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

783, 799 (E.D. Tenn. 2016), *aff'd*, 899 F.3d 428 (6th Cir. 2018).

**\*12** Here, Plaintiff filed a Charge of Discrimination with the EEOC which was received by the EEOC on November 5, 2018. (Doc. No. 31-9 at ¶ 33; Doc. No. 29-2 at 2). The record shows at Doc. No. 29-2 at 2 that Plaintiff filed contemporaneously with the THRC. Thus, in order for the complaint with the EEOC to have been timely filed, the allegedly unlawful employment practice at issue must have occurred no more than 300 days prior to Plaintiff's EEOC filing—meaning, here, on or after January 9, 2018. [22]

As discussed above, Title VII allows for two different types of claims: (1) those alleging discrete discriminatory or retaliatory acts (comprised of "discrete acts" such as "termination, failure to promote, denial of transfer, or refusal to hire"); and (2) those alleging a hostile work environment (which are "composed of a series of separate acts that collectively constitute one 'unlawful employment practice' "). *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–115 (2002). For the former type of claim, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act" and "[t]he charge, therefore, must be filed within the 180–or 300–day time period after the discrete discriminatory act occurred." *Id.* at 113. For the latter, however, the plaintiff must file his EEOC charge within 180 or 300 days of "an act contributing to the [hostile work environment] claim"; provided that the plaintiff does so, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117. Therefore, while Plaintiff here has alleged that he suffered from numerous discriminatory and retaliatory acts during the time that he was employed by Defendant, only incidents that took place within the timely filing period (i.e., on or after January 9, 2018) are actionable. "All prior discrete discriminatory acts are untimely filed and no longer actionable." *Id.* at 103.

Here, Defendant does not appear to argue that Plaintiff's Title VII hostile work environment claim is time-barred, and the Court will not grant summary judgment to Defendant on this claim on the basis of untimeliness (and likewise will forgo any analysis on this point). Instead, Defendant's argument regarding the timeliness of Plaintiff's Title VII claims focuses on whether any alleged discrete adverse employment events took place prior to January 9, 2018. Rather than specifying the date(s) or periods of time during which these events occurred, however, Defendant (unhelpfully) argues that "any

alleged claims of discrimination actions occurring prior to January 9, 2018" are time-barred. (Doc. No. 27 at 7). While this statement is true, it is unhelpful in that it does not indicate *which* events Defendant contends occurred prior to January 9, 2018. Plaintiff's filing with the EEOC also does not indicate particular dates on which the alleged incidents of discrimination or retaliation occurred. (Doc. No. 29-2 at 2). Plaintiff's Response is equally unhelpful; in the Response, Plaintiff simply states that all of his claims are "timely" (without identifying any relevant dates) and that "the discrimination and retaliation was and is continuous." (Doc. No. 31 at 9). [23]

**\*13** Plaintiff alleges a host of allegedly unlawful employment practices, with the first occurring in April 2017 when Plaintiff's application for Department Chair was denied. (Doc. No. 31 at 5). The next event occurred in October 2017, when the dean requested that faculty members participate in the OEP screening program. (Doc. No. 31-9 at 11). These two events clearly occurred before January 9, 2018, and therefore claims based on them are outside the limitations period. The other events mentioned in the EEOC charge (Plaintiff being questioned about his signature, having his paycheck withheld, being given non-preferred class schedules, and receiving an 8-hour schedule instead of a 7.5-hour schedule) are not as easily attributable to a clear date certain. (Doc. No. 29-2 at 2).

The Court thus undertakes its own analysis of the record to determine which of the aforementioned events occurred prior to January 9, 2018 and therefore are no longer actionable. [24]

### 1. *Defendant questioning Plaintiff's signature*

The record is clear that the issue related to the signature on Plaintiff's timesheets arose in 2017, but (as discussed above) the record is unclear regarding when the issue stopped. Plaintiff indicated in response to Defendant's Statement of Facts that instances of being questioned about his signature extended "beyond 2017" but that he could not remember when the issues stopped. (Doc. No. 31-9 at ¶ 7). Plaintiff claims that the "record" shows that this issue persisted beyond 2017 (*id.*), but cites only his own affidavit (Doc. No. 31-4 at ¶ 3) as evidence of such. (*Id.*). Plaintiff also asserts in his Statement of Facts that "issues with regard to [his] timesheets lasted beyond 2017." (Doc. No. 32 at ¶ 2). In response, Defendant admits only that "Plaintiff so states," *i.e.*, that Plaintiff claims in his affidavit these things to be true. (*Id.*). But again, as discussed above, by failing to dispute the truth

of what Plaintiff states, Defendant is deemed to have admitted the truth of what Plaintiff states and not merely that Plaintiff states what he states.

But that gets Plaintiff only so far. The record contains no evidence beyond Plaintiff's own vague contention that the issue extended "beyond 2017." The time period January 1–8, 2018 is "beyond 2017," and so the Court will not find that Plaintiff has shown that a jury could find that this issue continued to occur after January 9, 2018. [25] It was incumbent here for Plaintiff to point to evidence sufficient to make this showing. And if all Plaintiff has is his own amorphous statement that the incident occurred "beyond 2017," it is sheer speculation that it occurred beyond January 8, 2018; Plaintiff simply needed to introduce more specific evidence to demonstrate what he needed to show here. Thus, a claim based on the discrete discriminatory act of Plaintiff being questioned about the signature on his timesheets is outside the limitations period and thus presumptively time-barred.

### 2. *Defendant withholding Plaintiff's paychecks*

Plaintiff's response to Defendant's statement that "Dr. Jara does not recall any incidents after 2017 as to ... getting paid promptly" suggests that Plaintiff does not recall whether the issue regarding his paychecks being withheld persisted after 2017. (Doc. No. 31-9 at ¶ 7). Plaintiff responds: "Denied. Jara testified that he 'didn't recall' and the record shows issues with his timesheets beyond 2017. See Jara Affidavit at ¶3." (*Id.*). Plaintiff's response, in reality, is not really a denial of Defendant's statement. Instead, Plaintiff's response indicates that he does not know whether any of his paychecks were withheld subsequent to 2017. Because the record shows only that Dr. Jara does not recall whether his paychecks were withheld after 2017, the Court cannot accept as true that Dr. Jara has pointed to evidence sufficient for a jury to find that paycheck withholding continued to occur after January 9, 2018 (which, as a reminder, is the relevant date for measuring whether claims related to these events are time-barred). Thus, a claim based on the discrete discriminatory act of withholding Plaintiff's paychecks is outside the limitations period and thus presumptively time-barred.

### 3. *Plaintiff receiving non-preferred class schedules*

**\*14** Plaintiff states in the EEOC charge that "[he] was given class schedules that were the very opposite of [his]

submitted preferences," (Doc. No. 29-2 at 2), but does not indicate when he received these non-preferred class schedules (nor does Plaintiff indicate what exactly these preferences were). Plaintiff's Response to Defendant's Statement of Facts does make reference to Plaintiff's desire to teach upper-level classes and other issues related to class preferences, but does not mention any dates or time periods during which Plaintiff received a class schedule that did not align with his preferences. (*See, e.g.*, Doc. No. 31-9 at ¶¶ 11, 16, 19, 27, 29). Defendant's Response to Plaintiff's Statement of Facts does not mention preferred class schedules at all. (Doc. No. 32). The Court is left with little or no information in the record (or references in the parties' briefing) regarding the timing of Plaintiff receiving non-preferred class schedules. Ultimately, the Court need not even address the timeliness of this claim because Plaintiff does not make any allegations in the Complaint whatsoever regarding being given class schedules that did not match his submitted preferences. Thus, Plaintiff receiving non-preferred class schedules (and any arguments contained in the parties' briefing referencing such claims) will be disregarded when considering the extent to which Plaintiff has Title VII claims that survive the Motion. [26]

### 4. *Plaintiff receiving an 8-hour schedule instead of a 7.5-hour schedule*

This particular event (Plaintiff being given an 8-hour schedule while "others" received a 7.5-hour schedule) is not mentioned Plaintiff's Response to Defendant's Statement of Facts or Defendant's Response to Plaintiff's Statement of Facts. While there are references made to foreign-born professors being assigned more course hours than non-foreign born professors, the Court cannot construe this event alleged in the EEOC charge to invoke a difference in assigned hours between foreign-born professors and non-foreign born professors. Ultimately, the Court need not even address the timeliness of this claim because Plaintiff does not make any allegations in the Complaint whatsoever regarding being given an 8-hour schedule while unspecified "others" were given a 7.5-hour schedule. Thus, Plaintiff receiving an 8-hour class schedule (and any arguments contained in the parties' briefing referencing such claims) will be disregarded when considering the extent to which Plaintiff has Title VII claims that survive the Motion. [27]

### D. **Equitable tolling of Title VII claims (Counts I and II)** [28]

**Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)**

2022 Fair Empl.Prac.Cas. (BNA) 37,428

"It is well established that 'filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but [rather] a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.' " *Truitt v. Cty. of Wayne*, 148 F.3d 644, 646 (6th Cir. 1998) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). *See also Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843 (2019) (holding that Title VII's charge-filing precondition to suit requiring that charge be filed with the EEOC within specified period was not a "jurisdictional" requirement, but rather a claim-processing rule that was subject to forfeiture by a party who waits too long to invoke the rule). The equitable tolling doctrine is read into every federal statute. *E.E.O.C. v. Kentucky St. Police Dep't*, 80 F.3d 1086, 1095 (6th Cir. 1996). It is the plaintiff's burden to demonstrate why he or she is entitled to equitable tolling. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004). "Equitable tolling 'should be granted only sparingly' and typically when an opposing party has 'engaged in ... misrepresentations or other wrongdoing ....' " *Brittmon v. Upreach, LLC*, 285 F. Supp. 3d 1033, 1046 (S.D. Ohio 2018) (quoting *Amini v. Oberlin College*, 259 F.3d 493, 500 (6th Cir. 2001) (citations omitted)).

**\*15** The Sixth Circuit has identified five factors a court should consider when determining whether equitable tolling should be applied:

> 1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice to the defendant; and 5) the plaintiff's reasonableness [in] remaining ignorant of the particular legal requirement. *See Andrews v. Orr*, 851 F.2d 146, 151 (6th Cir. 1988). The propriety of equitable tolling must necessarily be determined on a case-by-case basis. *See Jarrett*, 22 F.3d at 260 (citation omitted).

*Truitt*, 148 F.3d at 648. [29] "[T]he five factors considered in deciding whether to equitably toll a limitations period are not comprehensive, nor is each of the five factors relevant in all cases." *Amini v. Oberlin Coll.*, 259 F.3d 493, 500 (6th Cir. 2001). As the undersigned specifically noted years ago, the

correct outcome of this kind of ambiguous and discretionary test for equitable tolling tends not to be cut-and-dried on the front end. Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1017–19 (1997). Presented with the task of applying this test, the Court cannot claim the ability to pronounce an outcome that is indisputably correct; instead, it must simply call it like it sees it.

Plaintiff argues that if any of his Title VII claims are found to be untimely, equitable tolling should apply. (Doc. No. 31 at 9). [30] Plaintiff states in his deposition that Defendant made it clear that an employee having a complaint of discrimination should go to Defendant's EEO Office and that this is "the same as going to the EEOC outside the University." (Doc. No. 31 at 10) (citing Doc. No. 29-1 at 80–81)). Defendant does not respond to this allegation in its Motion or Reply; the Court will thus accept this fact as true for purposes of ruling on this Motion. Plaintiff submitted complaints to the EEO Office at TSU on February 15, 2017, March 1, 2017, and April 18, 2017. (Doc. No. 31 at 10). Plaintiff thereafter filed his EEOC charge on November 5, 2018 alleging failure to promote, issues with the signature on his timesheets, the English proficiency screening program, scheduling and hours, and being "talked down to and belittled." (Doc. No. 31-9 at ¶ 33; Doc. No. 29-2 at 2). Because of this, Plaintiff argues that he lacked any notice of a filing requirement, that he was "extremely diligent in pursuing his rights," that Defendant was aware of his complaints, and that he could reasonably rely on Defendant's representation that his filing with the EEO office was the same as filing with the EEOC. (Doc. No. 31 at 10). Based on the factual record, these arguments are convincing. It is undisputed that Plaintiff filed these multiple complaints with Defendant's EEO Office, and additionally lodged complaints with "superiors, administers and HR" of the university in 2017 and 2018. (Doc. No. 32 at 2). And while neither party's Statement of Facts mentions either party's position as to whether Defendant affirmatively misled Plaintiff regarding the EEOC filing requirement, Defendant's silence in response to Plaintiff's contention that "[h]e was informed by the University that filing a complaint within the state university was the equivalent of filing a complaint with the EEOC" is telling. (Doc. No. 31 at 10).

**\*16** These circumstances indicate that factors one, two, three, and five weigh in Plaintiff's favor in this case, as Plaintiff did not know of the requirement to file with the EEOC (as opposed to Defendant's EEO Office) and was diligent in pursuing his rights through the EEO Office. Defendant makes no argument in its Reply regarding whether

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

equitable tolling applies to this case, and Defendant makes no argument that the factors should not weigh in favor of equitable tolling in this case. In particular, Defendant makes no argument regarding factor four, absence of prejudice to the defendant. While Plaintiff likewise provides no argument regarding this factor, the Court independently finds nothing in the record that suggests any particular prejudice to Defendant.

With all five of the factors enumerated in *Truitt v. County of Wayne* weighing in Plaintiff's favor here, the Court finds that the principles of equitable tolling should apply to Plaintiff's Title VII claims for discrimination and hostile work environment due to national origin (Count I). In particular, because the Court accepts as true for purposes of resolving this Motion that Defendant actively misled Plaintiff regarding the sufficiency of filing a claim with Defendant's EEO Office, the Court tolls the time elapsed between Plaintiff filing his complaints with the EEO Office and making his filing with the EEOC. Thus, the delay in time between the alleged adverse employment actions and Plaintiff's filing with the EEOC on November 5, 2018 is excused, and the Court will treat Plaintiff's EEOC filing as falling within the 300-day window required by 42 U.S.C. § 2000e-5(e)(1). Thus, Plaintiff's Title VII claims based on the four discrete acts identified in Section C. above as being outside the limitations period (*i.e.*, Plaintiff being denied the Department Chair position, the OEP Screening, the questioning of Plaintiff's signature on his timesheets, and the withholding of Plaintiff's paychecks) are not subject to summary judgment based on limitations.

### E. **Timeliness of Title VI claims**

As discussed above, Plaintiff's Title VI claims appear to be based both on general retaliation (including, but not limited to, alleged discrimination in the form of the above-referenced failure to promote) and on the above-referenced alleged retaliatory hostile work environment. [31] Defendant argues that Plaintiff's Title VI claims are time-barred. Defendant states:

> Plaintiff's lawsuit was filed in 2020 complaining of a failure to promote that occurred in 2017. (Docket No. 1, page 6, para. 65.) Plaintiff's Title VI claim should be dismissed. In the alternative, Defendant would submit that Plaintiff's Title VI claim should be limited strictly to allegations within

> one year prior to the filing date of Plaintiff's lawsuit, which was February 13, 2020. (Docket No. 1.)

(Doc. No. 27 at 12). Defendant thus argues only that the failure-to-promote aspect of Plaintiff's general retaliation claim is untimely, and does not at all address the timeliness of Plaintiff's retaliatory hostile work environment claim (or any other allegations which fall under the category of "general retaliation"). [32] In response, Plaintiff does not address whether his Title VI claims are *timely*, and instead he addresses only Defendant's arguments regarding the *merits* of his Title VI claims. (Doc. No. 31 at 16). The Court thus views Defendant's limitations-based argument for summary judgment on Plaintiff's Title VI claims to apply only to the discrete act of Defendant failing to promote Plaintiff to the Department Chair position.

**\*17** The applicable limitations period for Title VI is the state's (Tennessee's) personal injury limitations period, which is one year. *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996); *Simmons v. Middle Tennessee State Univ.*, 117 F.3d 1421 (6th Cir. 1997). Plaintiff filed this case on February 13, 2020. (Doc. No. 1). Plaintiff's application for Department Chair was denied in April 2017. (Doc. No. 31 at 5).

Thus, Plaintiff brought his Title VI claim alleging retaliation in the form of a failure to promote after the expiration of the limitations period. As indicated above, Plaintiff states (conclusorily and very generally) that his claims were timely filed but makes no specific argument in support of such assertion; he likewise does not argue that the doctrine of equitable tolling applies to his Title VI claims. [33]

**\*18** Therefore, the Court will grant summary judgment to Defendant on Plaintiff's Title VI claim for general retaliation in the form of a failure to promote because the claim is time-barred, as it falls outside of the relevant limitations period. In other words, Plaintiff's Title VI claims will survive Defendant's Motion, with the exception of Plaintiff's Title VI failure-to-promote general retaliation claim.

### F. **Administrative exhaustion (Count II: Title VII retaliation)**

Defendant argues that the Court should find that Plaintiff is barred from pursuing his Title VII retaliation claim because

it was not included in his original Charge of Discrimination filed with the EEOC (which alleged only discrimination based on national origin). (Doc. No. 27 at 9).

To explain why this retaliation claim should survive the present Motion, Plaintiff does nothing beyond citing *Azbell*. But *Azbell* is irrelevant to the discussion at hand, as it addressed what activities are protected under Title VII, not the circumstances under which a plaintiff could be excused from meeting requirements related to exhausting administrative remedies. *See* 2019 WL 4887199, at *3.

The Sixth Circuit has explained Title VII's exhaustion requirement as follows:

> As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge. See 42 U.S.C. § 2000e–5(f)(1); *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). This rule serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion. *See id.* at 44, 94 S.Ct. 1011. Hence, allowing a Title VII action to encompass claims outside the reach of the EEOC charges would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role. At the same time, because aggrieved employees—and not attorneys—usually file charges with the EEOC, their pro se complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge. *See Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006). As a result, "whe[n] facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir.1998).

*Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361–62 (6th Cir. 2010). Here, Plaintiff failed to claim retaliation in his EEOC filing. Plaintiff makes no argument that his retaliation claim is "reasonably related to" or "grow[s] out of the factual allegations in the EEOC charge." *Id.* Even if the Court undertakes this line of argument itself, it still finds (even viewing Plaintiff's EEOC filing "liberally") that Plaintiff's failure to meet the administrative exhaustion requirement requires granting summary judgment on Plaintiff's retaliation claims. Plaintiff failed to check the box on the EEOC form

evincing an intent to charge retaliation (which is a relevant, though not dispositive consideration, *see e.g. Schaneville v. Publix Super Markets, Inc.*, No. 3:20-CV-01038, 2021 WL 5054106, at *5 (M.D. Tenn. Nov. 1, 2021); *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 (6th Cir. 2016)), and there is nothing in the narrative portion of the EEOC form which could be construed as a claim of retaliation. No language on the EEOC form would put the EEOC or Defendant on notice that Plaintiff was alleging retaliation. *See id.* at 363 (finding that the plaintiff failed to exhaust his administrative remedies on a Title VII retaliation claim where plaintiff failed to check off the retaliation box on the EEOC form, the form's narrative summary included "nothing ... that could be interpreted as claiming retaliation," and the EEOC charge would not have put the EEOC or the employer on notice of a retaliation claim).

**\*19** Therefore, the Court will grant summary judgment to Defendant on Plaintiff's retaliation claim under Title VII (Count II) as he has failed to exhaust his administrative remedies as to that claim. *See e.g.*, *Jones v. City of Franklin*, 309 F. App'x 938, 944 (6th Cir. 2009).

### G. **Title VII (Count I: national origin discrimination)** [34]

Defendant asserts that Plaintiff cannot establish a *prima facie* case of national origin discrimination under Title VII because 1) there was no adverse employment action, and 2) Defendant did not treat Plaintiff differently than similarly-situated employees. (Doc. No. 27 at 8). [35]

Title VII of the Civil Rights Act makes it illegal for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). [36]

To survive a defendant's motion for summary judgment on a Title VII claim for disparate treatment, [37] a plaintiff may seek to raise a genuine issue of material fact by offering either direct evidence of discrimination or indirect (*i.e.*, circumstantial) evidence of discrimination in accordance with the familiar so-called *McDonnell Douglas* burden-shifting framework.

