# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **CABINETS TO GO, LLC,** | ) |
| Plaintiff, | ) |
| v. | ) No. 3:21-cv-00711 |
| **QINGDAO HAIYAN REAL ESTATE GROUP CO., LTD** (青岛海燕置业集团有限公司), | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Pending before the Court are three motions filed by Cabinets To Go, LLC ("CTG"). The first is CTG's Motion for Summary Judgment (Doc. No. 124). Defendant Qingdao Haiyan Real Estate Group Co., LTD ("Haiyan") has responded (Doc. No. 132), and CTG has filed its reply (Doc. No. 136). The second is CTG's Motion to Strike the Declaration of Lei "Sabrina" Li (Doc. No. 138), which has also been fully briefed. (Doc. Nos. 142, 146). The third is Plaintiff's Motion for Reconsideration (Doc. No. 109), wherein CTG requests the Court reverse its dismissal of former Defendants Alno Industry SDN BHD and Scioto Valley Woodworking, Inc., doing business as Valleywood Cabinetry ("Valleywood"). (Id. at 1). Alno Industry SDN BHD and Valleywood filed individual briefs opposing reconsideration (Doc. Nos. 118, 119), and CTG filed a single reply brief. (Doc. No. 121).

For the following reasons, the Court will deny CTG's three Motions (Doc. Nos. 109, 124, 138).

I.  CTG'S MOTION FOR SUMMARY JUDGMENT

   A. Undisputed Facts and Background[1]

Haiyan, a Chinese cabinet- and components-manufacturer, had a long-standing business relationship with CTG beginning in 2011. (Doc. No. 137 ¶ 3). However, in 2018, the United Nations began imposing duties on Chinese-manufactured goods. (Doc. No. 137 ¶ 1). The duties increased over time, and, in December 2019, the International Trade Commission imposed additional anti-dumping duties and countervailing duties on Chinese cabinet suppliers. (Doc. No. 137 ¶ 2). No later than fall 2019, CTG responded to these trade developments, (Doc. No. 137 ¶ 5), and stopped purchasing products manufactured in China or made with Chinese-manufactured parts to avoid paying these tariffs and duties. (Doc. No. 137 ¶ 6).

Before CTG placed any of the purchase orders at issue in this case with Haiyan, CTG communicated that it "would no longer purchase any Chinese products, and that a material term of any agreement for [CTG] to purchase products from Haiyan was that the products could not be manufactured in China." (Doc. No. 126 ¶ 24). On several occasions, CTG reiterated its unwillingness to purchase Chinese goods. (Doc. No. 137 ¶ 10; see also id. ¶ 16 ("Because [CTG] repeatedly emphasized the importance of manufacturing goods outside of China, Haiyan knew it was a material term of the contract. Additionally, Haiyan knew it was a material term of the contract because it understood [CTG] would be subject to substantial tariffs if it had to import products manufactured in China.")).

---

[1] The facts in this section are undisputed unless specifically noted otherwise and are drawn from the undisputed portions of the parties' statements of facts (Doc. No. 137), the exhibits, depositions, and declarations submitted in connection with the summary judgment briefing that are not contradicted by the evidence in the record.

In December 2019, CTG's Chief Legal Officer, Jill Witter, sent Haiyan an email that CTG asserts is a "summary of [Haiyan's] obligations under the agreement to supply products." (Doc. No. 137 ¶ 11). In relevant part, that email states:

> NO PLYWOOD FROM CHINA WILL BE ACCEPTED. Additionally, all major components (the box, doors, drawers) must be manufactured in Malaysia for us to avoid additional tariffs. We further ask that all raw materials intended for Cabinets To Go be segregated and maintained separately. As before, Sara Valencia will be working with your team on review and approval of documentation. Kim Surber will be working with you regarding required labeling, box art, and any changes required to reflect importation from Malaysia.
>
> Please review the labeling requirements as set out in the Supplier Manual to ensure correct labeling. Recently, we have noticed product that is not correctly labeled. Particular attention to labeling of parts (not included within the RTA package) and multiple contained in a single box but intended to be sold separately to insure adequate labeling.