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

1. *Indirect evidence (McDonnell Douglas)*

**\*20** The Sixth Circuit has summarized the applicability and workings of the *McDonnell Douglas* burden shifting framework as follows:

A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence.... Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted).

Therefore, if only indirect (and no direct) evidence is present, the plaintiff bears the burden under *McDonnell Douglas* of first showing its *prima facie* case of discrimination, *i.e.*, that:

> 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class.

*Hughes v. Gen. Motors Corp.*, 212 F. App'x 497, 502 (6th Cir. 2007) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir.2000)). [38]

If and when the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show some legitimate, non-discriminatory explanation for its action(s). *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

The Supreme Court has prudently cautioned, given the confusion sometimes discernible in this context, that "[t]he nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). As the Sixth Circuit recently explained:

**\*21** Establishing a prima facie case is not difficult, and it creates a "presumption that the employer unlawfully discriminated against the employee." *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 169 (6th Cir. 1996) (quoting [*Burdine*, 450 U.S. at 254]). This presumption does not shift the burden of proof, but only the burden of producing some evidence of permissible motive. *See Burdine*, 450 U.S. at 256 n.8, 101 S. Ct. 1089.

*Harris v. City of Akron, Ohio*, 836 F. App'x 415, 419 (6th Cir. 2020).

Thus, as to the existence of legitimate and non-discriminatory reasons for its action(s), the defendant bears only the burden of production and not the burden of persuasion. *Garren v. CVS Rx Servs., Inc.*, 482 F. Supp. 3d 705, 717 (E.D. Tenn. 2020) (citing *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003)). [39] To meet that burden of mere production, "the defendant need not *persuade* the court that it was actually motivated by the proffered reason[s]." *Burdine*, 450 U.S. at 254 (emphasis added). Rather, "[i]t is sufficient if the defendant's evidence *raises a genuine issue of fact* as to whether it discriminated against the plaintiff." *Id.* (emphasis added). [40] To raise such genuine issue, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection[, which] must be legally sufficient to justify a judgment for the defendant." *Id.* at 255. "The defendant only has to present [evidence of] 'clear and reasonably specific' reasons that will 'frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.' " *Harris*, 836 F. App'x at 419 (quoting *Burdine*, 450 U.S. at 258). [41]

**\*22** If the defendant carries its burden to show a legitimate nondiscriminatory reason, then finally the burden shifts back to the plaintiff to show that the reason offered by the defendant

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    13

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802-04 (1973); *Burdine*, 450 U.S. at 255. This resulting burden is one of persuasion, and this burden of persuasion (as to pretext) at this stage "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256. In other words, once the burden has shifted back to the plaintiff, the plaintiff must show by a preponderance of the evidence [42] each of two components of pretext: that the defendant's reasons (i) were not its true reasons and (ii) were instead actually a pretext for discrimination. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020). To defeat a summary judgment motion in such circumstances, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

An employee can show pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "Whichever method the plaintiff employs, he always bears the burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.' " *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir.2003)).

"The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?' " *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [or failed to rehire] her.' " *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400). The plaintiff "must meet this evidentiary burden by a preponderance of the evidence." *Id.* (citation omitted). If the plaintiff can do so, he meets his burden of showing that the employer's stated reason for the allegedly discriminatory reason was not its true reason.

But something more is required of the plaintiff. That is, the plaintiff must address the second component of pretext, *i.e.*, that the actual reason was discriminatory. That is, as indicated above, "[t]o demonstrate pretext, a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." [43] *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), [44] and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)). [45] In other words, if the burden has shifted back to the plaintiff, the plaintiff's trial burden would be to show by a preponderance of the evidence that the defendant's reasons were not its true reasons and were instead actually a pretext for retaliation. *Kirilenko-Ison*, 974 F.3d at 661. "To avoid summary judgment, then, the [plaintiff] must present evidence from which a reasonable jury could find that poor performance was not the real reason that [the defendant] terminated [the plaintiff], and that unlawful retaliation in fact was." *Ford Motor Co.*, 782 F.3d at 767. In some cases, the evidence that the defendant's proffered reason was not the proffered reason will serve equally as evidence that the real reason was discriminatory, and vice versa. After all, evidence may suggest that the defendant's proffered (non-discriminatory) reason was not the real reason precisely because it suggests that the real reason was discriminatory; likewise, evidence may suggest that the defendant's proffered (non-discriminatory) reason was discriminatory precisely because it suggests that (suspiciously) the proffered reason was not the real reason. But under Sixth Circuit law, the Court must be mindful to require evidence of both kinds, even if it turns out to all be the same evidence.

**\*23** It is worth summarizing in some detail how all of these (variously shifting and conditional) requirements apply in the *summary judgment context* in particular, once the above-referenced principles of summary judgment are applied to the unique framework of indirect-evidence cases under *McDonnell Douglas*. As one court put it, addressing Title VII claims of discrimination, "[a] defendant's summary judgment motion slightly modifies the order of these [*McDonnell Douglas*] showings" because these showings are stated in terms of the trial context (where the plaintiff bears the initial and ultimate burden of proof) but the defendant-movant (consistent with the discussion above) bears the initial burden under Rule 56. *Sherman v. Fountain Valley Police Dep't*, No. SACV172217JVSDFMX, 2019 WL 4238873, at \*7 (C.D. Cal. Apr. 2, 2019) (internal quotation marks omitted).

The Sixth Circuit has spoken very helpfully on this topic:

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

[When a] discrimination plaintiff bases his case on indirect evidence (i.e., evidence requiring inferences to reach the conclusion that the defendant discriminated against the plaintiff), we apply the burden-shifting framework first set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–05, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *Rowan*, 360 F.3d at 547; *Town v. Mich. Bell Tel. Co.*, 455 Mich. 688, 568 N.W.2d 64, 67–68 (1997). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir.2000) (applying the *McDonnell Douglas* framework to a sex-discrimination claim). Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir.1996) (applying the *McDonnell Douglas* framework to a disability-discrimination claim). The defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. *Id.* Although the burdens of production shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981).

*Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179 (2009). [46]

In the Court's view, what the summary judgment analysis boils down to, stated as concisely as possible (which, alas, is not particularly concisely), is set forth in the following paragraph.

**\*24** To obtain summary judgment on Title VII or THRA claims grounded exclusively on the so-called "indirect-evidence" theory, the defendant must either (i) show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of that element); *or*, failing that, (ii) (a) make an evidentiary showing [47] that there

was a legitimate, nondiscriminatory reason for its alleged actions and then (b) show that there is no genuine issue of material fact as to pretext (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of pretext). On the other hand, the plaintiff will avoid summary judgment if : (i) either (a) the defendant fails to meet its initial burden to show the lack of a genuine issue of material fact as to any or more elements of the plaintiff's indirect-evidence *prima facie* case, *or* (b) the plaintiff presents sufficient evidence to demonstrate a genuine issue of material fact as to any element(s) of such *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; and (ii) either (a) the defendant cannot make an evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or, if the defendant can make such a showing, (b) the plaintiff demonstrates that there is a genuine issue of material fact as to pretext. [48]

As an alternative to indirect evidence, a plaintiff may seek to establish its case via direct evidence. "[D]irect evidence is evidence which, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor.' " *Bartlik v. U.S. Dep't of Labor*, 73 F.3d 100, 103 n.5 (6th Cir. 1996) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995)). The Court concludes that a defendant-movant does not bear the burden of showing preliminarily the absence of direct evidence, [49] and Plaintiff does not suggest that there is direct evidence of discrimination in this case. Therefore, the Court will focus its discussion on indirect evidence.

## 2. *Element three: adverse employment action*

Plaintiff alleges three adverse employment actions: 1) Defendant "[gave Plaintiff] and other similarly situated individuals significantly more credit hours to teach in comparison to professors in his department who were born in America"; 2) Defendant "[gave Plaintiff] and other similarly situated individuals less pay in comparison to professors in his department who were born in America"; and 3) "Plaintiff was not even interviewed for his Department Chair position despite having significantly better qualifications than other individuals who applied and the African-American professor who received the position." (Doc. No. 1 at 5). [50]

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    15

**Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)**

2022 Fair Empl.Prac.Cas. (BNA) 37,428

### a. Failure to promote

"For purposes of Title VII, a failure to promote is an adverse employment action." *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999) (*citing Hale v. Cuyahoga County Welfare Dep't*, 891 F.2d 604, 606 (6th Cir.1989)). Defendant does not appear to dispute that a failure to promote, if properly alleged, constitutes an adverse employment action.

**\*25** "In order to establish a prima facie claim of [ ] discrimination based on a failure to promote, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions." *Id.* Defendant argues that Plaintiff has failed to establish the second and fourth elements.

### i. Qualified for a promotion (element two of *prima facie* indirect-evidence case based on failure to promote)

Defendant argues that Plaintiff was not qualified for the promotion, because he had no previous experience as a Department Chair or experience in an administrative position. (Doc. No. 27 at 9). Plaintiff argues that a genuine issue of material fact exists regarding whether he was qualified for the position of Department Chair. Plaintiff asserts that contrary to Defendant's suggestion, previous experience as a Department Chair or in an administrative position was not required, so Plaintiff's lack of such experience would not render him unqualified. (Doc. No. 31 at 12). Plaintiff also argues that the candidate who ultimately was hired did not (unlike Plaintiff) have any grants on his resume and thus was unqualified for the position just as Defendant claims Plaintiff was. (*Id.* at 12).

The Sixth Circuit has explained what is required for a plaintiff to satisfy the qualifications element of the *prima facie* test:

> At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc) (noting that "courts traditionally treat explanations that rely heavily on subjective considerations with caution," and that "an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination");

> *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991) (holding that a plaintiff can show that she is qualified by presenting "credible evidence that she continued to possess the objective qualifications she held when she was hired") (emphasis added). The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575–76 (6th Cir. 2003); *see also George v. Youngstown State Univ.*, 966 F.3d 446, 464 (6th Cir. 2020). The Sixth Circuit has explained that the relevant employer can help identify what these qualifications are:

> [A]s the one who creates the position in question, the employer largely enjoys the right to decide the qualifications it prefers in one who holds the position and, it follows, whether an applicant lacks the necessary knowledge or experience. *See Wexler*, 317 F.3d at 575; *Alexander*, 576 F.3d at 563–64; *see, e.g., Romano v. Hudson City Sch. Dist.*, 772 F. App'x 258, 265 (6th Cir. 2019) (holding that the plaintiff failed to establish a prima facie case because she lacked a required credential for the job); *Brown v. City of Cleveland*, 294 F. App'x 226, 231–32 (6th Cir. 2008) (same). And given an employer's superior knowledge of its workplace and industry, the employer's stated job requirements will typically be the objective criteria by which we measure a fail-to-hire claim. *See George*, 966 F.3d at 464–65 (quoting *Wexler*, 317 F.3d at 576) (acknowledging that "the specific qualifications will vary depending on the job in question" and plaintiff must demonstrate "possession of the required general skills"); *Alexander*, 576 F.3d at 564 (holding that a job description amounts to evidence of the minimum job qualifications). Who, after all, better understands the relevant field and the corresponding skills necessary to succeed than the employer? Not a federal court, one reason why we do not "substitute [our] judgment for that of management" when it comes to business decisions like setting necessary job qualifications. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) ("[I]t is inappropriate for the judiciary to substitute its judgment for that of

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

management." (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000))).

**\*26** *Flowers v. WestRock Servs., Inc.*, 979 F.3d 1127, 1131–32 (6th Cir. 2020). Additionally, the Sixth Circuit has indicated that if a defendant does not uniformly apply its criteria for a position, the "disparate application of the criteria implies that [the defendant] could have relaxed intentionally its requirement" for certain applications, meaning that a plaintiff has shown a genuine dispute of material fact as to whether they are qualified. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009); *see also Grice v. Jackson-Madison Cty. Gen. Hosp. Dist.*, 981 F. Supp. 2d 719, 734 (W.D. Tenn. 2013), *aff'd sub nom. Grice v. Jackson-Madison Cty. Gen. Hosp.*, 570 F. App'x 539 (6th Cir. 2014).

As noted in the Factual Background section, the Job Announcement stated under the headings "Minimum Qualifications/Experience" and "Required Education—Experience—Skill Minimum Qualification":

> The successful candidate must have earned a doctorate (or the foreign equivalent or its equivalent in training, ability, and/or experience) in Mathematics or a closely related field and have sufficient experience and achievement to qualify for the rank of Professor. The successful candidate will have a record of scholarship and research that includes peer-reviewed publications and securing external funding. The candidate should provide evidence of effective leadership experience, exceptional communication and interpersonal skills, and an ability to work productively with faculty and students from diverse backgrounds.

(Doc. No. 29-16 at 3). In this description, there is no reference to the (alleged) qualifications that Defendant relies on in its briefing, namely that a candidate have previous experience as a Department Chair or in an administrative position. (Doc. No. 27 at 9). The Job Announcement instead contains a much more general requirement that a successful candidate have "evidence of effective leadership experience." And

Defendant cites the Court to no evidence outside of the Job Announcement for the proposition that what it asserts was a qualification for the position.[51] Defendant thus has failed to show that there is no genuine issue of material fact as to this element of the Plaintiff's indirect-evidence *prima facie* case; it never made the preliminary showing of such as necessary to shift the burden to Plaintiff on this issue.

Even if Defendant had shifted the burden, Plaintiff would have satisfied it. Plaintiff has shown that the requirements in the Job Announcement were not applied consistently to all candidates. A professor at the school testified in his deposition that the minimum qualifications for the Department Chair position included having a doctorate (or equivalent) in mathematics or a closely related field and a record of securing external funding, commenting that he was "not sure how we could have overlooked the fact that [Dr. McMurray] did not have any—had not received any funding." (Doc. No. 31-6 at 6). Additionally, an individual who works in the mathematics department (and served multiple times as an interim department chair) indicated that another finalist for the position had a degree in agricultural sciences, which made him unqualified for the position, and that she was "shocked" that an individual with such background was included as a finalist. (Doc. No. 31-7 at 10-11). Therefore, the Court finds that Plaintiff has pointed to a genuine dispute of material fact regarding whether he was qualified for the position. Plaintiff has shown not only that he met the qualifications listed in the employer's Job Announcement, but also that the requirements were not applied consistently to all candidates.

**\*27** Therefore, the Court finds that Plaintiff has shown a genuine dispute of material fact regarding whether he was qualified for the position.

> ii. Similarly situated non-protected class members received promotion (element four of indirect evidence *prima facie* case for failure to promote)[52]

Defendant argues that Plaintiff cannot show the fourth element of the indirect-evidence *prima facie* case, because an African American individual (an individual who is also in a protected class) received the position. (Doc. No. 27 at 9).

In so arguing, Defendant has entirely misstated the requirement of element four of the *prima facie* case. Plaintiff need only show that someone with similar qualifications and *outside of his protected class* got the promotion, and

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

not also that the person who got the promotion was not in any protected class. *See Brown v. Oakland Cty.*, No. 14-CV-13159, 2015 WL 5215840, at *7 (E.D. Mich. Sept. 4, 2015) (explaining that a Latino individual could point to an African American individual as "a member of a different protected class"); *see also Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) ("[T]o satisfy the fourth prong, Plaintiff must show that the City treated differently similarly situated employees of a different race."); *Tippie v. Tennessee Dep't of Revenue*, No. 10-2702-STA-DKV, 2012 WL 1900656, at *8 (W.D. Tenn. May 24, 2012) ("Plaintiff has failed to make out the fourth element of her prima facie case: she has not shown that any individuals of another race or gender were treated differently."). As an African American individual, the person who received the promotion was in *a* protected class (African American individuals), but one different from the protected class Plaintiff was in (Chilean individuals). Thus, not only are the protected classes of Plaintiff and the African American individual different, but even the *kinds* of protected classes Defendant has referred to here (race and national origin) are different.

Therefore, the Court finds that Defendant has failed to meet its initial burden of showing an absence of evidence that Plaintiff was replaced by an individual outside of his protected class.

Defendant makes no other challenge to Plaintiff's indirect-evidence *prima facie* case. It thus has failed to prevail at the first stage of the *McDonnell Douglas* analysis. Defendant has not asserted a legitimate, nondiscriminatory reason for not promoting Plaintiff and thus cannot prevail at later stages of the *McDonnell Douglas* analysis. Defendant has failed to show that there is no genuine issue of material fact as to Plaintiff's claim for national-origin discrimination under Title VII; thus, this claim survives the Motion.

## H. **Title VI**

In support of its Motion, Defendant argues, "Given the material facts, Plaintiff fails to establish a prima facie case against Defendant for a Title VI claim of race, national origin and/or color discrimination." (Doc. No. 27 at 12). However, regarding Plaintiff's Title VI claim, Defendant argues only that Plaintiff failed to establish an indirect-evidence *prima facie* case based on a failure to promote. Plaintiff's Title VI failure-to-promote claim, as discussed above, is time-barred. But (also as discussed above) Plaintiff also brings *other* Title VI claims, as to which Defendant sets forth no argument on the merits. Thus, the Court will deny summary judgment to

Defendant on Plaintiff's Title VI claims other than the Title VI failure-to-promote claim

## I. **§ 1981 (race)** [53]

**\*28** The Sixth Circuit has explained that:

In order to establish a claim for racial discrimination under section 1981, a plaintiff must plead and prove that (1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a). *See Christian*, 252 F.3d at 871–72. As the district court observed, the "intent" element of the claim can be established either by direct evidence or inferentially. *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir.1985) (explaining that the direct and circumstantial means of proof are two "different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent"). When a claimant seeks to prove intentional discrimination inferentially in a section 1981 case, federal courts follow the burden-shifting framework that the Supreme Court has prescribed for analogous civil rights cases described in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S. Ct. 2363, 105 L.Ed.2d 132 (1989), *overruled on other grounds by* Pub. L. 102–166, § 101 (noting that "this scheme of proof, structured as a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination ... should apply to claims of racial discrimination under § 1981") (internal quotes and citation omitted); *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (holding that "[t]he elements of [a] prima facie case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981") (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n. 5 (6th Cir. 2000)).

*Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006).

Typically, courts conduct their analyses of a § 1981 claim and a Title VII claim concurrently, as they are analyzed under the same framework. *Aldridge v. City of Memphis*, No. 05-2966-STA-DKV, 2008 WL 2999557, at *3 (W.D. Tenn. July 31, 2008), *aff'd*, 404 F. App'x 29 (6th Cir. 2010); *Frazier*

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

*v. Phillip's Masonry Grp., Inc.*, No. 1:09-0022, 2010 WL 1882123, at \*6 (M.D. Tenn. May 11, 2010); *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram, Inc.*, No. 3:14 C 02325, 2016 WL 2927983, at \*\*3, 8, 10 (M.D. Tenn. May 19, 2016). However, the Court here provides its analysis of the § 1981 claim separately from the above Title VII analysis both because the parties have briefed it separately and because the only § 1981 claim is based on race, and the only remaining Title VII claim is based on national origin.