(Doc. No. 126-3 at 2). Shortly after Witter sent this email, CTG's Manager of Customs Compliance & Process Development, Kim Surber, forwarded Haiyan the latest version of the generic Supplier Manual. (Doc. No. 137 ¶ 12). That version of the Supplier Manual includes an "International Shipping" section, which specifically states that: "Supplier is responsible for fulfilling any customs obligations origin marking or labeling requirements, and certification or local content reporting requirements." (Doc. No. 137 ¶ 13). The Supplier Manual also notes that "[a] commercial invoice must be produced for each entry to U.S. Customs, and must meet the following general conditions," which includes information related to the "country or origin of merchandise." (Doc. No. 137 ¶ 14).

Soon after, in January 2020, CTG began purchasing seven new product lines exclusively from a mill Haiyan acquired in Malaysia. (Doc. No. 137 ¶¶ 4; 17). On average between February 2020 and July 2021, CTG purchased over $700,000 of products from Haiyan per month. (Doc. No. 137 ¶ 21).

But on or around July 28, 2021, CTG inspectors at the mill discovered evidence that the company alleges demonstrates that products in thirteen shipping containers were manufactured in China. (Doc. No. 137 ¶¶ 24–25). Over the next three days, CTG's President and CEO, Jason Delves, and Witter attempted to contact Sabrina Li, a Haiyan representative, multiple times to discuss the issue and learn the true country of origin of the products at issue. (Doc. No. 137 ¶ 26). Meanwhile, CTG identified other purchase orders that may have also included Chinese-made products and asked Haiyan to certify their country of origin. (Doc. No. 137 ¶ 27).

In early August 2021, another Haiyan representative, Wei Wei Wang responded in Sabrina Li's stead and stated that the products at issue met CTG's standards. (Doc. No. 137 ¶ 28). However, on August 24, 2021, Delves received a phone call from Sabrina Li and another Haiyan representative, Amanda Li, who confessed they could not certify the products' country of origin because the products and/or their component parts had been manufactured in China.[2] (Doc. No. 137 ¶ 29).

In September 2021, the thirteen identified containers arrived in the United States, (Doc. No. 137 ¶ 30), and CTG began searching for a bonded warehouse to store the products it suspected were not manufactured in Malaysia. (Doc. No. 137 ¶ 32). On September 27, 2021, U.S. Customs and Border Protection ("CBP") gave notice to CTG that it had to import the products in the thirteen containers (the "Landed POs") or CBP would seize those products. (Doc. No. 137 ¶ 33). As a result, CTG amended its customs declaration regarding the country of origin for the Landed POs and imported them. (Doc. No. 137 ¶ 34). Because the Landed POs were then subject to tariffs

---

[2] Notably, CTG relies on this statement by Amanda Li throughout its briefing to underscore its uncertainty in the products' country of origin without Haiyan's certification rather than as evidence that the products at issue were in fact made in China. (See generally Doc. Nos. 127, 136).

associated with importing Chinese products, CTG had to pay an additional $931,526 in tariffs and related costs. (Doc. No. 137 ¶ 34–35).

CTG again raised concerns regarding the country of origin of Haiyan's products and reiterated the requirement that they be manufactured outside of China, but, thereafter, according to CTG, Haiyan refused to deliver additional products even though a "substantial amount of [CTG]'s products were still in transit or ready to ship." (Doc. No. 137 ¶¶ 36–37). CTG had already paid Haiyan over $180,000 for these orders. (Doc. No. 137 ¶ 38–39).

In its Amended Complaint, CTG brought five causes of action against Haiyan—breach of contract and breach of warranty under the United Nations Convention of Contracts for the International Sale of Goods (the "CISG"), breach of contract and breach of warranty under Tennessee law, and violation of the Tennessee Consumer Protection Act, Tenn. Code. Ann. § 47-18-104(7) (the "TCPA"). (Doc. No. 26). There, each cause of action was premised on a single alleged bad act—that, despite the parties' agreement, Haiyan did not manufacture the Landed POs in Malaysia. (Id. ¶¶ 52–84; see, e.g., ¶ 57 ("Haiyan breached the contracts with [CTG] by attempting to satisfy [CTG]'s purchase orders with products that did not meet [CTG]'s specification. Specifically, Haiyan attempted to repackage Chinese-manufactured products in a manner that suggested they were manufactured in Malaysia and ship them to Cabinets to Go.")).