Defendant argues that Plaintiff cannot prevail on his § 1981 claim because (according to Defendant) in his deposition Plaintiff merely provided his subjective belief that Defendant was motivated to discriminate against him (on the basis of race) because he was the only Hispanic in the department, which (again according to Defendant) is not enough to show Defendant's intent to discriminate against Plaintiff. (Doc. No. 27 at 13). Defendant has a point. When asked about why Defendant would be motivated to discriminate against him, Plaintiff responded that it was based on "[his] belief, because [he is] the only Hispanic professor in the department; perhaps the only one in the college." (Doc. No. 31-5 at 13). But the fact that Plaintiff (according to him) *stands alone* in this racial class does not count for more than a scintilla of evidence of intent to discriminate against him *because he was in* that racial class, and because this testimony tends to suggest that Plaintiff lacks any *other* evidence (or facts) suggesting that Defendant had discriminatory intent. Plaintiff's testimony here tends to show preliminarily that he lacks adequate evidence of Defendant's intent to discriminate against him based on race. [54] This reality is only enhanced by Plaintiff's response (found at Doc. No. 31-9 at ¶ 10) to Defendant's assertion in its Statement of Undisputed Facts that Plaintiff "believes that [Defendant] is motivated to discriminate against him because he is the only Hispanic in the department, although [Plaintiff] does not know why that would motivate [Defendant] to discriminate against him." This response suggests that Plaintiff lacks any competent evidence to raise a genuine issue of material fact as to whether Defendant was animose against Plaintiff based on his race. [55]

**\*29** Therefore, the Court finds that Defendant has shifted the burden to Plaintiff to show sufficient evidence that Defendant intended to discriminate against him on the basis of race.

As indicated above, to make this showing, Plaintiff can either present direct evidence of discriminatory intent, establish an indirect-evidence case under *McDonnell Douglas*, or both.

Plaintiff's entire response regarding the § 1981 claim was as follows:

> Defendant argues that Plaintiff's allegations of discrimination and retaliation are completely subjective and that [Defendant] TSU would not have hired [Plaintiff] or promoted him if it had intended to discriminate against him. Defendant then argues that [Plaintiff's] claim is based on "mere conjecture or speculation." However, a significant number of facts support this belief (see Complaint and Jara Affidavit) that the hostile work environment and retaliation he suffered from for years is a result of two things: 1) his Chilean national origin and not being born in the United Sates, and 2) lodging numerous complaints about being discriminated and retaliated against. Notably, nearly all of the issues in his complaint arose *after* he received a new Department Chair and *after* he lodged multiple complaints about being discriminated and retaliated against. This, as well as the aforementioned facts, are sufficient to create significant issues of material fact with regards to intent. As such, his Section § 1981 Claims should remain.

(Doc. No. 31 at 16-17). Plaintiff does not mention or reference his race claim under § 1981. And he certainly does not indicate any instances, or evidence, of race discrimination. Thus, the Court finds that he has failed to meet his resulting burden to show a genuine issue as to the existence of Defendant's intent to discriminate against him on the basis of *race*. Alternatively, the Court finds that he has abandoned his race claim under § 1981. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). Accordingly, Defendant is entitled to summary judgment on Plaintiff's § 1981 claim, not only to the extent it is based (improperly) on his national origin and ethnicity, but also to

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

the extent that it is based (as any cognizable § 1981 claim must be) on his race.

## CONCLUSION

Therefore, for the reasons discussed herein, the Court will grant in part and deny in part the Motion. Specifically, the Court will:

(a) grant the Motion as to Count II and Count IV;

(b) grant the Motion in part and deny the Motion in part as to Count III; [56]

(c) deny the Motion as to Count I.

An appropriate order will be entered.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 331276, 2022 Fair Empl.Prac.Cas. (BNA) 37,428

## Footnotes

1   Unless otherwise noted, the facts in this section are (a) taken from facts in Plaintiff's Response to Defendant's Statements of Undisputed Material Facts (Doc. No. 31-9) and Defendant's Response to Plaintiff's Concise Statement of Additional Material Facts (Doc. No. 32); and are (b) undisputed. The facts set forth herein are either undisputed or specifically identified as disputed. Additionally, the Court relies on some facts in this Opinion as laid out in Plaintiff's briefing. Defendant has not contested any of these facts, and, from the record, they do not appear to be in dispute. Therefore, when relevant, the Court has included these facts.

Plaintiff additionally offers evidence related to his attempt to settle this matter with Defendant. This evidence appears to be both irrelevant and otherwise inappropriate under the Federal Rules of Evidence. Fed. R. Evid. 408; *S. Ry. Co. v. Madden*, 235 F.2d 198, 201 (4th Cir. 1956) ("It is too well settled for argument that evidence of unaccepted offers of compromise or negotiations looking to compromise is inadmissible."); *Cheyenne River Sioux Tribe v. United States*, 806 F.2d 1046, 1050 (Fed. Cir. 1986) ("An unaccepted offer of settlement ordinarily is not admissible evidence to show either the existence or amount of liability.").

2   There appears to be a typographical error in Defendant's Response to Plaintiff's Statements of Facts. Defendant says, "Dr. McNeely testified at deposition that omission was an oversight on his resume." (Doc. No. 32 at ¶ 4). This is the first and only mention of Dr. McNeely in that document, and the Court takes Defendant to have been referring actually to Dr. McMurray.

3   Plaintiff denies this fact but provides no additional details or citation to the record to support his denial. Therefore, the Court deems this fact undisputed for purposes of ruling on the present Motion.

4   The record is unclear regarding when the issues with the timesheets stopped, with Plaintiff indicating that they extended "beyond 2017" but that he could not remember when the issues stopped. (Doc. No. 31-9 at ¶ 7; Doc. No. 31-4 at 1).

5   The Court perceives nothing in the record reflecting who sent these emails.

6   The Court perceives noting in the record reflecting who accosted Plaintiff in this manner.

7   Defendant admits that the occurrence of some of these events (alleged to have occurred by Plaintiff in Doc. No. 31-10, paragraph 8) is undisputed. (Doc. No. 32 at 3). But as to the occurrence of other of these events, Defendant purports to admit only that it is undisputed "that Plaintiff so states," *i.e.*, that Plaintiff claims that they occurred. (Doc. No. 32 at 2–4). Such an answer fails to cut the metaphorical mustard. Plaintiff's Concise

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

Statement of Additional Material Facts (Doc. No. 24) posited that *these events occurred*, not that Plaintiff *claims* that these events occurred. Defendant did not dispute that any of these events occurred, inasmuch as its responses to the effect that it admits only that Plaintiff "states" that these events occurred do not constitute a disputation that such events occurred. Given that no dispute has been raised as to the occurrence of any of these events, they are deemed undisputed at least for purposes of the Motion.

The Court notes below another context in which Defendant took the ill-advised approach of responding to a statement purported by Plaintiff (in Doc. No. 32-10) to be true by admitting only that it was undisputed that "Plaintiff so states." In this other context also, Defendant will be deemed to have admitted the statement that he declined to dispute based on the unwise choice to make the unhelpful observation that it is "undisputed" that Plaintiff states what he states.

8    In some cases, national origin and race "are so intertwined that it is difficult to separate the two for purposes of analysis; such as in the case where an employee believes that he has been subjected to discrimination but he cannot determine whether it can be traced to a personal characteristic common to people of a certain national origin or his national origin, itself." *Kun*, 949 F. Supp. at 19. But the current case does not appear to involve any such intertwining. Plaintiff identifies in each of his claims whether he is bringing such claim based on race, national origin, or both. Plaintiff does not assert that his national origin and race discrimination claims are so intertwined that they cannot be separated nor does he claim that he cannot determine whether he was discriminated against based on his Chilean origin or based on his Hispanic race.

9    One district court in this circuit concisely explained the separateness of these two theories, and the importance of pleading them separately, as follows:

   A hostile work environment claim is a distinct theory of discrimination. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts [of discrimination or retaliation].") As such, it should be pleaded separately under Rule 10(b) of the Federal Rules of Civil Procedure. *See, e.g.*, *Harris v. Radioshack Corp.*, 2002 WL 1907569, at *2 (S.D. Fla.2002) ("If Plaintiff desires to assert discrimination claims under various theories, these claims must be asserted in separate counts in accordance with Fed. R. Civ. P. 10(b).").

   *Smith v. Glenny Glass Co.*, No. 106CV638, 2007 WL 1202713, at *4 (S.D. Ohio Apr. 20, 2007).

10    A plaintiff must "tie the alleged ... hostile work environment to [a] protected class[.]" *Land v. S. States Coop., Inc.*, 740 F. App'x 845, 850 (6th Cir. 2018). In other words, the "hostil[ity]" of the environment must be directed at or implicate members of (or membership in) a protected class.

11    A plaintiff must establish five elements for a hostile work environment claim: 1) the plaintiff is a member of a protected class; 2) the plaintiff was subjected to unwelcomed racial harassment; 3) the harassment was based on race; 4) the harassment created a hostile work environment; and 5) the existence of employer liability. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999); *Pendleton*, 2016 WL 2927983, at *10. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). The harassment must be both objective and subjectively offensive to constitute a Title VII violation. *Id.* at 21-22. When looking at a hostile work environment claim, a court should employ a totality of the circumstances test. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (discussing *Harris*). "A court determines whether a hostile work environment has been created 'by looking at all the circumstances ... includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Bradley v. Arwood*, 705 F. App'x 411, 422 (6th Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*,

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

510 U.S. 17, 23 (1993)). "Whether conduct is severe or pervasive is 'quintessentially a question of fact.' " *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (*O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)). The fact intensive nature makes "the severity and pervasiveness evaluation ... particularly unsuited for summary judgment." *O'Shea*, 185 F.3d at 1098.

Plaintiff argues that there is a genuine dispute of material fact regarding his hostile work environment claims. He argues:

> As previously noted, [Plaintiff] continued to be harassed with regards to his signature on his timesheets. In the past few years, he was the only professor not allowed to teach higher level courses, denied standard things such as letters to help him get grants, called names such as "incompetent" and "a disgrace" in emails to the faculty, accused of giving students answer to final exams in advance, screamed at, intimidated/ threatened, removed from the curriculum committee and not given other committee assignments, and forced to teach lower level courses. In fact, things got so bad that [Plaintiff] had to acquire a body camera to record instances of harassment. These actions amount [to] significantly more than a "mere offensive utterance" and clearly interfered with [Plaintiff's] work performance.

(Doc. No. 31 at 11-12). However, as noted, Defendant has not shifted the burden on this claim (by showing preliminarily, subject to Plaintiff's rebuttal, the absence of a genuine issue of material fact), or addressed any of the relevant legal principles, and so Plaintiff actually is not required to show the existence of a genuine issue of material fact on this claim for it to survive the Motion.

12    Herein, the Court refers to a retaliation claim that is based on a more discrete adverse employment action, as opposed to one based on "harassment" or a hostile work environment, as a claim of "general retaliation."

13    As noted below, Title VI, as amended, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

14    By this, the Court means a claim of retaliation based on an adverse employment action that is more discrete than harassment or a (hostile) work environment.

15    Defendant does mention this claim and seems to allude to it. (Doc. No. 27 at 10). However, Defendant does not cite any relevant case law or make any arguments regarding it.

16    As made clear above, the Court is cognizant that Plaintiff has no obligation to show a genuine dispute of material fact unless and until Defendant meets its burden to show preliminarily the absence of a genuine issue of material fact.

17    The Court is unpersuaded by Defendant's reliance on *Phillips v. Anderson Cty.*, No. E200901883COAR3CV, 2010 WL 4514886, at *7 (Tenn. Ct. App. Nov. 10, 2010). In that case, the court was clear that the plaintiff's trial testimony alone was not sufficient when it amounted to speculation (discussed below) and "was undercut by other circumstantial and direct evidence." *Id.* This case does not support Defendant's position that such evidence should not be relied on in the summary judgment context in assessing whether the (non-movant) plaintiff has shown a genuine dispute of material fact. The case instead indicates that testimony presented at trial could not support a particular outcome when it was speculation and was contradicted by other record evidence. More fundamentally, the Court declines to afford appreciable weight to a state case, given that the Court here is dealing with a federal procedural matter, *i.e.*, the admissibility and weight to be given certain testimony on a motion brought under Federal Rule of Civil Procedure 56.

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

18    Oddly, although protesting the presentation of such evidence, Defendant attempts to present similar evidence, such as evidence that particular professors believe that Plaintiff has been treated fairly. (*E.g.*, Doc. No. 31-9 at ¶¶ 17, 22). The Court likewise will not consider these statements.

19    The undersigned will highlight a few important points regarding the terminology used herein, by reference to something he wrote years ago:

> On the subject of limitations, courts often use language loosely, interchanging various terms for one another. For maximum clarity, terms must be defined so that important concepts are distinguishable from one another, then used consistently in accordance with those definitions. Herein, legal authorities will be paraphrased in terms of the following definitions to convey the concepts expressed therein, regardless of the terms used (or misused) by the authority being cited.

> As used herein, a "statute of limitations" refers to a legislative enactment, or codification thereof, that sets forth a limitations period.... A "limitations period" refers to the length of time-the specific number of days, months, or years-in which a given claim can be commenced, as set forth in a statute of limitations. "Limitations" [refers] to the legal doctrine whereby a plaintiff is barred from bringing a claim based upon the lapse of the applicable limitations period. To say that limitations "applies" is to say that, under limitations law, a claim is time-barred.

> Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1017–19 (1997).

20    Defendant does not specify which of Plaintiff's Title VII claims (i.e., Count I or Count II) it believes is time barred. The heading of Defendant's argument states that Plaintiff's Title VII claims are "mostly" time barred, but the argument itself speaks in terms of all of Plaintiff's Title VII claims. (Doc. No. 27 at 6–7). The Court will assume that Defendant is arguing that both Claim I and Claim II (including Plaintiff's retaliation claim) are time-barred.

21    A "deferral state" is a state that has enacted its own laws prohibiting discrimination in employment. *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 406 (6th Cir. 1999).

22    While Plaintiff's Charge of Discrimination was received by the EEOC on November 5, 2018, Plaintiff dated the Charge of Discrimination October 4, 2018. (Doc. No. 29-2 at 2). This roughly one-month difference has no impact on the Court's analysis of this issue, as Plaintiff's filing would not meet the 300-day deadline even if considered "filed" on October 4.

23    As discussed below in relation to Plaintiff's Title VI claims, the Court does not find that Plaintiff has adequately invoked the so-called "continuing violations doctrine."

24    The Court constrains its review of the record to only Plaintiff's Response to Defendant's Statement of Facts (Doc. No. 31-9) and Defendant's Response to Plaintiff's Statement of Facts (Doc. No. 32) because, as discussed in a footnote above, it is not the Court's job to sift through the entire record to find evidence to bolster Defendant's Motion. (*See* footnote 49, above).

25    It is noteworthy, though certainly not dispositive, that in the Complaint, all alleged specific instances of Plaintiff's timesheet signature being challenged are from the year 2017. (Doc. No. 1).

26    The Court cannot "dismiss" these claims, as they were never alleged in the Complaint to begin with.

27    Again, the Court cannot "dismiss" these claims, as they were never alleged in the Complaint to begin with.

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

28    Although the Court discusses the continuing violations doctrine in connection with the Title VI claim below, the Court does not discuss it here because it finds that equitable tolling applies. As will be discussed, equitable tolling does not appear relevant to the Title VI claim, as the Title VI claim did not need to be exhausted.

29    The undersigned here will reiterate what he has said previously about multi-factor tests generally:

> "The undersigned has noted on multiple occasions that multi-factor (or balancing) tests, though often having considerable desirability and merit, tend to foster outcomes that are unpredictable on the front end, given such tests' subjectivity." *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at \*16 (M.D. Tenn. Aug. 28, 2020) (quoting Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1050 (1997) (proposing a multi-factor test to resolve civil limitations issues, while conceding that when courts "apply[ ] a multi-factor test, [it is] always an unpredictable endeavor") and Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 95 (1995) (proposing multi-factor test to resolve collateral estoppel issues, while conceding that its drawback is that it "would produce unpredictable resolutions of collateral estoppel issues, in that it is so flexible and calls for very subjective judicial determinations")). This reality tends not to bode well for the prospects of a multi-factor test to resolve a question as a matter of law at the summary judgment stage.

> *Acosta v. Peregrino*, No. 3:17-CV-01381, 2020 WL 5995049, at \*6 (M.D. Tenn. Oct. 9, 2020) (Richardson, J.).

30    The Court construes Plaintiff's Response to invoke the doctrine of equitable tolling in relation to his Title VII claims only. While Plaintiff writes, "Plaintiff contends that *all* of his claims are timely and that the discrimination and retaliation was and is continuous. However, should this Court question the timeliness of any specific claims, they are subject to equitable tolling." (Doc. No. 31 at 9 (emphasis added)), Plaintiff makes this argument under the heading "Plaintiff's VII [sic] Claims are Timely and/or Subject to Equitable Tolling." In elaborating on the applicability of equitable tolling, Plaintiff focuses only on his Title VII causes of action, and not any other claims. Thus, the Court reads Plaintiff's statement to mean that Plaintiff contends all of his *Title VII* claims are timely, or otherwise subject to the doctrine of equitable tolling.

31    Plaintiff does not specifically indicate in the Complaint which events he contends support his Title VI claims (aside from being denied the promotion to Department Chair, which occurred in 2017).

32    True, Defendant also states that alternatively, "Plaintiff's Title VI claim should be limited strictly to allegations within one year prior to the filing date of Plaintiff's lawsuit, which was February 13, 2020." (Doc. No. 27 at 12). But again, as previously discussed, the Court will not undertake a review of the record to find evidence and form arguments on Defendant's behalf. Defendant here has not articulated which events underlying Plaintiff's Title VI claims it contends are barred by the relevant statute of limitations, other than Plaintiff being denied the Department Chair promotion. The Court therefore will not analyze whether to grant summary judgment on timeliness grounds as to any other aspect of Plaintiff's Title VI claims.

33    In his Response, Plaintiff makes a brief reference indicating that all of his claims should survive because they involve "continuous" conduct. (Doc. No. 31 at 9). Plaintiff does not elaborate on this reference or explain why this saves his claim. The Sixth Circuit recognizes the "continuing violation doctrine" (which Plaintiff does not specifically reference) when determining whether a claim for discrimination is timely filed:

> The "continuing violation" doctrine provides that when "there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period." *Haithcock v. Frank*, 958 F.2d 671, 677 (6th Cir. 1992). In other words, when a continuing violation is shown, "a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 408 (6th Cir.1999); *see*

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  24

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

*also* *Held v. Gulf Oil Co.*, 684 F.2d 427, 430 (6th Cir. 1982). This Court has held that continuing violations may be shown in one of two ways. The first is "where there is some evidence of present discriminatory activity giving rise to a claim of a continuing violation," and "at least one of the forbidden discriminatory acts [has] occurred within the relevant limitations period." *Haithcock*, 958 F.2d at 678 (citation omitted) (emphasis in original). The second type of continuing violation exists when a plaintiff has demonstrated a longstanding and over-arching policy of discrimination. *See id.* This requires a showing by a preponderance of the evidence "that some form of intentional discrimination against the class of which plaintiff was a member was the company's 'standing operating procedure.' " *EEOC v. Penton Indus. Publ'g Co.*, 851 F.2d 835, 838 (6th Cir.1988) (citation omitted).

*Kovacevich v. Kent State Univ.*, 224 F.3d 806, 829 (6th Cir. 2000); *Seay v. Fortune Plastics, Inc.*, No. 3:09-CV-0605, 2012 WL 610006, at *3 (M.D. Tenn. Feb. 24, 2012). But the Sixth Circuit has held, in the aftermath of *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (reversing the Ninth Circuit's application of the continuing violations doctrine to "serial violations" and holding the doctrine inapplicable to claims arising out of discrete acts of discrimination), that the first of these two ways may be used *only* with respect to claims of hostile work environment (of which, in this case, there are none, as explained more fully in a footnote herein). *See Maxwell v. Postmaster Gen. of U.S.*, 986 F. Supp. 2d 881, 884 (E.D. Mich. 2013) (noting that "subsequent to *Morgan*, the Sixth Circuit has also considered the continuing violations doctrine and found, outside the context of hostile work environment cases, that it only applies where the challenged acts are part of a 'longstanding and demonstrable policy of discrimination[ ]' " and that "*Morgan* overturned prior Sixth Circuit case law allowing application of continuing violations doctrine to serial violations" (citing *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir.2003))).