Now, CTG moves for summary judgment on each of its five causes of action because Haiyan failed to certify the products' country of origin and refused to deliver the orders that had not yet been shipped when CTG discovered Haiyan's alleged scheme. (Doc. No. 124 at 1).

B. Legal Standard

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

5

"The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. Id.

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

C. Analysis

The Amended Complaint (Doc. No. 26) alleges that CTG and Haiyan had an agreement for the purchase of Malaysian-made cabinets and component parts and that Haiyan broke that agreement by supplying Chinese products. (Doc. No. 26 ¶¶ 52–84). But CTG takes a different tack here; instead, it argues that it is entitled to summary judgment on its five claims because:

> Haiyan breached this contract in two respects. First, Haiyan admits it failed to provide the required country of origin certification for these products, which was a material term of the contract. This failure also constituted a breach of the warranty that Haiyan had promised to provide [CTG], and a violation of the TCPA. Second, Haiyan refused to deliver product it had manufactured for [CTG] even though that product was in transit to [CTG] or ready to ship. These breaches resulted in significant damage to [CTG], in the form of increased tariffs for the product it did receive and lost sales from the product that it did not receive.

6

(Doc. No. 127 at 12; see also Doc. No. 124 at 1 (summarizing the same)). In so doing, CTG poses two theories distinct from the one clearly forwarded in its Amended Complaint, (compare id.; with Doc. No. 26 ¶¶ 52–84 (hinging Haiyan's breach on the products' country of origin)), and the company fails to demonstrate that it is entitled to relief under either. As to the first, CTG falls short of establishing that Haiyan's failure to certify its products' country of origin violated a material term of any agreement between the parties. The second theory is entirely absent from the Amended Complaint (Doc. No. 26) and cannot be pursued without further amendment. The Court will address each in turn.[3]

i. Certification May Not Be Part of the Parties' Agreement.

CTG has not demonstrated the absence of a genuine dispute of material fact regarding whether certification of the products' country of origin was required as part of any agreement or warranty between the parties.

In its proposed Statement of Undisputed Facts in Support of Motion for Summary Judgment (Doc. No. 125), CTG acknowledges only one "material term of the contract"—that the products had to be manufactured "outside of China." (Id. ¶ 16; see also Doc. No. 126 ¶ 38 (stating the same and referencing Doc. No. 126-6 which makes no mention of certification)). But the difference between a failure to certify a product's country of origin and a failure to supply products made in a specific country is self-evident.[4]

---

[3] Other significant issues remain. For example, CTG curiously argues that its agreement with Haiyan is governed both by Tennessee law and the CISG. (Doc. No. 127 at 12–20 (asserting that it is entitled to relief on both its state law and CISG claims breach of contract and breach of warranty claims)). However, the Court need not reach that issue or any others to dispose of the instant motion.

[4] CTG conflates these concepts throughout its briefings. For instance, while discussing Count I, CTG states that "a key term of the contract between [CTG] and Haiyan was the requirement that Haiyan manufacture the goods for [CTG] in Malaysia." (Doc. No. 127 at 16). But CTG then describes the breach as "Haiyan ultimately refus[ing] to provide . . . certification." (Id. at 16).