The Sixth Circuit has stated, "In the context of a hostile work environment claim, to establish a continuing violation, a plaintiff must first produce evidence of a current violation taking place within the limitations period. Second, a plaintiff must show that the current violation is indicative of a pattern of similar discriminatory acts continuing from the period prior to the limitations period." *El-Zabet v. Nissan N. Am., Inc.*, 211 F. App'x 460, 464 (6th Cir. 2006) (quoting *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 376 (6th Cir. 2002) (cleaned up)). This doctrine appears to be applicable in the Title VI context. *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 584 (5th Cir. 2020).

Plaintiff has not asserted either of the two requirements for the doctrine's applicability in the context of a claim of hostile work environment. Nor he has he asserted a longstanding and demonstrable policy of discrimination, as has been required in the post-*Morgan* era for the doctrine's applicability in other contexts, *i.e.*, claims of discrete acts of discrimination. Thus, the Court finds that Plaintiff has not adequately invoked the continuing violations doctrine. *See e.g.*, *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." (quotation omitted)); *Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012) ("[E]ven if had they raised their argument at the appropriate time, we would find it waived on grounds that it is 'adverted to. in a perfunctory manner, unaccompanied by some effort at developed argumentation.' ") (quoting *Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007)); *Bowman v. Comm'r of Soc. Sec.*, No. 1:11-CV-865, 2012 WL 4343755, at *4 (W.D. Mich. Sept. 21, 2012) ("Issues raised in a perfunctory manner are deemed waived.").

Thus, although Plaintiff could contend that the Complaint includes allegations of events which took place within one year of the filing of the Complaint, (see Doc. No. 1 at ¶¶ 42, 44, 46, 47, and 48), the inclusion of these events in the Complaint still would fail to render Plaintiff's Title VI claims timely because Plaintiff has not shown that the continuing violations doctrine should apply.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    25

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

34    Because summary judgment will be granted to Defendant on Count II for Plaintiff's failure to exhaust his administrative remedies, this section will discuss only Plaintiff's Title VII claims contained in Count I in particular.

35    As is noted elsewhere in this opinion, courts apply the same framework in analyzing Title VII, Title VI, and § 1981 claims. It is unclear why Defendant (and, in turn, Plaintiff) set forth a separate argument as to each of the three kinds of claims or why each such argument was slightly different than the others.

36    Plaintiff and Defendant both quibble at various times regarding who all knew the ethnicity of Plaintiff and the other professors at various times. Here, the decisionmaker is the only person whose knowledge of Plaintiff's (and other professors') ethnicity is relevant to the Title VII analysis, and neither party has cited the Court to any relevant case law regarding the relevance of the knowledge (or lack thereof) of the particular person over whose knowledge the parties quibble. The Court is unpersuaded by these references to the record because neither party indicates that the decisionmaker (who is unknown) did not know about Plaintiff's protected status. *See Williams v. Wells Fargo Fin. Acceptance*, 564 F. Supp. 2d 441, 447 (E.D. Pa. 2008) ("[T]here can be no claim of disparate treatment where the employer made the adverse employment decision without awareness of the personal attribute that is the claimed discriminatory bias[.]"); *Stephens v. Nike, Inc.*, 611 F. App'x 896, 897 (9th Cir. 2015) ("The district court properly granted summary judgment on [Plaintiff's] federal race discrimination claims because [Plaintiff] failed to raise a genuine dispute of material fact as to whether the relevant decision maker was aware of his race or whether defendant continued to seek applications from other similarly qualified individuals outside the protected class.").

37    "Disparate treatment" is an umbrella term used to refer to discrimination against an employee based on the employee's membership in a protected class. The Supreme Court has explained the term as such:

Several of our decisions have dealt with the evidentiary standards that apply when an individual alleges that an employer has treated that particular person less favorably than others because of the plaintiff's race, color, religion, sex, or national origin. In such "disparate treatment" cases, which involve "the most easily understood type of discrimination," *Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S. Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977), the plaintiff is required to prove that the defendant had a discriminatory intent or motive.

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 985–86 (1988) (distinguishing disparate treatment from disparate impact cases).

38    The Sixth Circuit has found that, in failure to promote claims:

For Title VII purposes, the failure to promote is considered an adverse employment action. *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir.1999).

To establish a *prima facie* case in this context, the plaintiff must prove: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who are not members of the protected class received promotions. *Allen*, 165 F.3d at 410; *see also Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1095 (6th Cir.1996). If the plaintiff meets this burden, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory rationale for the adverse employment action. Upon so doing, the burden shifts back to the plaintiff to demonstrate that the proffered rationale is a pretext for discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).

*Gee v. Liebert Corp.*, 58 F. App'x 149, 153–54 (6th Cir. 2003).

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

39    As suggested herein, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff at all times, throughout this burden shifting. *Burdine*, 450 U.S. at 253; *Anthony*, 339 F.3d at 515. The Court keeps this in mind, albeit with the caveat that on the instant Motion it does not sit as the trier of fact but instead concerns itself only with what a reasonable trier of fact could (or could not) find at a hypothetical trial based on the evidence presented on this Motion. Notably, in seeking to meet its burden, the plaintiff cannot rely purely on mere personal belief, conjecture and speculation, because they are insufficient to support an inference of discrimination. *Garren*, 482 F. Supp. 3d at 717.

40    Given its use of the phrase "genuine issue of fact," *Burdine*'s description of the defendant's burden at the second stage could be misunderstood to apply only at the summary judgment stage. That is, because "genuine issue of material fact" is a key term of art uniquely applicable to motions for summary judgment, one might conclude that *Burdine* here was talking only about the burden a defendant bears at the second stage on the defendant's motion for summary judgment. But it was not. *Burdine* did not involve summary judgment at all; the case went to the Supreme Court after a (bench) trial. The Court has no reason to believe, though, that the standard is any different at the summary judgment stage; whether at summary judgment or at trial, the defendant's burden is to raise a genuine issue as to whether it had a valid (legitimate and non-discriminatory) reason.

The reasons why it is enough for the defendant, even at trial, to merely "raise a genuine issue" as to whether it had a legitimate and non-discriminatory reason become clear once one considers the indirect-evidence framework as a whole and the reality that the ultimate burden of proving discriminatory intent lies with the plaintiff. Specifically, the first reason is that the defendant cannot have the burden of persuasion on the issue of whether its reason was valid rather than discriminatory, because (as just noted) the plaintiff has the burden on that issue. And the second reason is that the entire function (purpose) of the second stage—whether at the trial or summary-judgment stage—is merely to determine whether *there is a genuine issue* as to whether the defendant had a valid reason for its action(s). If the defendant fails to show that there is, then there is no genuine dispute that the defendant's action(s) were unlawfully discriminatory, and the plaintiff prevails. *See Burdine*, 450 U.S. at 254 ("Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case."); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (noting that if the plaintiff's claim is not defeated at the first stage, then the defendant-employer's "failure to introduce evidence of a nondiscriminatory reason will cause judgment to go against it."). But if the defendant does make this showing, then the issue of whether the defendant *actually* had a valid reason is hashed out at the third step, at which the plaintiff (bearing as she does the ultimate burden to show discriminatory intent) bears the burden of showing that a discriminatory reason, rather than the defendant's proffered valid reason, was the real reason for the defendant's action(s).

41    The bracketed words added by the Court to this quote are significant; they denote the difference between a burden (a) merely to *articulate* (or state) some non-discriminatory reason(s) that supposedly motivated the employment decision, and (b) to *provide some evidence* that there was/were some non-discriminatory reason(s). It is true that some cases use language that seemingly suggests that the burden is the former. *E.g.*, *Redlin*, 921 F.3d at 607; *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001); *Petway v. Textron Aerostructures*, No. 93-6114, 1994 WL 70862 (6th Cir. Mar. 3, 1994) ("[the defendant] met its burden of articulating a legitimate non-discriminatory reason for [the plaintiff's] transfer by stating that she was selected for force reduction pursuant to its SFR procedure."). But both *Burdine* and *Harris* (which, as noted, was relying on *Burdine)* make clear that the employer meets its burden of production only if it presents not merely *some statement* of what the employer now says the reason was, but rather evidence of what the reason actually

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    27

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

was at the time in question. So although this may indeed be a burden of articulating a reason, it is a burden of articulating a reason supported by *evidence*.

42　The "preponderance of the evidence" standard applicable here is the trial standard. At the summary judgment stage, as suggested above, the standard is modified, such that the question becomes whether a reasonable jury *could* make the required finding by a preponderance of the evidence.

43　The required second component seems to coalesce with the required overall showing that the plaintiff must make to meet his or her overall burden of showing unlawful discrimination. Presumably, this is what the Supreme Court had in mind when it stated that the plaintiff's burden as to pretext "merges" with the plaintiff's overarching burden as to the discrimination claim as a whole. *Burdine*, 450 U.S. at 256.

44　One might reasonably ask whether *St. Mary's*, which as noted in *Ford Motor Co.* required the plaintiff to show both components, effectively overruled *Burdine* in one respect. Specifically, this aspect of *St. Mary's* seems in tension with *Burdine*'s statement that the plaintiff may meet its burden of persuasion as to pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256. The dissent in *St. Mary's* certainly saw the tension. But as far as the undersigned can tell, *Burdine* has never been considered to have been overruled in any respect, and certainly neither the Supreme Court nor the Sixth Circuit has shown any compunction about citing *Burdine* (at least parts of *Burdine* other than the statement apparently displaced by *St. Mary's* as noted above) in the aftermath of *St. Mary's*. The Court is confident at the very least that the aspects of *Burdine* upon which the Court relies remain good law after *St. Mary's*.

45　One might ask why it is not enough to speak simply in terms of the requirement to show that the real reason was retaliation (the second component of pretext) without mentioning a separate requirement to show that the real reason was not the (non-retaliatory) reason proffered by Defendant (the first component of pretext). After all, the second seems necessarily subsumed in the first. But the Sixth Circuit has articulated these as separate requirements that each must be satisfied, and so the Court will proceed accordingly.

46　Although *Blair* states that "the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination[,]" 505 F.3d at 524, this is actually true only if the defendant-movant met its initial burden of showing the absence of sufficient evidence for a jury to reach such a conclusion. *See Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) ("The moving party must demonstrate the 'basis for its motion, and identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986))).

47　To be clear, the requirement here is not merely to *articulate* a legitimate reason, but also (as discussed below) to *present evidence* that the articulated legitimate reason was in fact the reason.

48　As indicated below, courts' references to a plaintiff's (conditional) requirement to show "pretext" is actually a (conditional) requirement to show not just pretext (*i.e.*, that the claimed reason was provided to conceal the real reason) but also to show that the real reason was of an unlawful, discriminatory nature.

49　Despite substantial searching over time, the Court has been unable to find any cases in which the court made it a point to ensure that the defendant-movant met an initial burden to show a likely absence of direct evidence before looking to see whether the plaintiff could meet that burden by pointing to some direct evidence; instead, from what their opinions indicate, courts generally start by asking whether the plaintiff has identified anything that constitutes direct evidence.

Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 37,428

50   Defendant acknowledges only the third alleged adverse employment action (regarding Plaintiff's failure to receive a promotion to Department Chair) and makes no mention of the first two alleged adverse employment actions. Defendant has thus failed to make any showing that there is no genuine issue of material fact as to these alleged adverse employment actions.

51   It is not the Court's job "to root through the record not unlike a pig in search of truffles to uncover any grain of evidence that might support the position of a party that chose to otherwise sit on its hands." *Penn-Daniels, LLC v. Daniels,* No. 07-1282, 2010 WL 431888, at *3 (C.D. Ill. Jan. 28, 2010) (citing *Casna v. City of Loves Park,* 574 F.3d 420, 424 (7th Cir. 2009)); *see also Emerson v. Norvartis Pharm. Corp.,* 446 F. App'x 733, 736 (6th Cir. 2011) (noting that "judges are not like pigs, hunting for truffles" that might be buried in the record).

52   This argument was made by Defendant in connection with Plaintiff's Title VII and Title VI claims. Plaintiff addressed this argument in his section on Title VI.

53   As indicated above, a cognizable § 1981 claim is necessarily grounded in the plaintiff's race, and so Plaintiff's § 1981 claim is cognizable only to the extent it is based on his race (as opposed to his national origin and ethnicity). Though it may not be immediately apparent that "Latino" or "Hispanic" is a protected *race* (as opposed to a protected ethnicity or place of national origin), neither party seems to dispute this characterization. Additionally, many courts have found that a Latino or Hispanic individual can bring a race discrimination claim, often referring to such individuals with the words "Latino" and "Hispanic" interchangeably. *E.g., Guzman v. Concavage Marine Constr. Inc.,* 176 F. Supp. 3d 330, 334 (S.D.N.Y. 2016) ("As Defendants rightly acknowledge, discrimination against Latinos may be actionable under § 1981."); *Escalera v. Bard Med.,* 373 F. Supp. 3d 793, 801 (W.D. Ky. 2019), *case dismissed,* No. 19-5383, 2019 WL 3226309 (6th Cir. July 2, 2019) (not raising issue of plaintiff identifying as Latino, despite no such option existing on the EEOC form for race claim); *Brown v. Oakland Cty.,* No. 14-CV-13159, 2015 WL 5215840, at *1 (E.D. Mich. Sept. 4, 2015) (not raising issue and describing plaintiff as Latino when discussing race claim). The undersigned suggests caution in using the terms interchangeably because, to the extent one term references Latin America and the other term references Spain or Spanish speaking (as opposed to, for example, Brazil and Portuguese speaking) a person can be Latino/a without being Hispanic, and vice versa.

54   Defendant also noted that Plaintiff received promotions, raises, and tenure, indicating that it did not intend to discriminate against him. (Doc. No. 27 at 13). These undisputed facts regarding advances made by Plaintiff in his employment with Defendant tend to show preliminarily (subject to Plaintiff's rebuttal, of course) an absence of an intent to discriminate against Plaintiff. But unlike Plaintiff's testimony suggesting that Plaintiff lacks any real evidence of discriminatory intent, these facts do not necessarily tend to suggest that *Plaintiff lacks countervailing evidence* sufficient to reach a jury on the issue of discriminatory intent, which is really what matters when a defendant moves for summary judgment on a plaintiff's claims; the question is not so much whether the defendant can point to evidence (or undisputed facts) suggesting that the jury should find in its favor rather than the plaintiff's, but rather whether the defendant can show that the plaintiff lacks evidence sufficient even to reach a jury at all. The facts Defendant points to here serve more to show why it should prevail in front of a jury than to show that Plaintiff lacks evidence even to reach a jury. That said, these facts certainly do not hurt Defendant in its bid to shift the summary-judgment burden to Plaintiff on the issue of discriminatory intent.

55   Specifically, in response to this assertion of Defendant, Plaintiff states:

> Denied. [Plaintiff] testified that he has been subjected to things no one else in the department has been. Also, per his Affidavit, he is "confident that the hostile work environment and retaliation that [he] suffered from is a result of my Chilean national origin and not being born in the United States, and because I complained about being discriminated against."

**Jara v. Tennessee State University, Not Reported in Fed. Supp. (2022)**

2022 Fair Empl.Prac.Cas. (BNA) 37,428

(Doc. No. 31-9 at ¶ 10). As the Court has previously discussed, the Court cannot consider Plaintiff's rank speculation and beliefs as grounds for raising a genuine dispute of material fact in response to a motion for summary judgment. Moreover, Plaintiff here speculates only that Defendant was animose against Plaintiff based on his *national origin*, not his race.

56    Plaintiff's Title VI claims will survive aside from Plaintiff's Title VI claim for general retaliation based on the discrete adverse act of a failure to promote, on which summary judgment will be granted on the basis of limitations.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

2008 WL 170081
Only the Westlaw citation is currently available.
United States District Court,
M.D. Tennessee,
Nashville Division.

Jacqueline E. WADE,

v.

AUSTIN PEAY STATE UNIVERSITY.

Nancy J. Dawson

v.

Austin Peay State University.

Mary M. Warner

v.

Austin Peay State University.

Cheryl D. Garrett

v.

Austin Peay State University.

Nos. 3:05-0076, 3:04-1150, 3:05-0097, 3:05-0229.
|
Jan. 16, 2008.

**Attorneys and Law Firms**

Jacqueline E. Wade, Nashville, TN, pro se.

Nancy J. Dawson, Clarksville, TN, pro se.

Mary M. Warner, Nashville, TN, pro se.

Leslie Ann Bridges, Tennessee Attorney General's Office, Sam Delk Kennedy, Jr., Office of the United States Attorney, Nashville, TN, for Austin Peay State University.

*MEMORANDUM*

ROBERT L. ECHOLS, District Judge.

**\*1** Pending before the Court are Defendant Austin Peay State University's ("APSU's") Motion For Summary Judgment As To Plaintiff Jacqueline E. Wade (Docket Entry No. 176), Motion For Summary Judgment As To Plaintiff Nancy J. Dawson (Docket Entry No. 183), and Motion for Summary Judgment As To Plaintiff Mary M. Warner (Docket Entry No. 205), to which the *pro se* Plaintiffs responded in opposition, and APSU filed replies.

Plaintiffs Jacqueline E. Wade, Ph.D. ("Dr.Wade"), Nancy J. Dawson, Ph.D. ("Dr.Dawson") and Mary M. Warner ("Ms.Warner") are African Americans who were formerly employed at APSU. They filed separate actions against APSU in early 2005. In Amended Complaints filed in October 2006, all three Plaintiffs alleged claims of race discrimination, racially hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U. S .C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1983, and the Tennessee Human Rights

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  1

Act, Tenn.Code Ann. § 4-21-101 *et seq.* ("THRA"). [1] Plaintiffs seek compensatory and punitive damages, back pay and front pay, injunctive relief, attorney's fees, and costs.

## I. *FACTS*

The Court first observes that Dr. Dawson and Ms. Warner did not comply with Local Rule 56.01, which requires the non-moving party to respond by admitting or denying each statement of material fact set forth by the Defendant in support of its motion for summary judgment. Rather, these two Plaintiffs filed their own statements of material facts without responding to Defendant's filing. Despite these Plaintiffs' failure to comply with Local Rule 56.01, the Court will consider all of their filings in ruling on the motions for summary judgment.

Beginning in March 2000, APSU, like other State of Tennessee higher education institutions, underwent severe budget cuts for several years. These budget cuts or impoundments at APSU totaled $6,613,700. In fiscal year 2000-2001, the State of Tennessee reduced financial support for APSU by $826,500. The next fiscal year, 2001-2002, state support decreased by an additional $287,200. Although the appropriation initially increased by $700,000 in fiscal year 2002-2003, an impoundment in the spring of 2003 resulted in a loss of funding in the amount of $1.5 million. Cuts occurred in state appropriations for fiscal year 2003-2004 in the amount of $2.8 million.

To make the required budget cuts, APSU administration, led by President Sherry Hoppe, allocated the diminishing resources first to instruction, followed by academic support (such as tutorial services, computer labs, library, etc.), and finally to programs that did not involve either instruction or academic support. Other criteria taken into account during the process of making budget cuts were the impact of the proposed cut on accreditation requirements, the extent to which the cut would violate affirmative action or other legal mandate, and whether less costly alternatives for providing the program or function existed or could be created. Examples of programs eliminated or revamped include the Office of International Education, the Academic Advisement Center, and the Office of Multi-ethnic Services. Most supervisors at APSU had to operate with fewer resources, including fewer staff members. (Docket Entry No. 179, Hoppe Aff. ¶¶ 6, 14.)

**\*2** The Plaintiffs contend that these budget cuts had a disparate impact on African American students and staff, and that Plaintiffs personally were subjected to race discrimination and a racially hostile work environment. Plaintiffs further contend that they were subjected to retaliation because they complained to their administrative superiors, including President Hoppe, and to the EEOC about race discrimination at APSU. The Court will now examine the facts unique to each Plaintiff.