7

The only other evidence CTG offers to this point is Witter's email (Doc. No. 126-3). CTG argues that Witter's email incorporates the full terms of the CTG's generic Supplier Manual (Doc. No. 126-4), which places certification requirements on suppliers, into its dealings with Haiyan. (Doc. No. 126 at 6). But, on its own, Witter's email does not go that far. It references the Supplier Manual in a single sentence: Witter asks Haiyan to "review the labeling requirements as set out in the Supplier Manual to ensure correct labeling." (Doc. No. 126-3 at 3). On its face, it does not even allude to a certification requirement. And although the Supplier Manual discusses a duty to certify internationally shipped goods, it also makes clear that that duty is distinct from any labeling obligations. (See Doc. No. 126-4 at 17 (distinguishing between "origin marking or labeling requirements" and "certification")). Without more, the question of whether Haiyan was obligated to certify the county of origin of the Landed POs or the undelivered products persists, and summary judgment cannot be granted.

ii. CTG's Second Theory is a New Claim.

Federal Rule of Civil Procedure 56(a) requires movants to identify each claim on which summary judgment is sought. Fed. R. Civ. P. 56 (a). But "[p]arties who seek to raise new claims at the summary-judgment stage must first amend their pleadings under Federal Rule of Civil

---

CTG makes this same mistake while discussing Count II, (see id. at 18 ("[CTG] and Haiyan had an enforceable contract for the sale of Malaysian-made goods. . . . Haiyan refused to certify that the product in the thirteen containers was manufactured in Malaysia, as required by their agreement.")), Count III, (see id. at 20 ("Again, the contract between the parties required Haiyan to manufacture Malaysian-made goods for [CTG]. . . . Haiyan's failure to certify the country of origin of these products therefore qualifies as a breach of warranty.")), Count IV, (see id. at 20–21 ("Haiyan's promise that it would manufacture [CTG]'s product in Malaysia was false . . . . Although Haiyan had repeatedly indicated that it would abide by this term, it ultimately refused to certify the country of origin of the thirteen containers when asked to do so.")), and Count V. (See id. at 21 ("Haiyan represented to [CTG] that it would manufacture goods for [CTG] in Malaysia . . . . However, when the quality control inspectors discovered evidence of transshipment, Haiyan refused to certify that the goods were Malaysian-made, which ran directly contrary to their previous representation to [CTG].")).

Procedure 15(a) before asserting the claims in summary-judgment briefing." Davis v. Echo Valley Condominium Association, 945 F.3d 483, 496 (6th Cir. 2019). "By that point, 'a plaintiff has conducted discovery and has had the opportunity to amend the complaint and raise additional theories.'" Id. (quoting West v. Wayne County, 672 F. App'x 535, 541 (6th Cir. 2016)). The failure to follow this rule "dooms" that claim. Id. This is because a plaintiff bringing new claims at summary judgment "generally 'subjects a defendant to 'unfair surprise' because the defendant has no opportunity to investigate the claim during discovery.'" Id. (citing M.D. ex rel. Deweese v. Bowling Green Indep. Sch. Dist., 709 F. App'x 775, 778 (6th Cir. 2017)).

CTG's second theory—which centers on Haiyan's supposed refusal to deliver products other than the Landed POs—is an entirely new claim. It appears nowhere in the Amended Complaint. (See generally Doc. No. 26). Mention of undelivered products is sparse, (id. ¶¶ 35–36, 40, 49–51), and, in CTG's few allegations concerning such products, it avers that "[CTG] had no choice but to refuse to accept those containers of products." (See, e.g., id. ¶ 49). On its face, CTG's second theory at summary judgment squarely contradicts the allegations in the Amended Complaint. Haiyan cannot have fair notice of a new claim, let alone of one premised on facts opposite those alleged. The Court need not interrogate it further. Absent amendment of the operative pleading, the Court cannot grant relief under this theory of harm.[5]

---

[5] The same could be said for CTG's first theory. As already explained, a breach of contract premised on a failure to certify is not the same as a breach of contract for supplying Chinese products in lieu of Malaysian ones. However, certain statements in the Amended Complaint indicate that CTG may have pleaded this theory. (See Doc. No. 26 ¶ 16 ("This case arises out of the breach by Defendants of their contractual duty to report truthfully and accurately the country of origin of the kitchen and bath cabinets and cabinet parts they supply to [CTG]."); see also id. ¶¶ 39–40 ("Because Haiyan would not certify that the products listed in the purchase orders discussed above were manufactured in Malaysia, [CTG] could not legally import the products under those purchase orders without amending its customs declarations and incurring costs related to additional tariffs. Because Haiyan would not certify the products listed in the purchase orders discussed above were manufactured in Malaysia, Haiyan was in breach of its contractual obligations to

9

D. Conclusion

For the reasons stated, CTG's Motion (Doc. No. 124) will be denied.