### *Dr. Wade*

Dr. Wade was employed at APSU from July 1996 through August 31, 2003, as the first full-time Director of the Wilbur N. Daniel African American Cultural Center ("AACC"). She was responsible for the AACC's overall leadership and management of its programs. The AACC had the unique mission to conduct major programs and provide African American-centered activities that focused on the contributions, achievements and socio-cultural perspectives of African Americans and other people of African descent. This mission was meant to help APSU become a welcoming environment for African American students and other African Americans who had been affected by the history of racial segregation in state institutions of higher learning. Dr. Wade revitalized the AACC by conducting many programs and services year round, and in doing so received outstanding performance evaluations for the first six years of her tenure. Even though performance evaluation standards changed university-wide in 2001 after President Hoppe's appointment, Dr. Wade continued to receive open praise from her supervisor, Dr. Joe Filippo, Assistant Vice President of Academic Affairs, for her job performance. She provided supervision

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    2

and direction to all full-time, temporary and student AACC staff, and she oversaw the AACC budget. During the first four years of her directorship, APSU provided Dr. Wade with adequate budgets, full-time staff, and student workers. The AACC had a programming budget supplied by the Office of Academic Affairs and an operational budget supplied by general operation funds. The co-curricular work of the AACC helped to enhance the classroom learning processes of African American students specifically and all students generally. (Docket Entry No. 211, Wade Aff. ¶¶ 2, 4-7, 22, 24-25.)

When Dr. Wade became director, the AACC was part of the Office of Enrichment Programs ("OEP") established by President Hoppe's predecessor as a means of "equalizing" all of the co-curricular programs on campus. Although there were a total of fourteen co-curricular programs in OEP, only five of them offered courses for credit: the African American Studies Program ("AASP"), the Women's Studies Program, the Heritage Program, the Honors Program and the International Studies Minor. In August 2001, APSU hired its first full-time director of the AASP, Dr. Dawson. The AACC and the AASP were the only stand alone programs in the OEP and the only programs run by African Americans. The International Studies Center was run by a Chinese American immigrant who was a tenured professor in the Psychology Department. All of the other programs in OEP were run by Caucasian faculty members whose directorships of OEP programs were part-time positions. The Caucasian directors were full-time faculty members with tenure or they were tenure-tracked, and they taught in traditional academic departments during the regular nine-month teaching year. These directors' respective departments provided them with administrative and secretarial support. Dr. Wade and Dr. Dawson were the only full-time directors of OEP programs. (*Id.* ¶¶ 9-11, 13-18.)

 **\*3** In 1997 Dr. Wade was elected as the tri-chair person of the AASAF organization that was established long ago at APSU. This organization was considered to be the collective voice of African Americans at APSU. When Dr. Hoppe was appointed interim President, the AASAF officers held a meeting with Dr. Hoppe to let her know that the group stood ready to assist her in understanding the needs and interests of the African American community. (*Id.* ¶¶ 20-21.)

In April 2000 at a program celebrating the re-opening of the AACC following a tornado, Dr. Hoppe proclaimed that she wanted to see the day when the AACC became a "center for all cultures." (*Id.* ¶ 26.) Late that month, concerned African American student groups sent Dr. Hoppe a written statement of their concern about her seeming lack of support for their cultural needs and interests. Dr. Hoppe invited Dr. Wade to a subsequent meeting between her and the students. During the meeting, Dr. Hoppe asked Dr. Wade if she heard Dr. Hoppe say that she wanted to see AACC become a "center for all cultures?" Dr. Wade attests that, when she answered, "yes," it became palpable that Dr. Hoppe was not happy with her answer, and Dr. Hoppe stated she was "surprised to hear a University administrator say this." Dr. Wade believes this incident marks the beginning of racially disparate treatment and retaliation directed toward her by Dr. Hoppe and members of her senior staff during the next three years for advocating AACC program objectives. (*Id.* ¶¶ 27-30 .)

In June 2000, Dr. Hoppe refused Dr. Wade's request to fill the AACC Secretary III position that had been vacant since September 1999. She also eliminated the vacant summer employee position that had been part of Dr. Wade's regular summer staff. Although Dr. Hoppe gave as a reason mandated budget cuts, Dr. Wade attests that Dr. Hoppe's reason was a pretext for discriminating against her. Dr. Wade met with Dr. Hoppe about her decision to reduce AACC staff. According to Dr. Wade, after rejecting the appeal, Dr. Hoppe stated this "should teach you to decide which side you are on." When Dr. Wade asked her to explain the comment, Dr. Hoppe allegedly said, "You should have filled the position when you had the chance" and abruptly ended the meeting without further comment. (*Id.* ¶¶ 31-33.)

In the summer of 2000, for the first time since beginning her directorship, Dr. Wade had to close the AACC for the month of July in order to take her usual vacation. Also in July 2000, Dr. Hoppe eliminated the AACC's $10,000

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    3

programming budget and gave as the reason mandated budget cuts. Thus, Dr. Wade felt she was forced to work without staff and funds. During June and August 2000, just as during the regular school year, she was the only staff member in the AACC and handled both her duties and the secretarial duties. This situation persisted until summer 2002 when Dr. Wade was allowed to hire a secretary at the declassified level of Secretary II. Dr. Wade felt Dr. Hoppe's actions in cutting staffing and funding were in retaliation for her position as an AASAF officer and the pressure that AASAF placed on Dr. Hoppe to reinstate the Affirmative Action Officer, LaVerne Walker, an African American female, to the President's cabinet. According to Dr. Wade, under the guise of administrative re-organization, Dr. Hoppe removed Ms. Walker from the cabinet and placed her under the Director of Human Resources, Bob Bird, a Caucasian male who had been openly critical of previous actions taken by Ms. Walker in furtherance of her role. Dr. Hoppe also promoted Bird to Executive Director of Human Resources without an advertised search that would have allowed African Americans to apply. Dr. Wade asked her supervisors, Dr. Hoppe, Dr. Filippo, and Dr. Bruce Speck, Vice President of Academic Affairs, verbally and in writing to restore her budget or provide *Geier* funds [2] to underwrite the needs of the AACC, but her requests were ignored. Ms. Walker previously had provided Geier funds for AACC programming. However, during 2001-2002, Ms. Walker was not able to supply as much funding as she had in previous years because Dr. Hoppe did not prioritize AACC's program funding needs in her directions for that year's use of *Geier* funds. After Ms. Walker left APSU in December 2002, Richard Jackson, an African American, was appointed as Director for Affirmative Action and Diversity Affairs, EEOC Officer and Legal Counsel for APSU. (*Id.* ¶¶ 35-40, 43, 47-53 .)

 **\*4** As an AASAF officer, Dr. Wade participated in an effort to include African Americans on the Search Committee for a permanent APSU president in 2001 when Dr. Hoppe was a candidate for the permanent position. When Dr. Hoppe was named as a finalist, Dr. Wade and other AASAF officers held a conference call with Tennessee Board of Regents ("TBR") Chancellor Charles Manning to report the organization's preferences among the final candidates. Dr. Hoppe was not among those preferred by AASAF; however, in July 2001, Dr. Hoppe was appointed permanently to the position of APSU President. Dr. Wade believes that, in retaliation for working with AASAF to express an opinion about the incoming president, Dr. Hoppe took action to declassify the AACC secretarial position from III to II and failed to restore program funding for the AACC. Dr. Wade claims that Dr. Hoppe did not take any similar action against Caucasian administrators who opposed her selection as president. (*Id.* ¶¶ 59-66.)

While Dr. Wade admits that neither Dr. Hoppe nor any of her top administrators used racial epithets against her, Dr. Wade perceived that Dr. Hoppe acted toward her in a hostile manner and there were acts of "racism that I believed was an essential part of the racially hostile climate on the campus." Dr. Wade claims that her direct superiors, Dr. Filippo and Dr. Speck, refused to advocate for her stating, "this is what Dr. Hoppe wants." In a meeting about the AACC and the AASP, Dr. Speck stated to Dr. Wade that he "was tired of your arm-twisting and resistance to my decisions." He also made clear that he would not tolerate Dr. Wade's and Dr. Dawson's "pushiness" and "uppityness." Dr. Wade was offended by the latter comment as "covert racial denigration." Dr. Wade "limped along" without adequate staff and funds. She felt that none of the co-curricular programs directed by Caucasian directors suffered the same budget and staff cuts as the AACC. (*Id.* ¶¶ 68-81.)

When Dr. Hoppe reorganized and dismantled OEP, the co-curricular programs managed by Caucasian directors went back to the sponsorship of the academic departments in which the directors served as regular full-time faculty. Only the AACC and the AASP remained as stand alone programs when the OEP was dismantled. (*Id.* ¶¶ 82-85.)

Dr. Wade attests that she was not recruited for internal promotions, she was not offered a joint faculty-administrator appointment, and she was not offered an upgrade in status to an Executive Director position which would have increased her salary and professional status on campus. She claims that Caucasians received such consideration. (*Id.* ¶¶ 88-106.)

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    4

In 2003, Dr. Hoppe proposed a reorganization plan for APSU. The AACC and the AASP were assigned to the Department of History and Philosophy. Dr. Wade and Dr. Dawson objected, and ultimately Dr. Speck placed the AACC as a direct report to the Dean of the College of Arts and Letters. Dr. Wade states she was not given an opportunity to upgrade her administrative rank under this new reporting line and the AACC did not receive any funding support from the College of Arts and Letters. Dr. Wade received a memorandum from Dr. Speck which she considered to be very antagonistic, amounting to racial harassment. She responded the same day and from then on felt she was treated in a hostile manner by Drs. Hoppe, Speck, and Filippo. Dr. Wade attests that various studies and investigations showed the existence of racism on the APSU campus. (*Id.* ¶¶ 109-132.)

**\*5**  On April 30, 2003, Dr. Wade filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC") complaining of race discrimination. Thereafter, Dr. Hoppe offered Dr. Wade a 10-month, rather than her usual 12-month contract, with a salary reduction of $10,000. Dr. Wade claims that no other Caucasian staff member at APSU received such a drastic cut in salary. Dr. Wade felt she was constructively discharged and that she had no choice other than to leave APSU in August 2003. (*Id.* ¶¶ 133-141.) Dr. Wade provides the affidavit of Dr. Dawson and various unauthenticated documents. The Court has reviewed this material, although it is not summarized here.

Dr. Hoppe attests that APSU and TBR policies provide for faculty and non-faculty employees to be hired and/or subsequently converted to ten-month contracts. According to guideline p-030 in TBR's policy and guidelines manual, "Modified Fiscal Year appointments (MODFY) is an alternative employment base for non-academic personnel ... service period is less than twelve-month fiscal year and will generally coincide with the nine month calendar." Employees converted to MODFY are paid in twelve monthly installments, so as not to interfere with benefits. Dr. Wade's position was converted from a 12-month contract to a 10-month contract as part of a university-wide budget reduction; however, Dr. Wade remained in a professional level position. (Docket Entry No. 179, Hoppe Aff. ¶ 7-8.)

While Dr. Wade's position was the only professional level position in the 26 positions that was converted from 12 months to 10 months in 2003-2004, three professional positions were affected by budget cuts in the previous years. The Academic Advisement Center and Multi-ethnic Services were completely eliminated. The Director of the International Studies Office was converted from an administrative 12-month contract to a 9-month faculty contract and his salary was reduced. One African American affected by job elimination was transferred to another equivalent position at her existing salary and the other African American was offered a lateral transfer but declined. At least five vacant professional positions were affected by budget cuts in 2001-2003 (Capital Projects Coordinator, Assistant Director of Purchasing, Events Coordinator, Financial Aid Counselor, and Assistant Registrar). (*Id.* ¶ 9.)

Although Dr. Wade claims that she was treated differently from Caucasians, Dr. Hoppe attests that the job of Marlon Crow, a Caucasian Associate Director, Center for Excellence in the Creative Arts, was totally eliminated during budget cuts while Dr. Wade's position was only reduced. The Center for Excellence in Field Biology, headed by Director Ben Stone, a Caucasian, was funded through special appropriations for centers of excellence and from more than $300,000 in externally funded grants for which the center applied. Gaines Hunt, a Caucasian who was Director, Center for Environmental Education, received a stipend for serving as Director while working fulltime as a department chair or dean. The stipend included not only farm coordination but also hard physical labor such as hay baling and loading. Carmen Reagan, a white female and Director, President's Emerging Leaders, was a full-time faculty member. She received only release time for serving as Director. The primary job of Jill Eichhorn, a white female who was Director, Women's Studies, was as a full-time faculty member. She received only release time and no stipend. Karen Swenson, a white female, also served as a full-time faculty member. As Director, Distinguished Lecture Series, she received only release time and no stipend. Allene Phy-Olsen, Caucasian, held the primary job of full-time faculty member. As Director of the Honors Program, she received only release time

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    5

and no stipend. Houston Davis, a white male, served as Director, Presidential Research Scholars. He coordinated the program as part of his regular job responsibilities and received no compensation or reassigned time. (*Id.* ¶ 10.)

**\*6** Dr. Hoppe further attests that, during her presidency, she annually attended events at the AACC and supported their programs. The AACC was treated like all other enrichment programs and other academic departments during the academic reorganization process and in the allocation of funds. Despite the significant budget cuts from 2001 to 2003, the AACC budget increased, from $133,695 in 2001-2002 to $157,015 in 2002-2003. By comparison, Women's Studies Program budgets totaled $3,989 and $2,927 in the same years and International Studies budgets were $113,964 in 2001-2002 and $18,717 in 2002-2003. (*Id.* ¶ 11, 31)

The AACC operating budget, which includes programming dollars, was not totally eliminated. However, between 1999 and 2000, two accounts were combined with no reduction in total operating expenses of approximately $24,000. A reduction of approximately $7,000 in AACC operating funds occurred as part of university-wide budget cuts in 2002-2003 that totaled $2.8 million. However, the AACC continued to receive a special allocation through Student Activities Funds and was not required to go through regular procedures to obtain such funding. The AACC was the only enrichment program to receive such an allocation of funding without going through the proposal/request process during the entire time Dr. Wade served as director. (*Id.* ¶ 13.)

Dr. Hoppe further attests that, despite the severity of APSU's ongoing budget situation, financial support for the AACC increased during her administration. Total salaries and benefits for center staff in the year she assumed office totaled $70,332. In 2002-2003, staff salaries and benefits totaled $94,982, partially as a result of a part-time secretary being changed to full-time in 2002-2003. The overall expenditures attributed to the AACC in 2001-2002 was $112,413 and increased to $127,852 in 2002-2003. (*Id.* ¶ 15.)

The AACC secretarial position was temporarily frozen in 2000-2001, and was one of 19 frozen staff positions and five frozen faculty positions (not including two faculty positions that were eliminated). These positions were frozen when they were unfilled due to resignations, etc., to avoid laying off individuals in filled positions. Dr. Hoppe attests that Dr. Wade was not alone in the freezing of her secretarial position; many departments operated under the stress of additional workload as a result of frozen positions and many of those supervisors expressed concerns about the budget cuts, too. Dr. Hoppe reduced secretarial staff in her own office from two to one. Most of the directors worked on enrichment programs on a part-time basis for release time from teaching responsibilities. None had a secretary except Ben Stone (who received Center for Excellence funding and grant funding) and Gaines Hunt (whose secretary related to his role as department chair). All of the part-time directors had budgets that were typically less than five percent of Dr. Wade's budget, yet they had regular programming and activities. While the full-time faculty salaries of those also serving as part-time directors with no monetary compensation were not cut, their release or reassigned time was. The request to unfreeze the clerical position for the AACC was considered along with requests from numerous other department heads who had frozen positions. The secretarial position was unfrozen in 2001-2002, while numerous other support positions remained frozen. (*Id.* ¶¶ 16-18, 20.)

**\*7** Additionally, Dr. Hoppe attests that, while Dr. Wade did have to run the AACC for a time with no help other than student workers, other program directors had to work under similar circumstances. The Women's Studies Program never had a full-time secretary. The Director's position is not full-time, and the director is a faculty member on a nine-month contract. She is given no reassigned time from her 12-hour teaching load. The Women's Center has never been open in the summer. Approximately 56-58% of APSU students are women, and approximately 19% of APSU students are African American. (*Id.* ¶ 19.)

While the AACC was closed for two months in the summer of 2003 as a result of significant budget cuts, Dr. Hoppe does not believe the closing had a negative impact on the experiences of African American students since only one activity at AACC occurred in each of the summers from 2000 to 2003. This "social development" activity,

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   6

described in a report by Dr. Wade, did not, in the opinion of Dr. Hoppe's executive team, warrant leaving the AACC open when APSU reduced other major university functions which did have significant activity in the summer. All academic department secretaries were reduced to a 10-month contract as part of the budget cuts despite the fact that numerous students were enrolled in classes in their departments during summer sessions. Budget cuts also required total closing of the International Studies Office and the Academic Advisement Center. (*Id.* ¶ 21.)

Dr. Hoppe attests that, to her knowledge, the AACC never received Geier funding for programming. The one documented request for *Geier* funding for 2002-2003 was denied at the state level. Applications for Geier funds are made annually to the TBR. Priority for funds at APSU typically has been for student scholarships and faculty/ staff development. To fund the requested AACC secretarial position with Geier funds would have required cutting a previously approved allocation. (*Id.* ¶¶ 22-23.)

According to Dr. Hoppe, the academic reorganization process at APSU was a six-month long series of proposals and responses and all affected departments and colleges had full opportunity for input. The primary purpose for the reorganization was to improve overall university efficiency. In the case of the AACC and the AASP, suggestions from the two directors, Dr. Wade and Dr. Dawson, and from several students resulted in the modification of the original proposal. While Dr. Speck's initial proposal recommended moving the AACC from the Office of Enrichment Programs in the academic division to the student affairs division, upon the request of Dr. Wade and Dr. Dawson to keep their programs in the same division, Dr. Speck modified his recommendation to put both programs under the Dean of Arts and Letters, an academic division. (*Id.* ¶¶ 24-25.)

Dr. Hoppe further attests that, from the time she became interim President to the present, she directed her senior staff to increase representation of African Americans in academic departments where they were under-represented or had no representation. She directed the use of *Geier* funds in combination with university funds to accomplish this. For example, an African American is currently employed as a *Geier* Scholar in the music department. In fall 2004, Dr. Hoppe directed creation of a *Geier* position in Astronomy and an African American signed a contract to begin employment, but he delayed his contract for personal reasons. She also approved a contract that transferred (without going through regular search processes) an African American professional staff member to a faculty position in a department that previously had no African American representation. This individual is a part of a *Geier* Grow-Your-Own program in which she is being supported financially in her attainment of a doctoral degree. Regular desegregation funds requested to support faculty and administrative hiring and retention, as well as other-race undergraduate student recruitment and retention totaled $175,000, $176,400, and $193,500 annually in 2001-2002, 2002-2003, and 2003-2004, respectively. APSU's awards under the *Geier* consent decree increased dramatically. In the year prior to Dr. Hoppe's arrival, APSU received less than $2,500. In 2001-2002, the amount increased to more than $14,000 and by 2002-2003 to more than $200,000. In 2003-2004, the amount totaled almost $300,000. (*Id.* ¶ ¶ 26-27.)

 **8** Additionally, Dr. Hoppe attests that in all the years since she became President, APSU met or exceeded affirmative action goals for African Americans in all employment categories based on national availability standards. Several African American professional staff have been employed or promoted since she became President, including the following positions: Director of Student Life and Leadership, Director of University Recreation, Assistant Director of Housing and Residence Life, Safety Inspector, and Manager of the Center for Creative Arts. (*Id.* ¶¶ 28-30.)

In Dr. Hoppe's view, African American faculty and staff were not disparately impacted by budget cuts. She indicates her view is substantiated by a review by the TBR general counsel prior to the cuts and the Office of the State Comptroller after the cuts. Examples of absence of disparate impact are evidenced in the fact that, of the five staff members who totally lost their jobs in July 2003 as a result of budget cuts, none were African Americans. Of the 26 professional/support staff members whose jobs were targeted for reduction to 10 months or 82.5% in that

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 7

same budget cycle, approximately 20% were African Americans, which is approximately the same percentage of African Americans in APSU's workforce. In a previous budget cut, the two African Americans whose jobs were eliminated in 2002 were both offered transfers to comparable positions within the university. One chose to accept the transfer and the other chose to resign. (*Id.* ¶ 29.)

Dr. Hoppe's senior staff included three vice-presidents and the university counsel. Two of the four are African Americans. Several African Americans served on her President's Circle of Advisors. She appointed a Minority Task Force to improve the retention of African American students. She supported her Senior Advisors' attendance at conferences for recruitment of African American faculty. Dr. Hoppe attests that she endeavored to make the campus climate welcoming for faculty, staff and students of all races, and she supported affirmative action. She attended the Asanbe Diversity Symposium, hired an African American as department chair in music, insured that APSU met or exceeded affirmative action goals in all employment categories, hired an African American to serve as affirmative action manager, hired an African American as assistant to the Provost, promoted an African American from clerical to professional, nominated an African American to participate in Leadership Clarksville, hired an African American chemistry faculty member and promoted an African American accountant to a faculty position and provided *Geier* funding for her to pursue a doctorate. (*Id.* ¶ 32.)

In a second affidavit, Dr. Hoppe attests that Dr. Jennifer Meningall, an African American who was Vice President for Student Affairs, authorized an APSU psychology professor, Dr. Rhonda Bryant, to study the academic, interpersonal, and social support needs of "at risk" African American students at APSU. Dr. Meningall rejected the study for several reasons, including that it was statistically invalid and the researcher failed to review her results with other committee members before submitting what was purported to be a "final" report. According to Dr. Hoppe, Dr. Wade did not present any evidence that any purported finding by Dr. Bryant affected Dr. Wade's ability to perform her duties during budget cuts. Annual reports provided by Dr. Wade showed no significant changes during the years in question. Additionally, Dr. Hoppe attests, a Racial Climate Study conducted by Dr. Houston Davis (Caucasian) and Dr. Eleanor Graves (African American) used the themes identified in the Bryant study, as well as themes identified in a study done by Raymond Winbush. The Davis/Graves study did not substantiate the findings of the non-statistically valid findings of the Bryant or Winbush Studies. (Docket Entry No. 227, Hoppe Aff. ¶ 6.)

 **\*9** Various unauthenticated documents were submitted by APSU, and the Court has reviewed that evidence. Additionally, the Court reviewed the affidavits of Dr. Filippo and Dr. Speck, although their content is not summarized here.

*Dr. Dawson*

Dr. Dawson attests that she was hired in August 2001 to be APSU's director of the African American Studies program ("AASP"). The program was housed in a division entitled Enrichment Studies. It was the first time the Enrichment Program had a professor whose locus of tenure was in Enrichment Studies. A special document was prepared and approved by APSU and the TBR outlining her tenure process. Dr. Dawson's responsibilities included the revitalization of the AASP program through teaching, programming, and curriculum development. When she became director, there was only one African American Studies course and there were about 11 students in the program who were minoring in the subject. Under her directorship, the program gained popularity and by the end of the 2001-2002 academic year, there were about 45 students minoring in African American Studies, six new courses had been added to the curriculum, and nearly 200 students were taking classes-accounting for a significant increase in student credit hour production. (Docket Entry No. 217, Dawson Aff. ¶ 2.)

Dr. Dawson believes the success of her program was the beginning of her problems at APSU, because the rapid growth of African American Studies upset some faculty and staff. Problems emerged with some academic advisors who tried to direct students away from AASP and other faculty attacked the content of the curriculum. (*Id.*)

In September 2002, Dr. Dawson received permission to search for an instructor/assistant professor position in African American Studies. She assembled a search committee of qualified faculty and staff. Her supervisor told her that she could not have an all-African American search committee. She asked him why he did not have a problem with all of the search committees on campus that had all Caucasian faculty, which in fact was quite normal because there were so few African American faculty on campus. As a result, a memo was sent out stating that all search committees were required to have African American representation. Consequently, Dr. Dawson attests, black faculty, who knew nothing about a department or program, were placed on search committees to be mere tokens. She alleges that this action was in direct retaliation for the African American Studies search committee that she assembled. The members of her search committee were simply the faculty and staff associated with African American Studies; their membership on the committee had nothing to do with race. However, APSU soon aborted the AASP faculty search because AASP was not producing enough credit hours. Dr. Dawson believes that the statistical manner in which the program was evaluated was biased, especially since it met the criteria in the first place. (*Id.* ¶ 4.)

 *10 At Dr. Dawson's urging, Dr. Speck and Dr. Filippo agreed to bring two experts to the campus, Dr. Fred Hord, director, Association of Black Cultural Centers, and Dr. James Stewart, past president of the National Council for Black Studies. According to Dr. Dawson these two organizations are among the premier professional groups governing African American Studies and African American Cultural Centers. The purpose of bringing the two experts to APSU was to foster greater sensitivity between faculty and staff concerning AASP and AACC. Dr. Dawson believes, however, that their visit on November 7, 2002 caused some faculty and staff to further resent the programs. (*Id.* ¶ 3.)

Dr. Dawson further attests that, as the 2002-2003 academic year unfolded, so did other forms of retaliation. On January 28, 2003, she states she received a telephone call during class time from Dr. Filippo. He asked to see her in her office immediately. When he arrived at Dr. Dawson's office about ten minutes later, Dr. Dawson was greeted by Dr. Filippo, Richard Jackson, APSU's Legal Counsel, and a representative from the campus police. She was told that Dr. Jennifer Menningall, Vice President for Student Affairs, reported that Dr. Dawson called her the day before and told her that a student had been raped by a professor on campus. According to Mr. Jackson, Dr. Dawson had refused to give Dr. Menningall the names of the student or the professor. In shock, Dr. Dawson informed the group that she did not speak to Dr. Menningall the day before and she did not know anything about such an incident. Mr. Jackson stated that Dr. Hoppe had launched an official university investigation into the incident and he was acting on her behalf. He asked Dr. Dawson not to discuss the matter with anyone. The next day, Dr. Dawson met with Mr. Jackson and Dr. Mennigall to discuss the issue. Dr. Mennigall said that someone called her office about noon on January 27, 2003, and the person "sounded like" Dr. Dawson. Dr. Menningall told Dr. Hoppe, who authorized an investigation into the rape allegation the next day. Mr. Jackson said he had to pull Dr. Dawson from her class because in rape cases time is important. Dr. Dawson stated she felt the investigation was handled inappropriately. She asked why more facts were not assembled and why she was not called at home. She asked for any written documentation regarding the case and asked for an official apology from APSU. Dr. Dawson told Mr. Jackson she was the victim if someone was pretending to be her. According to Dr. Dawson, Mr. Jackson told her he did not owe her anything. She told him she wanted to file a grievance for his rude behavior, but she did not know who to go to since he was the Affirmative Action officer. He said he would send her the information, but she did not receive anything further about this situation. (*Id.* ¶ 5.)

In March 2003, Dr. Speck submitted his university reorganization plan. The plan required AASP and AACC to report to the Department of History and Philosophy. These were the only two programs formerly a part of Enrichment Studies which were to report to an academic department instead of the Dean of the College of Arts and Letters. Therefore, Dr. Dawson felt she was treated differently than Women's Studies, the Honors Program, and others. She felt the contract she originally signed when she came to APSU had been violated and she would

now be evaluated under an entirely different contract. She also expected to be evaluated by a department which in her view had a history of racial insensitivity. (*Id.* ¶ 6.)

**\*11** On several occasions, Dr. Dawson expressed to Dr. Speck, Mr. Jackson and Dr. Filippo that she did not feel comfortable with APSU's history department and felt it was an inappropriate place to put African American Studies based on expert opinions and her personal interaction with some members of the department which she thought had been unfavorable. Dr. Dawson seems to allege that she asked to file a grievance about the hostile and racist environment in the Department of History and Philosophy, but she was precluded from doing so. She also felt that correspondence she received from Dr. Speck on April 28, 2003 was unprofessional and a breach of confidentiality because Dr. Speck sent copies of his letter to the chair of the history department, whom she was accusing of racial hostility. On May 2, 2003, Dr. Dawson responded to Dr. Speck that she had decided to pursue a grievance process outside of APSU where she could receive a fair and equitable hearing. (*Id.* ¶ 7.)

On May 23, 2003, Dr. Dawson received correspondence from Dr. Speck stating that AASP would be under the auspices of the Dean, not the department head, and that in her role as director of the program, she would report to the Dean as well. However, her faculty appointment would be based in the department of history, just as the faculty of other enrichment programs were assigned to particular academic departments. Dr. Dawson believed there was much confusion about who was in charge of AASP. Dr. Dawson had additional communications with Dr. Speck and Dr. James Diehr, Interim Dean of the College of Arts and Letters, about the placement of AASP. (*Id.* ¶ 8.)

When school started in August 2003, Dr. Dawson felt she was the victim of constant and intense retaliatory acts because she complained about racism and racial discrimination. Her responsibilities were taken away from her. She was asked to submit unnecessary paperwork. Some of the faculty in the history department were indirectly using tenure and retention to frighten and harass her. She felt her academic freedom was being violated by not allowing her to have input in certain curriculum decisions impacting AASP. (*Id.* ¶ 11.)

In October 2003, two nooses were found on campus the weekend following the NAACP Freedom Fund Banquet. Frightened students asked Dr. Dawson to seek intervention. At an AACC Advisory Committee meeting, Dr. Dawson requested that a public statement be made. She felt she was met with some hostility and resentment. Betty Wallace, a Caucasian professor in the history department and a member of Dr. Dawson's tenure review committee, felt that a public discussion about the issue would cause problems. Dr. Dawson attests that, after President Hoppe made a public statement, there was no more public follow-up. Students were left with unanswered questions and Dr. Dawson felt that retaliation against her intensified. (*Id.* ¶ 12.)

Due to the perceived retaliation, Dr. Dawson did not submit her dossier for tenure consideration in late 2003. She felt it was impossible for her to receive a fair and unbiased review by the history department. On January 26, 2004, she received a hand-delivered letter regarding her contract at APSU. She delivered a response on January 30, 2004, outlining retaliation and expressing a desire to stay at APSU if her numerous complaints could be addressed. She alleges that no investigation was initiated and she was given a notice of non-renewal of her faculty appointment. Dr. Dawson attests that members of the African American community have launched several complaints against APSU, and administrators have deemed certain race relations studies methodologically unsound when racial problems at the institution have been pointed out. (*Id.* ¶¶ 13-16.)

**\*12** Dr. Hoppe attests that, while the AASP experienced a significant percentage enrollment growth from 2001 to 2004, an increase of 242%, the actual numerical increase was from 3.8 full-time equivalent students in Fall 2001 to 13.0 full-time equivalent students in Fall 2004. This total enrollment did not meet the minimum target for one full-time faculty member, which was 16 full-time equivalent students. This target was based on the Tennessee Higher Education Commission funding formula. During her presidency, Dr. Hoppe required that all new faculty positions be justified based on student credit hour production in comparison to funding formula ratios unless accreditation

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   10

requirements prevailed. For a new faculty member in African American Studies to be justified, student credit hours would need to exceed 240. In the year Dr. Dawson requested a new faculty member, student credit hours totaled 159, or 66% of target. Compared to other programs, an additional faculty position in AASP was not warranted. In that same year, the Sociology student credit hours production exceeded its target by 423%, thus justifying the need for two positions which were approved. (Docket Entry No. 186, Hoppe Aff. ¶¶ 6-7.)

According to Dr. Hoppe, it is not unusual for small programs to have only one faculty member. At the time Dr. Dawson requested a second faculty member, another program, Professional Studies, also had a single faculty member and Women's Studies did not have a faculty member assigned full time. Student credit hour production compared to target student credit hours for Professional Studies was 121 % of target and Women's Studies was 46.2% of target. Dr. Dawson was not prohibited from hiring adjunct faculty to teach African American Studies classes. It would not have been prudent to use *Geier* funds for a new faculty member where student credit hour production did not demonstrate as strong a need as that of other departments. (*Id.* ¶¶ 8-10.)

Dr. Hoppe further attests that academic reorganization and university restructuring did not have a disparate impact on African Americans. Such reorganizations have affected six academic departments and fifty-three faculty since she became President in 2000. Of those, four faculty were African Americans. The academic reorganization took place after a six-month series of proposals and responses, with all departments and colleges having full opportunity for input. In the case of AASP and the AACC, suggestions from Dr. Dawson and Dr. Wade resulted in the modification of the original proposal. The assignment of Dr. Dawson for locus of tenure and personnel administration purposes to the history department was not out of the ordinary, as two other universities in the TBR system have a similar structure. Further, Dr. Dawson's curriculum vitae reveals that she previously taught for five years as an adjunct faculty member at Rose College in the department of history and political science. (*Id.* ¶ 14.)

 **\*13** Although Enrichment Programs were not as adversely affected as other university programs, the directors' reporting mechanism changed. All departments at APSU now report to a different college, given the fact that all colleges within the university were re-titled and reconstituted with more or fewer departments. (*Id.* ¶¶ 15-16.)

Most of the individuals who would have served on the retention/tenure/promotion committees for Dr. Dawson would have been outside her subject area because her committee was made up of other individuals in Enrichment Programs, which included Field Biology, Creative Arts, Honors, Women's Studies, etc. The only member of her committee who would have had knowledge of African American Studies would have been Dr. Wade. (*Id.* ¶ 17.)

Dr. Dawson was not demoted or terminated, and her tenure track appointment was not interrupted in any way. Once reassigned to the history department for locus of tenure and personnel issues, Dr. Dawson was not forced to restart her probationary period toward tenure. Under APSU policy 5:060, she had the option to restart her five-year probationary period to protect her progression toward tenure, but she elected not to do so. Dr. Dawson also did not cooperate with her supervisor's request to observe her classroom teaching for retention purposes and she failed or refused to participate in meetings necessitated by her failure to address curriculum changes for the program she coordinated. Consequently, her tenure-track contract was not renewed following her failure to submit a dossier for retention review. Dr. Hoppe notified Dr. Dawson in January 2004 that her contract would not be renewed after January 2005. Dr. Dawson's contract ended approximately two weeks after the beginning of the spring 2005 semester. Her teaching and directing responsibilities ended at the end of the fall 2004 semester. From 2000-2004, eight faculty have not been recommended for retention and/or tenure based on performance and recommendation through the extensive university tenure/promotion process. Of those, two were African American. This does not include one black faculty member whose tenure track appointment was not renewed due to downsizing of the Developmental Studies Program or Dr. Dawson, who chose not to apply for retention. (*Id.* ¶¶ 18-27, 40.)

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    11

Dr. Hoppe directed an investigation into the appearance of a noose on campus in October 2003. She twice addressed the campus community through university-wide email about the situation on October 21 and 23, 2003. The conclusion of the investigation was publicly announced in the *Leaf-Chronicle,* a Clarksville newspaper, on November 18, 2003. Subsequently, a member of the local NAACP chapter asked the U.S. Dept. of Education Office of Civil Rights to investigate the incident. That investigation resulted in a finding that the university handled the incident appropriately. Any decision about Dr. Dawson's retention was separate and unrelated to any statements she made about the noose. (*Id.* ¶¶ 28-34.)

 **\*14** Dr. Hoppe's affidavit in Dr. Dawson's case reiterates much of the same statistical information stated above in Dr. Wade's case with regard to Dr. Hoppe's support of African American faculty and staff. Throughout her tenure as President, the number of African American faculty ranged from 17 to 21. (*Id.* ¶¶ 35-41.)

According to Dr. Speck, Dr. Dawson's contract did not specify that the AASP would remain under Dr. Filippo. Such a stipulation would contradict the authority of the President to reorganize the university. During the reorganization, Dr. Speck consolidated the duties of his two Assistant Vice Presidents and eliminated one vice president position. The Enrichment Programs unit was integrated into the other colleges. Because all of the professors in Enrichment Studies except Dr. Dawson also reported to a department as part of the restructuring, Dr. Dawson also had to be assigned to a department. (Docket Entry No. 187, Speck Aff. ¶¶ 5, 7.)

The Court has also considered the affidavits of James Diehr and Richard Jackson and the unauthenticated documents presented by APSU in support of its motion for summary judgment, even though those materials are not summarized here. The Court has further considered the affidavit of Dr. Wade submitted by Dr. Dawson, as well as the unauthenticated documents Dr. Dawson produced in opposition to the motion for summary judgment.

*Ms. Warner*

In August 2001, Ms. Warner was hired at APSU as a tenure track Assistant Professor of English for the Developmental Studies Program ("DSP"). Previously, she was employed for five years at Tennessee State University and moved to ASPU only because she was offered a tenure-track position. During the 2001-2002 academic school year she received very high evaluation scores from students and positive reviews from superiors. In March 2002, however, she was informed that her contract to teach in all probability would not be renewed. (Docket Entry No. 223, Warner Aff. ¶¶ 2-3.)

In response to the letter of possible non-retention, Dr. Aleeta Christian, chairwoman of Developmental Studies, submitted a memorandum to Dr. Bruce Speck, Vice President of Academic Affairs. She contended that Ms. Warner's position in Developmental Studies was essential to African American student retention. Ms. Warner was the first and only full-time tenure track professor in Developmental Studies and a large percentage of the students were African American. According to Ms. Warner, Dr. Hoppe did not like Dr. Christian's report and began to retaliate against Ms. Warner. (*Id.* ¶¶ 4-5.)

Shortly after receiving the letter of potential non-retention from Dr. Hoppe, Ms. Warner and 23 other faculty members were placed in three tiered categories. Ms. Warner was placed in the third and last tier along with a white female, Nancy Matthews, who also taught in Developmental Studies. Even though Dr. Hoppe argued that Ms. Warner's termination was due to budget cuts, Ms. Warner was the only faculty member of the 24 placed into the three tiers to be eliminated. Nancy Matthews was allegedly told about other internal positions within APSU for which she could apply. Ms. Matthews' husband was a tenured APSU faculty member. In contrast, Ms. Warner was only offered short-term employment. Dr. Hoppe suggested that *Geier* money was to be used where there were very few African Americans, but that was not the case with regard to Ms. Warner. Ms. Warner asserts that President Hoppe did not like African American women. (*Id.* ¶¶ 7-8.)

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 42

**\*15** Ms. Warner avers that Dr. Christian offered her a short-term contract to teach at Fort Campbell; however, Dr. Hoppe ordered Ms. Warner to vacate her office. Confused, Ms. Warner made an appointment to see Dr. Hoppe. Ms. Warner explained that she had a short-term contract. President Hoppe was totally unaware that Ms. Warner had accepted a contract to teach at Fort Campbell. Because she was uninformed, Dr. Hoppe asked that Ms. Warner give her time to look into the situation. Ms. Warner left the meeting thinking all was well. The following morning, Ms. Warner received a phone call at home from President Hoppe, who seemed angry, but Ms. Warner did not know why. President Hoppe stated that she had approved the contract to teach at Fort Campbell, but make no mistake "you will not get another one." With that statement, Dr. Hoppe severed the phone call before Ms. Warner could respond. (*Id.* ¶¶ 9-10.)

Ms. Warner met with Richard Jackson on two occasions asking him to investigate why she warranted such treatment and why she was the only faculty member in the three tiers who was terminated. She also submitted email communications to set the appointments and set forth the discussion that she wanted to pursue. She met with Mr. Jackson in his office next to the president's suite. She lodged a complaint and requested an investigation, which Mr. Jackson refused. He told Ms. Warner that she had not been treated differently than others and she had no basis to claim discrimination because she did not have any one to whom to compare her situation. Mr. Jackson reiterated the same information at a second meeting at Shoney's. She wanted the paperwork to file a formal complaint, but no record of her meeting with him to file a complaint was documented. (*Id.* ¶ ¶ 11-13.)

For the next two months, Ms. Warner claims she existed on the APSU campus on an island disconnected from all involvement in being an active member of the campus community. She was no longer informed of faculty meetings. She was not allowed to continue as a committee chair. Peers stopped talking to her except to whisper apologies for her plight. She felt she was in a hostile work environment and her dreams and career had been shattered. (*Id.* ¶ 14.)

According to Ms. Warner, Dr. Hoppe and human resources personnel blocked or dismissed any openings for which she applied from that point on even though she solicited recommendations stating her qualifications. The Department of Labor referred her several times to APSU for openings; yet, each time she applied, the positions were closed or reneged upon because of "budget cuts." DES personnel thought the situation laughable because two of the positions for which she applied had been in their system for months with no qualified applicants to refer. (*Id.* ¶¶ 15-16.)

When Ms. Warner applied for the position of Instructor in English, she felt she was more than qualified. Although APSU contended that she was not qualified to teach World Literature, Ms. Warner had taken a number of courses in a variety of literatures of the world, as specified on her academic transcript. Ms. Warner filed suit when she could not obtain redress elsewhere. (*Id.* ¶¶ 17-20.) The Court has considered the unauthenticated documents Ms. Warner submitted in opposition to the summary judgment motion even though they are not summarized here.

**\*16** Dr. Hoppe attests that Ms. Warner was employed at APSU from August 2001 through December 2002 as an Assistant Professor of Development Studies. On March 14, 2002, during her first year of tenure-track employment, she was notified that her position was being eliminated due to budget cuts. This notification was given pursuant to APSU and TBR policies, which require that first-year tenure track faculty be notified of non-renewal by April 1 of the year that the employee's contract expires. (Docket Entry No. 208, Hoppe Aff. ¶¶ 5-7.)

Faculty targeted for position elimination were placed into three tiers based on the following criteria: (a) critical need for instruction based on student credit hour production compared to current number of full-time faculty in each disciplinary area; (b) number of part-time faculty used and/or available in a discipline; (c) accreditation issues; and (d) long-term availability of funding for the discipline. Developmental Studies fell in the third tier because it only met one of four criteria. Although there was a critical need for instruction based on student

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    13

credit hour production, part-time faculty were readily available, especially in English, Ms. Warner's discipline; no accreditation issues were involved; and long-term funding was to be cut dramatically by the TBR and the Tennessee Higher Education Commission. In contrast, areas in the first tier, such as chemistry and nursing, not only had a critical need for instruction, but there was not a ready supply of part-time faculty, accreditation would have been affected if the positions had been cut, and long-term availability of funding for the disciplines was certain. Similar reasons, at a lesser level, existed for disciplines in tier two, such as education. Tier three included some disciplines that were also in higher tiers (this would have been a second faculty position for the discipline) and also included areas like the library. In the final decision, the only two faculty not renewed were in Developmental Studies. The primary factor for this was the TBR/THEC decision to downsize Developmental Studies in universities and their concurrent decision to reduce state funding and tuition levels by $500,000 to $600,000 in 2003 for institutions that continued to offer these programs. Therefore, in addition to the university-wide budget cuts, Developmental Studies, in which Ms. Warner was employed, was subject to an additional state mandated budget cut. TBR and THEC determined that universities should discontinue offering remedial level courses and that funding for Developmental Studies courses (equivalent to 9-12 grade level skills) at universities would be reduced to the funding level for community colleges. Also, the TBR mandated that, effective fall 2005, universities could only collect community college tuition for Developmental Studies, which would cause a further budget reduction of approximately $650,000.

To prepare for the funding and tuition reductions, APSU made the decision not to tenure any more faculty in the Developmental Studies Department and to seek less expensive ways to provide Developmental Studies. There were only two Developmental Studies faculty members who were not tenured and thus, neither tenure-track contract was renewed. Ms. Warner was subjected to standard academic processes and procedures in accordance with TBR and APSU policies. APSU was under no obligation to use *Geier* funds to continue the position. With limited *Geier* funds, to underwrite the Developmental Studies Program position would have required a reduction in scholarships for black students and financial assistance to black faculty and staff who were pursuing degrees. (*Id.* ¶¶ 8-13, 27.)

 **\*17** Ms. Matthews, a Caucasian, was continued for one year in a temporary faculty position and subsequently selected for another position for which she applied and was qualified. Her discipline was math, not English like Ms. Warner. During the 2002-2003 academic year, the university's need for faculty to teach courses in developmental math significantly exceeded the need in English. As indicated in her 2001-2002 employment agreement, Ms. Matthews had sufficient prior higher education teaching experience to qualify for one year credit toward tenure, requiring under normal circumstances notification of non-renewal by January 1 of the year that her contract expired. Ms. Warner's contract did not so provide. To accommodate the fact that Ms. Matthews was not notified of non-renewal until well after January 1, she was provided with full-time employment for the entire 2002-2003 academic year. During spring 2003, she applied for and was selected for the Regents' Online Resource Coordinator position. (*Id.* ¶¶ 14-15, 17.)

Ms. Warner was also provided with full-time temporary employment through December 13, 2002. Thereafter, she was employed at APSU as an adjunct (part-time) faculty member from January 6, 2003 through May 8, 2003 and August 18, 2003 through December 12, 2003. (*Id.* ¶ 18.)

Ms. Warner filed an EEOC charge on October 8, 2003. The charge alleged discrimination based on an application for a position in January 2003 and also alleged that she was denied a faculty position in February 2003 based on her race. APSU has no record of Ms. Warner applying for a position in January 2003. Ms. Warner submitted a letter dated November 14, 2002 requesting that she be considered for the position of Assistant Professor of Professional Studies. The search process for the position was canceled and the position was not filled due to budget cuts. (*Id.* ¶ 19.)

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Ms. Warner applied for the position of Retention Specialist prior to September 2003. Her application was reviewed by the selection committee, which included African-American representation. The search was stopped in December 2003 and the position was not filled due to anticipation of a potential impoundment in the spring. Ms. Warner also applied for Instructor of English at Fort Campbell in January 2004. Again, her application was reviewed following standard university procedures. The selection committee, which included African-American representation, did not select Ms. Warner for interview and Human Resources records indicate that her lack of teaching experience in World Literature was a factor in her non-selection. The requirement for being able to teach World Literature was included in the position description. (*Id.* ¶ 20.)

Dr. Hoppe's affidavit in Ms. Warner's case reiterates much of the same statistical information stated above in Dr. Wade's and Dr. Dawson's cases with regard to Dr. Hoppe's support of African American faculty and staff. (*Id.* ¶¶ 21-26.)

 **\*18**  The Court considered the unauthenticated documents submitted by APSU in support of its summary judgment motion and by Ms. Warner in opposition to the motion.

## II. *STANDARD OF REVIEW*

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Covington v. Knox County School Sys.,* 205 F.3d 912, 914 (6th Cir.2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley,* 803 F.2d 236, 239 n. 4 (6th Cir.1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed.R.Civ.P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## III. *ANALYSIS*

### A. Timeliness of Ms. Warner's claim concerning non-renewal of her contract

Before bringing suit under Title VII for discrete acts of racial discrimination, Ms. Warner was required to file timely charges with the EEOC within 300 days of each discrete discriminatory act at issue or lose her ability to recover for that act. *See National R .R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110 (2002). APSU contends that Ms. Warner was notified of the nonrenewal of her teaching contract on March 14, 2002. As a result, she had 300 days, until January 8, 2003, to file the requisite charge of alleged race discrimination with the EEOC. However, Ms. Warner did not file an EEOC charge until October 8, 2003, and that charge related to the failure of APSU

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   15

to hire her in another position for which she applied. Thus, APSU contends that any complaint of discrimination relating to the nonrenewal of Ms. Warner's Developmental Studies contract must be dismissed for failure to comply with the statutory limitations period.

 *19  The Court agrees that any claim Ms. Warner may have concerning the nonrenewal of her contract is time-barred under Title VII due to her failure to file an EEOC charge by January 8, 2003. *See Morgan,* 536 U.S. at 110. The same claim brought under the THRA is also time-barred. The THRA claim is subject to a one-year statute of limitations. Tenn.Code Ann. § 4-21-311(d); *George v. Aventis Pharmaceutical, Inc.,* 252 F.Supp.2d 599, 607 (W.D.Tenn.2003); *Pearison v. Pinkerton's, Inc.,* 2003 WL 21212651 at *4-5 (E.D.Tenn.2003). Thus, the time within which Ms. Warner could proceed on a THRA claim for her contract nonrenewal expired on March 14, 2003.

APSU does not raise any similar claims of untimeliness with regard to other discrimination or retaliation claims brought by Ms. Warner, Dr. Wade or Dr. Dawson.

## B. Race discrimination claims

The Plaintiffs agree that they must prove their claims of race discrimination through circumstantial evidence by application of the familiar burden-shifting formula.[3] *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-143 (2000); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-253 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-803 (1973). To establish a *prima facie* case of race discrimination in a run-of-the-mill case, a plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for her position; and (4) she was replaced by, or treated differently than, a similarly situated employee who is not a member of the protected class. *See Laderach v. U-Haul of Northwestern Ohio,* 207 F.3d 825, 828 (6th Cir.2000). Once the plaintiff establishes a *prima facie* case, an inference of discrimination arises. *See id.* The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Once that reason is identified, the burden shifts back to the plaintiff to prove that her employer's articulated non-discriminatory reason for its action was merely a pretext for unlawful racial discrimination. *Id.* To show pretext, a plaintiff must prove the employer's asserted reason had no basis in fact, the reason did not in fact motivate the adverse employment action, or the reason was insufficient to motivate the adverse employment action. *Id.* The plaintiff carries the ultimate burden to prove race discrimination by a preponderance of the evidence. *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1246 (6th Cir.1995).

All three Plaintiffs satisfy the first element. They are members of the protected African American class.

As to the second element, the Court will assume for summary judgment purposes that Dr. Hoppe changed the material terms of Dr. Wade's employment contract when she reduced the length of the contract and Dr. Wade's salary, and that Dr. Wade's resignation thereafter amounted to a constructive discharge. The Court concludes that Dr. Wade satisfies the second element of showing an adverse employment action.

 *20  Dr. Dawson declined to submit her dossier to be considered for retention and as a result APSU notified her that her contract would not be extended. The Court believes a close question is presented whether Dr. Dawson suffered an adverse employment action at the hands of APSU administrators. Nonetheless, the Court will assume for summary judgment purposes that Dr. Dawson satisfies the second element.

Ms. Warner satisfies the second element because she has shown that she was not hired for the position of Retention Specialist or Instructor of English. These are positions for which she applied.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

As to the third element, Dr. Wade has shown that she was qualified to hold her position as director of the AACC. There is some evidence in the record that Dr. Dawson was not performing to expectations on all of her responsibilities as director of the AASP program; however, the Court will assume for summary judgment purposes that Dr. Dawson was qualified to continue in her position had she submitted her dossier and been approved for retention. Ms. Warner has shown that she was qualified for the position of Retention Specialist, but there is some question whether she was qualified for the position of Instructor of English where the job description required ability to teach World Literature, and she may or may not have been qualified to do that. The Court will assume for summary judgment purposes that Ms. Warner was qualified to teach these courses.

The *prima facie* cases of Dr. Wade and Dr. Dawson falter on the fourth element. Neither Plaintiff produced evidence to show that she was replaced by, or treated differently than, a similarly situated employee who was not a member of the protected class. *See Laderach,* 207 F.3d at 828.

The fourth element for Ms. Warner's claim is different. In the failure to hire context, the plaintiff must show that she was rejected for the position for which she applied and that the employer continued to seek applications from persons with plaintiff's qualifications and/or that a person outside the plaintiff's protected class was hired. *McDonnell Douglas,* 411 U .S. at 802; *Birch v. Cuyahoga County Probate Court,* 392 F.3d 151, 165 n. 12 (6th Cir.2004). Ms. Warner has not produced any such evidence.

Thus, the Court concludes that the Plaintiffs' claims of race discrimination do not survive the test of the *prima facie* case.

Even assuming that each Plaintiff did set forth a *prima facie* case, the burden of production shifts to APSU to show a legitimate, non-discriminatory reason for the action it took with regard to each Plaintiff. APSU presented extensive evidence of the budgetary pressures it faced between 2000 and 2004, and it presented evidence of the factors which guided administrators in cutting budgets and eliminating positions. Moreover, APSU presented evidence explaining the process of reorganizing the university structure and the factors which guided administrative decisions to move the AACC and the AASP under the Dean of the College of Arts and Letters and to assign Dr. Dawson to the department of history for locus of tenure and personnel issues. APSU presented evidence explaining that Ms. Warner was not chosen for the Retention Specialist position because the position was never filled due to budget cuts, and Ms. Warner was not chosen for the Instructor position because she lacked the qualifications to teach World Literature.

 **\*21** APSU having established legitimate, non-discriminatory reasons for its actions, the burden swings back to Plaintiffs to show that the reasons articulated by APSU for its decisions had no basis in fact, or the reasons given did not in fact motivate the adverse employment actions taken against the Plaintiffs, or the reasons given were insufficient to motivate the adverse employment actions taken against the Plaintiffs. At this point the Plaintiffs' claims again fail. Plaintiffs have not challenged the budgetary figures and statistics presented in APSU's affidavits to show that there was no basis in fact for the university's decisions. Plaintiffs make conclusory allegations that they believe, from their subjective perspective, that the reasons given by APSU did not in fact motivate the adverse employment actions taken against them. But self-serving assertions are not enough to survive summary judgment. Plaintiffs must produce admissible evidence that the reasons given by APSU did not in fact motivate the adverse employment actions taken against them or that such reasons were insufficient to motivate the adverse employment actions taken against the Plaintiffs.

The question is not whether APSU exercised prudent business judgment, but whether the Plaintiffs have come forward with evidence to refute the legitimate reasons given for the actions taken against them. *See Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986). The Plaintiffs' perception of themselves is not relevant. Rather, it is the perception of the decision maker that is relevant. *See id.* at 464-465. Plaintiffs' self-serving and conclusory

declarations of race discrimination in employment decisions affecting them, without specific evidence proving the existence of such race discrimination, is insufficient to show pretext and preclude the entry of summary judgment against them. *See Anderson,* 477 U.S. at 248; *Lewis v. Philip Morris Inc.,* 355 F.3d 515, 533 (6th Cir.2004); *Evans v. Jay Instrument and Specialty Co.,* 889 F.Supp. 302, 310 (S.D.Ohio 1995). Accordingly, the Court holds that APSU is entitled to summary judgment on each of the Plaintiffs' claims for race discrimination.

### C. Hostile work environment claims

A hostile work environment exists if the workplace is permeated with racially discriminatory intimidation, ridicule and insult that is sufficiently severe and pervasive to alter the conditions of the plaintiff's employment, and if an objectively reasonable person would view, and the plaintiff herself did view, the environment as abusive. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78, 81 (1998); *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993).

To establish a prima facie case of a hostile work environment, a plaintiff must show five elements: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir.1999). Whether a work environment is racially hostile or abusive can be determined only by looking at all of the circumstances. *Harris,* 510 U.S. at 23. Here, the Plaintiffs perceived the work environment as racially hostile, but the racial harassment alleged was not so severe and pervasive as to require jury trial on the issue. *See Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 81 (1998); *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir.2000).

**\*22** Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at intentional discrimination based on a protected category, such as race. *See Oncale,* 523 U.S. at 80; *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 790 (6th Cir.2000). The critical issue is " 'whether members of one [race] are exposed to disadvantageous terms or conditions of employment to which members of the other [race] are not exposed.' " *Id.* (quoting *Harris,* 510 U.S. at 25)). The inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by the individual. *Oncale,* 523 U.S. at 81. In determining whether the alleged harassment was sufficiently severe and pervasive, the Court must consider the totality of the circumstances. *Williams v. General Motors Corp,* 187 F.3d 553, 562 (6th Cir.1999). The Court must take into account the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris,* 510 U.S. at 23. Moreover, personal conflict "does not equate with discriminatory animus." *Morris,* 201 F.3d at 791; *Barnett v. Department of Veterans Affairs,* 153 F.3d 338, 342-343 (6th Cir.1998). None of the three Plaintiffs has presented sufficient evidence to proceed to trial on a claim of a hostile work environment based on race. The Court will first consider the claims of Dr. Wade and Ms. Warner and then turn to the claim of Dr. Dawson.

In her memorandum in opposition to the summary judgment motion, Dr. Wade contends she was subjected to a racially hostile work environment because: in a meeting held in May 2000 Dr. Hoppe indicated by her demeanor and body language that she was dissatisfied with an answer Dr. Wade gave to a question asked by Dr. Hoppe; in June 2000 Dr. Hoppe told Dr. Wade that the AACC's Secretary III position would be frozen and the summer worker positions would be eliminated, and when Dr. Wade asked for reconsideration Dr. Hoppe allegedly stated this "should teach you to decide which side you are on"; in July 2000 Dr. Hoppe eliminated the AACC's programming budget and Dr. Hoppe rejected Dr. Wade's request for restoration of the budget or use of *Geier* funds; and Dr. Wade's superiors did not recruit her for internal promotions or notify her of internal promotion opportunities that were not publicly advertised, as were several Caucasian employees. Dr. Wade stated in her affidavit that, during a meeting about the future of the AACC and AASP, Dr. Speck told her he would not tolerate her "pushiness" and "uppitiness."

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.    18

In her memorandum in opposition to the summary judgment motion, Ms. Warner does not identify any particular facts which she says created a racially hostile work environment. In her affidavit, she did not identify any facts showing that APSU administrators subjected her to comments, remarks, or actions that could be viewed as racial epithets, insults, intimidation, or ridicule.

 **\*23** Dr. Wade and Ms. Warner did not produce any evidence to show that APSU's decisions or actions concerning them were driven by racially discriminatory animus as opposed to pressing financial difficulties faced by the university. *See Wrenn v. Gould,* 808 F.2d 493, 502 (6th Cir.1987) ("In a Title VII claim, it is the employer's motivation and intent, not its business judgment, that is at issue.") While Dr. Wade and Ms. Warner may have felt subjectively that they were working in a racially hostile work environment, that is only half of the proof equation. They must also produce evidence to show that their work environment was permeated with racially discriminatory intimidation, ridicule, and insult on the part of APSU administrators and/or employees such that a reasonable person, viewing the situation objectively, would conclude that the environment was racially abusive. *See Oncale,* 523 U.S. at 81; *Harris,* 510 U.S. at 21-22.

Ms. Warner has produced no such evidence. Dr. Wade attests to one comment Dr. Speck made remarking on her "uppityness." Taking as true that Dr. Speck made this comment and taking as a given that Dr. Wade felt this comment was racially offensive to her, the remark is nonetheless isolated in this voluminous factual record. Dr. Wade has not pointed the Court to any other similar comment made to her by an APSU administrator or employee at any time. Offhand comments or isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *In re Rodriguez,* 487 F.3d 1001, 1010 (6th Cir.2007) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)). The other incidents of which Dr. Wade complains show at most the existence of interpersonal conflict between Dr. Wade and Dr. Hoppe concerning the funding and staffing of the AACC. *See Morris,* 201 F.3d at 791. The single comment attributed to Dr. Speck, even considered in the totality of all the circumstances, is not enough evidence to proceed to jury trial. *See Clay v. United Parcel Serv ., Inc.,* 501 F.3d 695, 707 (6th Cir.2007) (noting Sixth Circuit has affirmed grants of summary judgment where evidence of severity or pervasiveness is insufficient to proceed to trial). The claims of Dr. Wade and Ms. Warner do not meet the requirements of the law to show severe and pervasive racial harassment.

Dr. Dawson's hostile work environment claim relies on two specific incidents: the discovery of a noose on campus and as she terms it, "the false rape incident." (Docket Entry No. 215, Memorandum at 11.) She also contends that these two incidents, "among other situations at APSU" created a hostile work environment which interfered with her work performance.

The presence of a noose on the APSU campus is certainly a matter of concern, and is the type of incident that, if ignored by the APSU administration, could warrant potential relief in a federal court. *See E.E.O.C. v. Northwest Airlines, Inc.,* 188 F.3d 695, 702 (6th Cir.1999). The evidence in this case shows, however, that Dr. Hoppe and the APSU administration did not ignore the incident. Rather, the noose was removed, the campus police chief issued an official university statement in an email that was approved by Dr. Hoppe, and an investigation was conducted to try to identify those responsible, even though the investigators ultimately were unsuccessful in identifying a perpetrator. Dr. Hoppe addressed the issue in two campus-wide emails she sent to students and staff requesting cooperation with investigators and expressing the university's goal to create a campus climate welcoming and comfortable for all, the university's lack of tolerance for prohibited acts of intimidation and harassment, and the university's pledge to take appropriate action if any one determined to be responsible was a member of the campus community. The result of APSU's investigation was published in the local media. The U.S. Department of Education Office of Civil Rights investigated the incident at the request of the NAACP and concluded that APSU handled the matter appropriately. Although serious, this incident was isolated and Dr. Dawson has not produced evidence of any similar incidents that occurred on the APSU campus. She also has not produced any evidence that

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   19

she was subjected to racial epithets, ridicule or intimidation of any kind. Dr. Dawson contends that the "false rape incident" was humiliating to her and career-damaging. Taking the facts of this event in the light most favorable to Dr. Dawson, the evidence shows that Mr. Jackson, Dr. Filippo, and a representative from the campus police asked to meet with Dr. Dawson with some urgency during a class period to interview her about facts relating to an alleged rape of a student by a university professor. These investigators were sent by Dr. Hoppe, and all were under the impression that Dr. Dawson had earlier reported a rape incident to Dr. Meningall which required investigation. Dr. Dawson told the three investigators that she did not call Dr. Meningall to report any such incident and she did not know anything about it. Subjectively, Dr. Dawson may have felt humiliated in some way as a result of being approached in this manner, but she has not presented any evidence that a reasonable person looking at all of the facts objectively would find that Dr. Dawson was subjected to a work environment permeated with racially discriminatory ridicule, intimidation, or insult to alter the terms and conditions of her employment.

**\*24** The Court concludes that all three Plaintiffs have failed to produce sufficient evidence on their hostile work environment claims to warrant proceeding to a jury.

### D. Retaliation claims

To establish a retaliation claim, a plaintiff must show that (1) she engaged in protected activity, (2) the employer knew that she did, (3) the employer thereafter took adverse employment action against her, and (4) there was a causal connection between the protected activity and the adverse employment action. *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir.2007). Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to produce a legitimate, non-retaliatory reason for the adverse action taken against the plaintiff. *Randolph v. Ohio Dept. of Youth Servs.,* 453 F.3d 724, 737 n. 4 (6th Cir.2006). The burden then shifts back to the plaintiff to establish that the reason proffered by the defendant was merely pretextual and that the actual reason was retaliation for engaging in protected activity. *Id.*

The Plaintiffs essentially assert that every decision affecting their employment at APSU was retaliatory. The Court believes there is a close question presented as to whether the Plaintiffs adequately established a causal connection between each of the Plaintiffs' expressions about race discrimination and each one of the numerous acts of alleged retaliation of which the Plaintiffs complain. Nonetheless, the Court will proceed with the analysis as if each Plaintiff can establish a *prima facie* case of retaliation for complaining to university administrators and the EEOC about race discrimination.

The burden of production shifts to APSU. Defendant produced significant evidence that the actions it took toward each Plaintiff were determined by necessary business decisions required in the face of substantial funding cuts or university reorganization which affected all academic departments and programs, and that its actions were not driven by an intent to retaliate against the Plaintiffs for their protected conduct.

The burden thus shifts back to the Plaintiffs to show that Defendant's proffered reasons are a pretext for retaliation. The Court cannot conclude on this record that Plaintiffs have produced sufficient evidence of pretext to proceed to a jury. Plaintiffs have not produced evidence sufficient for a reasonable factfinder to reject the employer's proffered reasons for its actions. *See Michael v. Caterpillar Financial Servs. Corp.,* 496 F.3d 584, 597 (6th Cir.2007). Plaintiffs have not shown that APSU's proffered reasons had no basis in fact. *See id.* Plaintiffs presented no evidence that the budget figures and statistics on which APSU relied in making funding and staffing decisions lacked a basis in fact. Plaintiffs do not argue that the effects of university-wide reorganization as described by APSU administrators lacked a basis in fact. Moreover, other than their own self-serving observations that APSU retaliated against them, Plaintiffs have not presented any evidence to show that the reasons given by APSU administrators for their actions did not actually motivate their challenged conduct or were insufficient to warrant the challenged conduct. *Corrigan v. U.S. Steel Corp.,* 478 F.3d 718, 727 (6th Cir.2007) (affirming summary judgment in age discrimination case where plaintiffs offered only conclusory statements that defendant's reasons

were pretextual and did not support their claims with evidence of pretext). Therefore, because Plaintiffs have not presented evidence of pretext, their retaliation claims must fail.

## IV. *CONCLUSION*

**\*25**  For all of the reasons stated, Defendant Austin Peay State University's Motion For Summary Judgment As To Plaintiff Jacqueline E. Wade (Docket Entry No. 176), Motion For Summary Judgment As To Plaintiff Nancy J. Dawson (Docket Entry No. 183), and Motion for Summary Judgment As To Plaintiff Mary M. Warner (Docket Entry No. 205) will be granted. These actions will be dismissed with prejudice.

An appropriate Order shall be entered.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 170081

## Footnotes

1    Dr. Wade and Ms. Warner also alleged claims of age discrimination in their Amended Complaints, but they asserted few, if any, relevant facts in support of the claims, and they did not address age discrimination in their summary judgment filings. The Court finds that Plaintiffs failed to plead properly or they abandoned any claims for age discrimination.

2    "Geier funds" refers to money available under a settlement and consent decree which addressed racial disparities in Tennessee higher education. *See e.g.Geier v. Sundquist,* 128 F.Supp.2d 519 (M.D.Tenn.2001).

3    The Court may consider together the theories brought under Title VII and the THRA. *See Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 6

2020 WL 6892010
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee,
AT JACKSON.

MINI SYSTEMS INC.
v.
Marvin ALEXANDER et al.

No. W2019-01871-COA-R3-CV
|
October 6, 2020 Session
|
FILED 11/24/2020

**Appeal from the Chancery Court for Weakley County, No. 23150, Tony Childress, Chancellor**

**Attorneys and Law Firms**

Keely Wilson, Russell E. Reviere and Dale Conder, Jr., Jackson, Tennessee, for the appellant, Marvin Alexander.

Charles H. Barnett, III and Nicholas B. Latimer, Jackson, Tennessee, for the appellee, Mini Systems, Inc.

Arnold B. Goldin, J., delivered the opinion of the Court, in which J. Steven Stafford, P.J., W.S., and Carma Dennis McGee, J., joined.

# OPINION

Arnold B. Goldin, J.

**\*1** This case arises from a breach of contract dispute involving the construction of two storage buildings. Among other issues is whether Appellee's actions were "unfair or deceptive" pursuant to the Tennessee Consumer Protection Act. The trial court ultimately found that there was a breach of contract, but that Appellee's actions were not deceptive and dismissed the Tennessee Consumer Protection Act claim. Appellant now appeals the trial court's dismissal of his claim under the Tennessee Consumer Protection Act. For the reasons stated herein, we affirm the trial court's judgment.

## I. BACKGROUND AND PROCEDURAL HISTORY

Mini Systems, Inc. ("Appellee") and Marvin Alexander ("Appellant")[1] entered into a contract in which Appellee was to construct two storage buildings for Appellant. Specifically, Appellee was to dig the foundations for the buildings, pour the concrete pads, and erect the metal buildings. In return, Appellant agreed to pay Appellee $174,614.00.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 1

After construction began, a dispute arose concerning the quality of the work performed by Appellee. This dispute escalated into a lawsuit filed by Appellee against Appellant for (i) breach of contract; (ii) sworn account; and (iii) enforcement of a mechanic's lien and materialmen's lien. Appellant responded to the complaint and counterclaimed, alleging (i) material breach of contract, as well as of express and implied warranties; (ii) misrepresentation and fraud; and (iii) violation of the Tennessee Consumer Protection Act. Specifically, Appellant argued that Appellee breached the contract by negligently constructing the concrete pads for the storage buildings based on the fact that the construction plans called for the concrete pads to be poured in two pours rather than the monolithic (single) pour performed by Appellee.

The trial court ultimately dismissed all of Appellant's claims except for the breach of contract claim based on the fact that the construction plans called for a multiple pour of the concrete slabs rather than a monolithic pour. However, while the trial court held that Appellee's act of performing a monolithic pour was a material breach of the contract, it was "not intended to be deceptive or fraudulent," but rather was a misinterpretation of the engineer's design. This determination by the trial court resulted in a dismissal of Appellant's Tennessee Consumer Protection Act claim, which Appellant now appeals. For the reasons set out below, we affirm the decision of the trial court.

## II. ISSUES PRESENTED

The Appellant presents two issues on appeal for our review:

1. Whether the trial court erred in determining that Appellee did not violate the Tennessee Consumer Protection Act.

2. Whether the Appellant is entitled to attorney's fees incurred for this appeal.

## III. STANDARD OF REVIEW

This Court reviews a bench trial *de novo* upon the record with a "presumption of correctness as to the findings of fact, unless the preponderance of the evidence is otherwise." *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citing Tenn. R. App. P. 13(d)). We review questions of law *de novo* with no presumption of correctness. *Id.* (citation omitted).

## IV. DISCUSSION

*Whether the Trial Court Erred in Finding that Appellee's Actions Were Not Deceptive or Fraudulent*

In its Findings of Fact and Conclusions of Law, the trial court found that in pouring the concrete slabs, Appellee had failed to adhere to the construction plans and had performed a monolithic pour of the concrete rather than a multiple pour (two pours) as required by the plans, failed to make required saw cuts to the concrete, and used foam material rather than rubber as required by the plans. However, the trial court found that Appellee's actions did not constitute an unfair or deceptive practice under the Tennessee Consumer Protection Act ("TCPA"). Although Appellant now argues that the trial court erred in failing to additionally find that a violation of the TCPA occurred, we find no occasion to disturb the trial court's judgment.

**\*2** The TCPA was enacted "[t]o protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state."

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 2

Tenn. Code Ann. § 47-18-102(2). Tennessee Code Annotated section 47-18-104(b) provides a lengthy list detailing deceptive or unfair acts that may be actionable under the TCPA. In order to be successful under the TCPA, there must be a showing of "some deception, misrepresentation or unfairness, regardless of any breach of contract." *Hall v. Hamblen*, M2002-00562-COA-R3-CV, 2004 WL 1838180, at *4 (Tenn. Ct. App. Aug. 16, 2004) (citing *Hamer v. Harris*, No. M2002-00220-COA-R3-CV, 2002 WL 31469213, at *1 (Tenn. Ct. App. Nov. 6, 2002)). "A breach of contract is not per se a deception, misrepresentation or unfairness for purposes of the TCPA." *Carbon Processing and Reclamation, LLC v. Valero Mktg. and Supply Co.*, 694 F. Supp.2d 888, 913 (W.D. Tenn. 2010) (internal citations omitted).

At the outset, we note that Appellant's efforts to allege a TCPA violation in this case have been lacking since the issue was initially pled in his counterclaim. There, Appellant merely alleged facts and made a general claim that "[d]efendants' practices toward Plaintiffs constitute unfair or deceptive practices, and therefore are violations of the Tennessee Consumer Protection Act[.]" No specific subsection or violation of the TCPA on which Appellant was relying was pled. Similarly, neither the lack of specificity in Appellant's main brief nor contentions asserted at oral argument helped to clarify the issue. As in his counterclaim, Appellant argued generally rather than specifically in his main brief that Appellee's actions constituted an unfair and deceptive act, but again failed to point to any specific subsection of section 47-18-104(b) on which he was relying. Instead, Appellant merely recited facts from the record and concluded, without further citation or argument, that the mere existence of these facts necessitated a finding by this Court of an unfair or deceptive act on the part of Appellee. Appellant never articulated the specific provision of the TCPA that was violated. Not until Appellant's reply brief was there any indication that he was purportedly proceeding under section 47-18-104(b)(7) of the TCPA. For the first time in his reply brief on appeal, Appellant contended that Appellee's actions came under the purview of this provision "because it represented that its construction of the buildings, including the concrete pads, were of a particular style or quality when the construction was of another." Tenn. Code Ann. § 47-18-104(b)(7).

It is well-settled law in Tennessee that "it is not the office of a reply brief to raise issues on appeal." *Regions Financial Corp. v. Marsh USA, Inc.*, 310 S.W.3d 382, 392 (Tenn. Ct. App. 2009) (quoting *Gentry v. Gentry*, No. E2000-02174-COA-R3-CV, 2001 WL 839714, at *4 n.3 (Tenn. Ct. App. July 2, 2001)). "A reply brief is a response to the arguments of the appellee. It is not a vehicle for raising new issues." *Owens v. Owens*, 241 S.W.3d 478, 499 (Tenn. Ct. App. 2007) (citing Tenn. R. App. P. 27(c)). Because Appellant did not adequately articulate in his initial brief as to how the TCPA was violated, he has invited a potential finding of waiver on the issue. *See Castle v. State, Dep't of Corr.*, E2005-00874-COA-R3-CV, 2005 WL 2372762, at *4 (Tenn. Ct. App. Sept. 27, 2005) ("We will not consider an issue raised for the first time in a reply brief as an issue that has been raised properly on appeal.").

Based upon Appellant's assertions in his main brief, this Court cannot ascertain the specificities of his argument as to why the evidence presented in the record preponderates against the trial court's Findings of Fact and Conclusions of Law. It is not the job of this Court to construct the parties' arguments. *Heflin v. Iberiabank Corp.*, 571 S.W.3d 727, 734 (Tenn. Ct. App. 2018) (citing *Coleman v. Coleman*, No. W2011-00585-COA-R3-CV, 2015 WL 479830, at *9 (Tenn. Ct. App. Feb. 4, 2015)). Rather, it is the responsibility of Appellant to present this Court with a brief in compliance with the appellate rules of procedure, including in his main brief the issues he intends to argue and constructing an argument in support of those issues. Appellant failed to comply with this responsibility.

**\*3** Although Appellant's reply brief sought to clarify the issue, Appellant further confounded our review and understanding of his position when the matter was discussed at oral argument. Upon questioning by a member of the judicial panel about the basis of Appellant's TCPA claim, it was initially stated that Appellant was proceeding under the so-called "catch-all" provision of the TCPA, section 47-18-104(b)(27). However, it was subsequently argued that Appellant was proceeding under section 47-18-104(b)(7). It was then argued by Appellant that contentious email exchanges between the parties, including threats made by Appellee to file a lawsuit as well as the filing of a mechanic's lien, was conduct that went to the "absolute essence" of what the TCPA is designed to protect

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    3

against. However, we reject Appellant's contentions made at oral argument for two reasons. First, Appellant again attempted to raise issues that were not previously raised or briefed prior to oral argument. Nowhere in Appellant's main brief was the TCPA's catch-all provision addressed nor any of the allegations regarding threats. Again, these were raised for the first time at oral argument. As this Court has previously made clear, "[i]ssues initially raised at oral argument are not properly presented for review in accordance with this court's rules." *Christie v. Christie*, No. M2012-02622-COA-R3-CV, 2014 WL 4293966, at *6 (Tenn. Ct. App. Apr. 25, 2014). Second, it is clear that any allegations concerning threats of a lawsuit or the filing of a mechanic's lien do not concern the representation of a good or service as required by section 47-18-104(b)(7). As best we can perceive it given the statements offered by Appellant at oral argument, these specific allegations of threats and misconduct were proffered to support a claim under the TCPA's catch-all provision, codified at section 47-18-104(b)(27). This catch-all provision provides a cause of action when a party is "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person[.]" However, enforcement of this subdivision (b)(27) is vested exclusively in the office of the attorney general and reporter. Tenn. Code Ann. § 47-18-104(b)(27). Therefore, we reject any attempt by Appellant to proceed individually under the TCPA's catch-all provision.

Because we find that Appellant's initial brief was insufficient and unclear as to what provision of the TCPA he was proceeding under, we deem that Appellant has arguably waived any such claim.

Even if the issue was not waived and we were to ignore the previously enumerated deficiencies, we would still find the claim to be without merit. Section 47-18-104(b)(7) provides that "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another" is considered to be an unfair or deceptive practice. Tenn. Code Ann. § 47-18-104(b)(7). Here, Appellant appears to argue that the concrete pour is the good or service being misrepresented and would have us find that the mere act of performing the wrong concrete pour is unfair and deceptive because it is a misrepresentation of the good or service agreed upon under the contract. However, if this were true, it would transform every breach of contract action into a TCPA claim. Such is not the case. "Although every breach of contract is arguably 'unfair' in the colloquial sense, ... the TCPA envisions something more than the simple incompetent performance of contractual duties." *Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 786 (Tenn. Ct. App. 2010). A breach of contract action and a violation of the TCPA are separate causes of action, and "proof of the existence of one does not necessarily establish the existence of the other." *Hall*, 2004 WL 1838180, at *4. In order to come under the purview of section 47-18-104(b)(7), there must be some form of misrepresentation of a good or service. In the present case, the trial court found that the construction plans had been misinterpreted rather than misrepresented. We agree with the trial court's finding. Appellant's brief fails to point to any specific misrepresentations made by Appellee and we discern none in this record. It is not enough that Appellee erroneously performed the wrong concrete pour required under the contract. Again, as noted by the trial court, this resulted from a misinterpretation of the construction plans rather than an unfair or deceptive act on part of the Appellee. Without more, this Court cannot agree that Appellee's act of pouring a monolithic concrete pour rather than a multi-pour constitutes an unfair or deceptive act under the TCPA.

Appellant also relies on this Court's decision in *Holladay v. Speed*, 208 S.W.3d 408 (Tenn. Ct. App. 2006), to support a finding that Appellee violated the TCPA. In that case, a homeowner brought an action against a contractor, alleging breach of express warranty, implied warranty of good workmanship, misrepresentation, and a violation of the TCPA arising from damages to a home caused by alleged defects in an external insulation and finish system. *Holladay*, 208 S.W.3d at 410. The homeowner argued that the contractor's actions violated section 47-18-104(b)(7). *Id.* at 416. This Court ultimately found that the contractor's actions amounted to an unfair or deceptive act. *Id.* at 418. Specifically, the Court noted that the contractor's actions amounted to a misrepresentation, which it found to be an intentional deceptive act under the TCPA. *Id.*

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  4

**\*4** Appellant argues that this Court's decision in *Holladay* requires a similar result here. However, *Holladay* may be distinguished from the present facts. In the present case, the trial court found that it was a "misinterpretation of the engineer's design that caused the single pour to occur" rather than a misrepresentation that amounted to a deceptive act on part of Appellee. As we noted previously, Appellant would have us find that by signing the contract and then breaching that contract that Appellee committed an unfair and deceptive act. This would effectively transform every breach of contract into a TCPA violation even though, as noted earlier, it is well established under the law that this is not the case. Because we conclude there is no misrepresentation in the present case, we do not find *Holladay* dispositive.

Therefore, we do not find that the record preponderates against the trial court's finding that Appellee's actions did not constitute an unfair or deceptive act under the TCPA.

### *Whether Appellant is Entitled to Attorney's Fees*

Appellant is also requesting attorney's fees incurred for bringing this appeal pursuant to *Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 407 (Tenn. 2006), which permits recovery of attorney's fees and costs on appeal for claims proceeding under the TCPA. Because we do not find in Appellant's favor as to his asserted TCPA violations, we decline to award him attorney's fees on appeal.

### V. CONCLUSION

Based on the foregoing, we affirm the trial court's decision in dismissing Appellant's claims under the TCPA.

**All Citations**

Slip Copy, 2020 WL 6892010

### Footnotes

1      Although the notice of appeal was filed by Marvin Alexander, individually, and as trustee for the Marvin E. Alexander Trust, a brief was filed only by Marvin Alexander, individually.

---

**End of Document**          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.      5