## II. CTG'S MOTION TO STRIKE

Next, CTG filed a Motion to Strike the Declaration of Lei "Sabrina" Li (Doc. No. 138), wherein it requests that this Court "'strike or disregard' the Li Declaration as a sanction for Haiyan's refusal to participate in the discovery process." (Doc. No. 146 at 2). However, the Court's resolution of CTG's Motion for Summary Judgment (124) in no way rests on the declaration at issue, and, as CTG acknowledges, Haiyan is now required to make Sabrina Li available for deposition. (See Doc. No. 140 (granting CTG's Motion to Compel Depositions (Doc. No. 106))). Two months have passed since the Magistrate Judge granted CTG's Motion to Compel Deposition, (see Doc. No. 140), and trial remains several weeks away. If CTG has not yet deposed Sabrina Li, it has more than enough time to do so, and, if the alleged gamesmanship persists, CTG may seek to exclude her testimony through a motion *in limine*. That motion would have the weight of the Magistrate Judge's Order (Doc. No. 140) behind it. Accordingly, the Motion (Doc. No. 138) will be denied.

## III. CTG'S MOTION FOR RECONSIDERATION

Last, CTG requests that the Court reconsider and revise its Memorandum Opinion and Order (Doc. No. 71) dismissing Alno Industry SDN BHD and Scioto Valley Woodworking, Inc. ("Valleywood") pursuant to Federal Rule of Civil Procedure 54(b). (Doc. No. 109). As explained in a prior Order (Doc. No 131), CTG's Motion relies heavily on a partially redacted, public version of a Notice of Determination (Doc. No. 109-2). After the motion was fully briefed, the Court

---

[CTG] under each of the purchase orders discussed above.")). Because of the narrow phrasing of these allegations and to the extent that they are not conclusory, they would only support claims for breach of contract—not claims for any breach of warranty or violation of the TCPA.

10

ordered Haiyan and Valleywood to file under seal an unredacted version of the Notice of Determination, (Doc. No. 131), but neither Haiyan, Valleywood, nor CTG was able to obtain an unredacted version. (Doc. No. 148 at 3). Despite this, CTG asks this Court to fill in the blanks obscured by the redactions in its favor. (Doc. No. 150-1). The Court need not do so; the reconsideration requested cannot bring about the relief CTG seeks.

As the Court stated in its June 2022 Memorandum Opinion and Order, defects in CTG's allegations prompted Alno Industry SDN BHD's dismissal for lack of jurisdiction. (See Doc. No. 71 at 12–13 ("[CTG's allegations] are too vague, speculative, and sparse to show personal jurisdiction or require jurisdictional discovery. Hence the Court will dismiss the claims against Alno [Industry SDN BHD] without prejudice. CTG may refile those claims if it can cure the foregoing defects in the allegations it has raised.")). The Court invited CTG to file a second amended complaint that would cure those defects, (id.), but, over the past year, CTG has declined to do so. Instead, through the instant motion, CTG asks the Court to read into its Amended Complaint allegations informed by the Notice of Determination where none exist. (See generally Doc. No. 109). The same is true insofar as the Motion for Reconsideration (Doc. No. 109) relates to the Court's dismissal of Valleywood. Though the Court did not explicitly invite CTG to amend its allegations against Valleywood, it dismissed Valleywood due to defects in the Amended Complaint. (Doc. No. 71 at 10–12). Absent amendment of CTG's allegations, those defects remain. The Court will not co-author CTG's claims at the expense of parties already dismissed from the case. CTG's Motion for Reconsideration (Doc. No. 109) will be denied.

## IV. CONCLUSION

For the foregoing reasons, CTG's Motions (Doc. Nos. 109, 124, 138) will be **DENIED**.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE